1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  EDNA AFFHOLTER, et al.,        )    1:07-cv-0388 OWW DLB
                                  )
10                Plaintiffs,     )    SCHEDULING CONFERENCE ORDER
                                  )
11      v.                        )    Initial Disclosures Filing
                                  )    Deadline: 8/13/07
12  FRANKLIN COUNTY WATER DISTRICT, )
    et al.,                       )    Last Date to Add Parties:
13                                )    9/13/07
                  Defendants.     )
14                                )    Further Scheduling
    _____ )    Conference: 12/7/07 8:45
15                                     Ctrm. 3

16                                     Third Party Complaint
                                       Filing Deadline: 4/1/08
17

18

19  I.   Date of Scheduling Conference.

20       July 13, 2007.

21  II.  Appearances Of Counsel.

22       Marderosian, Runyon, Cercone, Lehman & Armo by Michael G.

23  Marderosian, Esq., Bret L. Runyon, Esq., Michael E. Lehman,

24  Esq., Charles A. Leath, Esq., and Shernoff, Bidart & Darras by

25  Michael J. Bidart, Esq., appeared on behalf of all Plaintiffs.

26       Lewis, Brisbois, Bisgaard & Smith by Joseph A. Salazar, Jr.,

27  Esq.,  appeared on behalf of Defendant Franklin County Water

28  District.

                                1

1      Jacobson, Hansen, Najarian & McQuillan by Leith B. Hansen,

2  Esq., appeared on behalf of Defendant AA&A Associates.

3      LaMore, Brazier, Riddle & Giampaoli by Jeffrey F. Oneal,

4  Esq., and Greenfield-Hardy by Robert H. Greenfield, Esq.,

5  appeared on behalf of Defendant Merced Irrigation District and

6  Merced Irrigation District No. 1.

7      Allen, Proietti & Fagalde by Terry L. Allen, Esq., and

8  Greben & Associates by Jan Adam Greben, Esq., appeared on behalf

9  of Defendant County of Merced.

10     Myers & Mayfield by Gregory L. Myers, Esq., appeared on

11 behalf of Defendant City of Merced.

12     McCormick, Barstow, Sheppard, Wayte & Carruth by Stephen E.

13 Carroll, Esq., appeared on behalf of Defendant Ranchwood Homes

14 Corp.

15 III.  Summary of Pleadings.

16     Plaintiffs' Summary

17     1.   Plaintiffs in this action own or reside in homes

18 generally located in four areas described within the Complaint as

19 follows: "Beachwood Plaintiffs" who own real property and/or

20 resided in Merced County, generally in an area bounded by Ashby

21 Road to the south, Beachwood Avenue to the west, the El Capital

22 Canal to the east and Coronado Avenue to the north; the

23 "Thornton/Lopes Plaintiffs" who own real property and/or reside

24 or resided in Merced County, generally in an area bounded by

25 Thornton Road to the west, Lopes to the south, Highway 140 to the

26 north and Massasso Street to the east; the "Dairy plaintiffs" who

27 own real property and/or reside or resided on Franklin Road in

28 Merced County, generally between Highway 99 and the Franklin Road

2

1  Bridge; and the "Yosemite plaintiffs" who own real property
2  and/or reside or resided in Merced County, generally in an area
3  bounded by Kirby Road to the west, Black Rascal Creek to the
4  north, a raised irrigation lateral to the south and Fairfield
5  Channel to the east.  Unless otherwise specifically described,
6  these Plaintiff groups shall be referred to collectively
7  throughout the Scheduling Conference Statement as "the
8  Plaintiffs."

9       2.   Plaintiffs' First Amended Complaint ("FAC") contains
10 citizen suit claims arising out of violations of the Clean Water
11 Act by all Defendants except Ranchwood Homes.  Plaintiffs FAC
12 also includes related state law claims for Inverse Condemnation
13 under Article 1, Section 19 of the Constitution of the State of
14 California, Negligent Maintenance, Dangerous Condition of Public
15 Property, Unreasonable Food Barrier and Nuisance.

16      3.   Defendants' Clean Water Act violations generally fall
17 within two categories - those involving the actions of the
18 defendants just before, during and after a flooding event
19 occurring in April of 2006, and longstanding violations of the
20 Clean Water Act by defendants some of which have been occurring
21 since the inception of the Act in 1970.  These violations have
22 resulted in and will continue to result in the contamination of
23 the specific waterways at issue in this action and contamination
24 of the soil and water in and around Plaintiffs' properties.  The
25 violations of the Clean Water Act by Defendants have been both
26 intentional and unintentional.

27      4.   Plaintiffs related state law claims generally fall into
28 two broad categories - those arising out of the biological and/or

                                3

1  chemical contamination in and around Plaintiffs' properties
2  resulting from Defendants' Clean Water Act violations and those
3  arising from a flooding event in April of 2006.  As to the flood
4  related claims, Plaintiffs contend that the actions of
5  Defendants, including but not limited to the importation of storm
6  and/or drainage water from other areas of Merced County; the
7  placement of certain public facilities, roads, canals and/or
8  other structures at or near Plaintiffs' properties which directed
9  flood waters onto the Plaintiffs' property and/or prevented the
10 natural flow of flood waters away from Plaintiffs' property, were
11 substantial factors in causing flooding to Plaintiffs'
12 properties.

13      5.   Plaintiffs contend that as a result of the actions of
14 the Defendants, they have suffered and will continue to suffer,
15 personal injuries and emotional distress resulting from the
16 flooding event and exposure to toxins.  Plaintiffs further
17 contend they have suffered damage to their real and personal
18 property including the loss of value to their real property.

19      6.   Under the Clean Water Act claims Plaintiffs seek
20 declaratory and injunctive relief as well as the payment of civil
21 penalties and reasonable attorneys fees and costs as provided
22 under 33 U.S.C. § 1365(d).  Under Plaintiffs' related state
23 claims, damages are sought for personal injury, personal property
24 damage, real property loss (including stigma damages) and special
25 damages, including wage loss, loss of past and future income,
26 loss of rental income, business interruption losses, medical and
27 related expenses, medical monitoring costs, cleanup costs and
28 relocation expenses as well as recovery of attorneys fees and

**4**

1   costs pursuant to California Code of Civil Procedure § 1036.

2      **Defendants' Summary**

3      1.   Defendant FCWD is a public entity formed for the

4   purpose of operating a wastewater collection and treatment

5   facility.  It is located north of the City of Merced and serves

6   numerous households in the Beachwood area.  It operates in

7   compliance with a WDR Order issued by the California Regional

8   Water Control Board.  FCWD contends that to the extent there may

9   be bacteria in and/or around Plaintiffs' property, it is

10  naturally occurring and its mere presence is not the result of

11  some act of omission by FCWD.

12     2.   It is the contention of the City of Merced, MID and

13  MIDD1 that each operates its waste water treatment facility and

14  its collection system in accordance with its NPDES permit and

15  that in the event that it violates the permit, it reports the

16  matter and abides by corrections and mitigation as dictated by

17  the RWQCB.

18     3.   It is the contention of the City of Merced, FCWD, MID

19  and MIDD1 that its handling of the flood which occurred in April

20  2006, was reasonable and did not result in any damage to any of

21  the Plaintiffs caused by either flood waters or alleged

22  contamination from those waters.

23     4.   It is the contention of the City of Merced, FCWD, AA&A

24  Associates, Inc., MID and MIDD1 that they have not caused any

25  damage to any of the Plaintiffs for any alleged contamination of

26  ground water or surface water at or near their residences or

27  businesses.

28     5.   It is the contention of the City of Merced, FCWD, MID

1 and MIDD1 that there is nothing which it has done which would

2 lead to a "taking" as defined by Article 1, Section 19 of the

3 Constitution of the State of California.

4     6.   It is the contention of the City of Merced, FCWD, AA&A

5 Associates, Inc., MID and MIDD1 that the Plaintiffs have not

6 suffered any damages as a result of any contamination and that

7 they have failed to mitigate damages sustained by them as a

8 result of flooding which occurred in April, 2006.

9     7.   It is the contention of the City of Merced, FCWD, AA&A

10 Associates, Inc., MID and MIDD1 that the Plaintiffs who suffered

11 damage as the result of flooding that occurred in April, 2006,

12 knew or should have known of the likelihood of such flooding and,

13 nonetheless, accepted the risk associated with such flooding.

14     8.   It is the contention of the City of Merced, FCWD, AA&A

15 Associates, Inc., MID and MIDD1 that the Plaintiffs and each of

16 them failed to mitigate any damages that they claim to have

17 suffered.

18     9.   It is the contention of the City of Merced, FCWD, AA&A

19 Associates, Inc., MID and MIDD1 that the actions of the

20 Plaintiffs and each of them contributed to any damages suffered

21 by them.

22     10.   It is the contention of the City of Merced, FCWD, MID

23 and MIDD1 that it is immune from prosecution of all state claims

24 pursuant to Government Code §§ 835.4, 820.2, 830.6 and 831.2.

25     11.   It is the contention of City of Merced, FCWD, MID and

26 MIDD1 that the Plaintiffs and each of them are barred by the

27 statute of limitations as set forth in the California Code of

28 Civil Procedure § 338(j) and 28 U.S.C. § 2462.

1    12.   It is the contention of AA&A Associates, Inc., that the

2    Plaintiffs and each of them are barred by the statute of

3    limitations as set forth in the California Code of Civil

4    Procedure §§ 338(a)(b) and (c) and 28 U.S.C. § 2462.

5    13.   It is the contention of the City of Merced, FCWD, MID

6    and MIDD1 that some of the Plaintiffs' actions are barred as a

7    result of their failure to file the appropriate claim as required

8    by Government Code §§ 900 and 901, et seq.

9    14.   It is the contention of the AA&A Associates, Inc., that

10   the Plaintiffs do not have standing to bring an action under the

11   Clean Water Act.

12   15.   It is the contention of AA&A Associates, Inc., that

13   some of the Plaintiffs do not have standing to bring suit, to the

14   extent that they have assigned their claims to their insurers.

15   16.   It is the contention of the City of Merced, FCWD, MID

16   and MIDD1 that the Plaintiffs do not have standing to bring an

17   action under the Clean Water Act.

18   17.   It is the contention of the City of Merced, FCWD, MID

19   and MIDD1 that some of the Plaintiffs have entered into a flood

20   easement which prevents them from pursuing an action for damages

21   which they claim to have suffered as the result of any flooding

22   that they may have experienced.

23   18.   It is the contention of the City of Merced, FCWD, MID

24   and MIDD1 that claims which have been brought by the Plaintiffs

25   for equitable relief are barred by the doctrines of laches and

26   unclean hands.

27   19.   It is the contention of AA&A Associates, Inc., that

28   some of the claims which have been brought by the Plaintiffs for

1  equitable relief are barred by the doctrines of waiver, estoppel

2  and moving to the nuisance.

3      20.   It is the contention of the City of Merced, FCWD, MID

4  and MIDD1 that the Plaintiffs' claims are barred because they

5  have failed to exhaust their administrative remedies.

6      21.   It is the contention that the City of Merced, FCWD,

7  AA&A Associates, Inc., MID and MIDD1, that at all times, they

8  acted in good faith.

9      22.   It is the contention of AA&A Associates, Inc., that

10  they were not engaged in any activity in Merced requiring a PNDES

11  permit.

12     23.   It is the contention of those Defendants that own or

13  operate a Publicly Owned Treatment Works ("POTW") that to the

14  extent there was any excursion from its operating permit that the

15  Defendants are immune or otherwise not subject to liability under

16  the defenses of "upset," "interference" and/or "permit as a

17  shield" defenses.

18  IV.   Orders Re Amendments To Pleadings.

19      1.   Plaintiffs agree that they shall file their Amended

20  Complaint to add additional claimants, approximately 1,200

21  individuals, and to name additional parties, on or before

22  September 13, 2007.

23      2.   All parties agree that the Amended Complaint can be

24  filed on or before September 13, 2007, without the necessity of a

25  motion or hearing.

26      3.   Plaintiffs will be amending their Complaint to include

27  claims based upon environmental contamination resulting from the

28  Baltimore Air Coil Facility in Merced.   Defendants have been

**8**

1  previously notified of the intention to file suit via statutory

2  notice letters.  Upon expiration of the statutory waiting

3  periods, Plaintiffs will amend their Complaint accordingly.

4  Plaintiffs are further considering amendments related to the

5  filing of citizen actions for discrimination pursuant to 42

6  U.S.C. § 1983 and 28 U.S.C. § 1343 as well as additional RCRA

7  claims against the current Defendants.  All of the currently

8  contemplated amendments, if pursued, will be made within the next

9  60 days.  At this juncture, there is no proposed final deadline

10  for amendments to the pleadings.

11       4.   In order to efficiently handle the anticipated

12  mandatory cross claims and counter claims, Defendants request the

13  Court make the following Order:

14            a.   In the interests of judicial economy, all present

15  and future cross-claims and counterclaims for which there is not

16  a responsive pleading on file in this Court are hereby deemed

17  answered and denied.  In addition to the foregoing, all parties

18  are deemed to have pled all potential affirmative defenses in

19  response to all present and future cross-claims and

20  counterclaims.

21            b.   All Defendant parties are deemed to have filed

22  cross claims or counterclaims, as the circumstance warrants,

23  against all other parties stating claims for: (a) contribution

24  under section 1432 of the California Civil Code, (b) for

25  equitable indemnity, and (c) for declaratory relief under the

26  Federal Declaratory Relief Act, 28 U.S.C.

27            c.   If any party in Paragraph 2.b chooses to bring an

28  additional claim for relief other than those listed above in

1  paragraph 2.b, that party shall file and serve the appropriate

2  pleading in accordance with the Federal Rules of Civil Procedure.

3  Any such party may, by notice to the Court and all parties, waive

4  the provisions of paragraphs 2.a and 2.b.

5         d.   To the extent Plaintiffs amend this First Amended

6  Complaint, the Defendants shall meet and confer regarding a

7  stipulated list of affirmative defenses to be added to those in

8  paragraph 2.b and do so by providing notice to the Court and all

9  parties.  Barring such consensus between the Defendants, they are

10  ordered to amend their cross claims and/or counterclaims pursuant

11  to the Federal Rules of Civil Procedure.

12      5.   The parties agree that counterclaims and cross-claims

13  shall be filed in accordance with the Federal Rules of Civil

14  Procedure.  Third-Party Complaints shall be filed on or before

15  April 1, 2008.

16      6.   The parties further agree that Plaintiffs shall have to

17  and including April 1, 2008, to add parties without the necessity

18  of a Rule 15 motion.

19  V.   Factual Summary.

20     A.   Admitted Facts Which Are Deemed Proven Without Further

21  Proceedings.

22         <u>Plaintiffs' List</u>

23      1.   FCWD is a public entity.

24      2.   Merced Irrigation is a public entity.

25      3.   Merced Irrigation District, Drainage District No.

26  1 is a public entity.

27      4.   The City of Merced is a governmental entity.

28      5.   The County of Merced is a governmental entity.

1          6.   Ranchwood Homes Corp. is a California corporation

2    authorized to do business and doing business in the County of

3    Merced.

4          7.   AA&A Associates, Inc. is a private corporation

5    authorized to do business and doing business in the County of

6    Merced.

7          8.   The flooding event which is referenced in

8    Plaintiffs' First Amended Complaint occurred in Merced,

9    California on April 4, 2006.

10         9.   The FCWD facility does not operate under an NPDES

11   Permit.

12        10.   The FCWD facility is approximately 1.5 miles

13   northwest of the City of Merced in Sections 14 and 23, T7S, 413E,

14   MDP and M.

15        11.   WDR Order No. 89-171 is the only waste permit that

16   regulates the FCWD facility and its discharge of 0.6 million

17   gallons per day (MGD) of undisinfected treated waste water.

18        12.   The FCWD facility includes head works in a

19   concrete lined aeration basin with two aerators.

20        13.   Black Rascal Creek is a tributary to Bear Creek,

21   which is a tributary to the San Joaquin River, all waters of the

22   United States.

23        14.   The El Capital Canal conveys irrigation water from

24   the Merced River south of the FCWD facility with both waters

25   flowing into Bear Creek.

26        15.   Less than a half a mile downstream of the

27   confluence between the El Capital Canal and Bear Creek is Crocker

28   Dam.

1    16.   The MID was established to provide irrigation

2  water to the farms in the central portion of the San Joaquin

3  Valley located around the City of Merced.

4    17.   The MID was organized under the California Water

5  Code in 1919.

6    18.   The MID is comprised of five major operational

7  enterprises, water utility, parks and recreation, hydroelectric

8  project, electric services and storm drainage.

9    19.   The MID distributes water through an 800 plus mile

10  system of dirt and concrete lined channels and pipelines.

11    20.   The MID owns, operates and maintains five

12  recreational areas adjacent to Exchequer and McSwain Dams.

13    21.   The Lake McSwain recreation area is located

14  adjacent to Lake McSwain.

15    22.   McClure Point, Barrett Cove, Horseshoe Bend and

16  Bagby recreation areas are all located adjacent to Lake McClure.

17    23.   A total of six boat launch facilities are

18  available in the recreational system.

19    24.   Over 600 camp sites are available to the public

20  over a year round basis.

21    25.   The MID owns, operates and maintains the new

22  Exchequer dams, reservoirs and hydroelectric facilities.

23    26.   The MID is authorized to act as an electric

24  utility under the California Water Code.

25    27.   The MID has owned and operated hydroelectric

26  generating facilities on the Merced River since 1927.

27    28.   Merced County's population is approximately

28  250,000 people.

12

1

**Defendants' List**

2   29. That on or about April, 2006, the County of Merced

3 and its watershed experienced torrential rainfall.

4   30. The parties have not had sufficient time to

5 determine whether all facts asserted by Plaintiffs to be

6 uncontested are in fact uncontested.

7  B. Contested Facts.

8   1. Whether all illegal discharges and activities

9 complained of in Plaintiffs' First Amended Complaint occurred in

10 waterways which are waters of the United States or the State of

11 California.

12   2. Whether the EPA and the State of California have

13 formerly concluded that discharges by Defendants of the

14 complained of in previous notices served upon Defendants are

15 prohibited by law.

16   3. Whether the affected waterways detailed in

17 Plaintiffs' First Amended Complaint and in the notices served

18 upon Defendants are navigable waters of the United States within

19 the meaning of 33 U.S.C. § 1362(7).

20   4. Whether Defendants FCWD, AA&A Associates, Inc.,

21 Merced Irrigation District, Merced Irrigation District, Drainage

22 District No. 1, the County of Merced or the City of Merced have

23 violated and continue to violate the Clean Water Act by

24 violations of the terms of their NPDES Permits, if one has been

25 issued to the entity.

26   5. Whether each of the violations by Defendant FCWD,

27 AA&A Associates, Inc., Merced Irrigation District, Merced

28 Irrigation District, Drainage District No. 1, the County of

1  Merced or the City of Merced in excess of their NPDES Permits

2  constitute separate actionable violations of the Clean Water Act.

3      6.    Whether Defendants FCWD, AA&A Associates, Inc.,

4  Merced Irrigation District, Merced Irrigation District, Drainage

5  District No. 1, the County of Merced or the City of Merced will

6  continue to violate the limits in terms of the NPDES Permits, as

7  well as state and federal standards with respect to the

8  discharges and releases as identified in notices to Defendants,

9  unless appropriate civil penalties and equitable relief is

10  granted.

11      7.    Whether the FCWD owns, maintains and/or operates a

12  waste water treatment, refuse and disposal facility that served

13  the adjacent community in areas around Plaintiffs' residences.

14      8.    Whether the FCWD facility demonstrates severe

15  problems with the collection system, in that water, both surface

16  and groundwater drainage is to Black Rascal Creek which parallels

17  the southbound drain of the FCWD facility.

18      9.    Whether the water quality control plan for the San

19  Joaquin River basin contains water quality objectives for all

20  waters of the basin and is being violated as sewage from the FCWD

21  facility leaks or is otherwise discharged from the facility

22  through leaking collection pipes, hydrologically connected ponds

23  or inconsistent maintenance schedule.

24      10.   Whether the FCWD has chronic pollution problems

25  associated with, among other things, its antiquated facility and

26  collection system, undersized capacity, old equipment and

27  inconsistent maintenance schedule.

28      11.   Whether the FCWD has illegally released treated

14

1  sewage directly to adjacent waters of the United States, with the
2  most recent event occurring in April or May of 2006.

3         12.   Whether in April of 2006, a failure of a levee on
4  the channelized portion of Black Rascal Creek caused flooding
5  within the service area and inundated portions of the sewage
6  collective system causing the influent flow to spike.   To reduce
7  water levels in the disposal ponds from April 14 to May 2, 2006,
8  FCWD illegally discharged treated sewage to Black Rascal Canal.

9         13.   Whether FCWD claimed the discharge was necessary
10  to ensure the ponds were at a level that would allow adequate
11  capacity for the coming year and to avoid future discharges to
12  Black Rascal Creek.   Records indicate that these illegal
13  discharges could have been avoided.

14         14.   Whether due to its proximity to a hydrological
15  connection with adjacent waters, the ponds of the FCWD facility
16  discharged directly to the waters of the United States.

17         15.   Whether pollutants deposited by the FCWD migrate
18  to the waters of the United States.

19         16.   Whether FCWD has admitted that it will continue to
20  have problems with illegal discharges in the future and that the
21  likelihood of increases each year are due to flooding,
22  urbanization, loss of adjacent wetlands, loss of tributaries and
23  other hydrological factors.

24         17.   Whether FCWD admits that direct discharges such as
25  those that have occurred in 2006 were violations of the Clean
26  Water Act.

27         18.   Whether FCWD's waste water collection system is a
28  source of unpermitted and unregulated pollution.

                              **15**

19.    Whether the FCWD's waste water collection system suffers frequent sewer overflows which enter storm drains, ditches, creeks and other waters of the United States.

20.    Whether the FCWD facility has poor documentation concerning collection system overflow events and maintenance.

21.    Whether due to FCWD's collection system's poor condition, it discharges subsurface pollutants each and every day contributing to the general overall pollutants entering the ground and groundwater from their ponds.

22.    Whether FCWD has no NPDES permit allowing such discharges.

23.    Whether discharges by the Merced Irrigation District are a contributing factor to the illegal problems of the discharges by the FCWD.

24.    Whether the Clean Water Act violations of the FCWD affect the health and enjoyment of victims who reside, work and recreate in the affected area.

25.    Whether the violations of FCWD have resulted in property loss to Plaintiffs, including real and personal property.

26.    Whether the Merced Irrigation District (MID) and Merced Irrigation Drainage District No. 1 (MIDD1) had been in continuous operation prior to the passage of the Clean Water Act and have been violating the Act since it was passed.

27.    Whether in 2005, various recreational locations owned, operated or maintained by the MID had a combined 658,575 visitor days.  Human waste, hydrocarbon pollutants, solvents, pesticides, detergents and sediment are all pollutants discharged

from the lakes and the MID recreational areas to other waters of
the United States, including Canal Creek, El Capital Canal and
Black Rascal Creek which are downstream from the lakes.

28.   Whether the MID intentionally discharges from
these lakes and reservoirs to other waters.  By these acts, the
MID is discharging pollutants to the waters of the United States.

29.   Whether changes in the movement, flow or
circulation of any navigable water or groundwater, including
changes caused by the construction of dams, levees, channels,
causeways or flow diversion facilities create waste products
which are "added" to the water by tangential processes in
generating electricity.  The MID has no NPDES permit for these
types of discharges occurring from one water to another water of
the United States.

30.   Whether for more than 40 years, the MID has
utilized pesticides in its 800 plus miles of canals, laterals and
pipelines.

31.   Whether the MID has ever had an NPDES permit for
discharges related to pesticide use prior to the adoption of
statewide general NPDES permit for the discharge of pesticides
for aquatic weed and pest control in waters of the United States,
and the general NPDES permit for discharges of aquatic pesticides
to waters of the United States for vector control.

32.   Whether either the MID does not have any valid
aquatic pest permit or vector permit, or the MID's use and
application of pesticides violates the provisions of these
permits.  Any NPDES permit violation is also a violation of the
Clean Water Act.

17

1     33.   Whether the MID has failed to implement adequate
2  best management practices in its use of pesticides by failing to
3  employ best available technology and best conventional
4  technology.

5     34.   Whether the MID's discharge of pesticide waste
6  creates or causes conditions of nuisance and pollution.

7     35.   Whether the discharges cause or contribute to
8  long-term adverse impacts on beneficial uses.

9     36.   Whether the MID's discharges adversely impact
10 human health and the environment.

11    37.   Whether the discharge of pesticides by the MID are
12 non-compliant with all FIFRA label instructions, DPR and DHS
13 Regulations, as well as any use permits issued by CACs.

14    38.   Whether the MID has failed to minimize the extent
15 and duration of impacts caused by the discharge of pesticide
16 related pollutants and to demonstrate that, following completion
17 of resource or pest management projects, the water quality of the
18 receiving waters is equivalent to the pre-application state.

19    39.   Whether receiving waters outside the treatment
20 area in and around plaintiffs' residence and environment are or
21 are not free of toxics.

22    40.   Whether the MID discharges are causing or
23 threatened to cause groundwater in the vicinity of Plaintiffs'
24 residence to contain waste constituents in excess of background,
25 groundwater quality objectives.

26    41.   Whether the MID and MIDD1 have violated the Clean
27 Water Act by reason of their failure to acquire an NPDES permit
28 and for discharging pollutants into the waters of United States

1  without an NPDES permit.

2       42.   Whether with regard to the aquatic pest permit and
3  vector permit, the MID and MIDD1 is in violation of those permits
4  each and every day, since the date they filed a notice of intent
5  and received coverage under these general NPDES permits.   Each
6  and every discharge is a separate violation of the Clean Water
7  Act.

8       43.   Whether violations of the MID and MIDD1 have
9  affected the health and enjoyment of Plaintiffs who reside, work
10  and recreate in the affected areas.

11       44.   Whether the violations of the MID and MIDD1 have
12  resulted in real and personal property damage sustained by
13  Plaintiffs.

14       45.   Whether the City of Merced owns and operates a
15  POTW waste water collection system which collects various
16  industrial and domestic waste.   Due to either bypass or overflow,
17  wastes are discharged to surface waters.   These discharges occur
18  both surface and subsurface.

19       46.   Whether the City of Merced's POTW operation also
20  alone or in combination with other sources, causes or threatens
21  to cause degradation of area groundwater by allowing polluted
22  waste leaving the collection system to be the positive in areas
23  such as the areas around Plaintiffs' residences where the
24  polluted waste is discharged into groundwater.

25       47.   Whether the City of Merced fails to report many of
26  these violations and fails to take corrective actions as required
27  by its permit and RWQCB standard provisions which have been made
28  part of Merced's permit.

1       48.   Whether the bypass or overflow of waste to surface
2 waters by the City of Merced is prohibited.

3       49.   Whether the City of Merced's POTW operation alone
4 or in combination with other sources caused or threatens to cause
5 degradation of groundwater.

6       50.   Whether the City of Merced fails to report
7 violations of its permit and fails to take corrective action as
8 required by its permit.

9       51.   Whether the City of Merced fails to take
10 corrective action in order to eliminate its violations of the
11 Clean Water Act.

12       52.   Whether the City of Merced's POTW has been in
13 continuous operation prior to the passage of the Clean Water Act.

14       53.   Whether much of the City of Merced's collection
15 system predates the Clean Water Act.

16       54.   Whether the City of Merced has been violating the
17 Clean Water Act and POTW and were required to come into
18 compliance with its discharge restrictions.

19       55.   Whether bypasses or overflows from the collection
20 to surface water, including storm drains, ditches and other flood
21 control devices, violate the Clean Water Act.

22       56.   Whether the City of Merced's collection system
23 leaks subsurface to waters of the United States, including storm
24 drain system including ditches and other control devices.

25       57.   Whether the City of Merced's storm drain system
26 carries these pollutants to the vicinity of Plaintiffs'
27 residences where the pollutants discharge into groundwater or
28 during flooding discharge overland into the residences of

1 Plaintiffs.

2       58.   Whether, when discharging subsurface, the City of

3 Merced's collection system discharges these pollutants to surface

4 waters, including the storm drains, ditches and other flood

5 control devices where these pollutants are carried and

6 distributed to the vicinity of Plaintiffs' residences.

7       59.   Whether by discharging polluted water to the

8 vicinity of Plaintiffs' residences, the City of Merced causes or

9 threatens to cause degradation of area groundwater.

10       60.   Whether the City of Merced fails to report all

11 bypasses and overflows, particularly those occurring subsurface.

12       61.   Whether the City of Merced's waste water

13 collection treatment and disposal system provides sewage services

14 to industry and 76,000 plus residents.   Numerous significant

15 industrial users, including users from the metal finishing and

16 aluminum forming categories, discharge more than a million

17 gallons per day of waste into the City of Merced's leaking

18 collection system.   Discharges include toxic metals, solvents,

19 polyaromatic hydrocarbons (PAHs), petroleum hydrocarbon

20 pesticides, endocrine disruptures, immune suppressants and

21 pharmaceuticals and the like.

22       62.   Whether the collection system for the City of

23 Merced facility suffers from significant inflow and infiltration

24 which may be caused by pipe misalignment, cracks, crown erosion,

25 open joints, roots and the like.   Due to the proximity of the

26 collection system to surface waters and in particular the storm

27 drain system, the collection system discharges the surface and

28 subsurface flows to waters of the United States.

21

1     63.   Whether the City of Merced is aware of these

2   discharges and fails to take corrective actions.

3     64.   Whether intentional or unintentional diversion of

4   flow from any portion of the City of Merced's treatment facility

5   or collection system and transport systems, including pumping

6   facilities is a violation of the City of Merced's permit and a

7   violation of the Clean Water Act.

8     65.   Whether frequent sewer overflows often enter storm

9   drains, ditches, flood control devices, creeks and other waters

10  of the United States.  The City of Merced has poor documentation

11  concerning its collection system.  The City of Merced fails to

12  report all surface overflows and bypasses to our RWQCB.

13    66.   Whether the City of Merced also fails to report

14  any subsurface discharges.  All of the discharges from the City

15  of Merced facility are contributing to the general overall

16  pollutants entering ground and groundwater in and around

17  Plaintiffs' residences.

18    67.   Whether the City of Merced's storm drains empty to

19  Black Rascal Creek, Canal Creek and El Capital Canal where

20  pollutants enter groundwater and migrate to the vicinity of

21  Plaintiffs' residences.

22    68.   Whether between January 1, 2002, and January 1,

23  2007, the City of Merced had 240 violations due to the

24  intentional or unintentional diversion of flow from the

25  collection and transport systems, including pumping facilities

26  via surface flow to a water of the United States, including storm

27  drains, ditches and flood control devices.

28    69.   Whether between January 1, 2002, and January 1,

2007, the City of Merced had 1,500 violations due to the intentional or unintentional diversion of flow from the collection and transport systems, including pumping facilities via subsurface flow to a water of the United States, including storm drains, ditches and flood control devices.

70.   Whether between January 1, 2002, and January 1, 2007, the City of Merced had 1,500 violations for causing or threatening to cause degradation of area groundwater.

71.   Whether between January 1, 2002, and January 1, 2007, the City of Merced had 1,500 violations for failing to report the immediately preceding violations.

72.   Whether between January 1, 2002, and January 1, 2007, the City of Merced had 1,500 violations for failure to take corrective action in order to eliminate the violations as enumerated above.

73.   Whether pursuant to the Clean Water Act, the EPA and State of California have formerly concluded that violations by the City of Merced are prohibited by law.

74.   Whether due directly to the violations of the City of Merced in relationship to the Clean Water Act, Plaintiffs have suffered loss of property value, damage to real property and suffered personal injuries.

75.   Whether large sections of Merced County discharges pollutants to Plaintiffs' residences and land via the County's municipal separate storm sewer system (MS4s).  MS4s are a conveyance or system of conveyance (including roads with drainage systems, streets, catch basins, curbs, gutters, ditches, manmade channels or storm drains) designed or used for collecting or

1  conveying storm water which is not a combined sewer and which is

2  not a part of a publicly owned treatment or POTW."

3          76.   Whether the County of Merced uses its MS4s for

4  local flood control and elimination of contaminated storm water,

5  UST cleanup discharge, polluted process water, chlorinated water

6  and other waste by routing polluted discharge and flood waters

7  away from other county lands to Plaintiffs' residences and land.

8          77.   Whether the County of Merced's activities,

9  property and facilities convey polluted water from various

10 locations via the County's MS2s to Canal Creek, El Capital Canal

11 and Black Rascal Creek.

12         78.   Whether in 2006, the County of Merced discharges

13 caused or contributed to waters backing up and flooding

14 Plaintiffs' property in and around the storm drainage area with

15 various pollutants, none of which the County was authorized to

16 discharge by any NPDES permit the County has obtained.

17         79.   Whether the Clean Water Act, section 402(p)

18 requires the County of Merced to develop and implement a program

19 to reduce pollutants discharged with storm water runoff to the

20 maximum extent practicable.  This program is administered through

21 NPDES permits.  These regulations require operators of medium and

22 large MS4s like the County's to obtain NPDES storm water permits.

23 The County has not obtained a Phase I municipal area storm water

24 discharge permit.

25         80.   Whether starting from the first day the County was

26 required to obtain a Phase I NPDES permit for storm water under

27 the Clean Water Act, it has been in violation of the Act.

28         81.   Whether the County of Merced discharges human

24

waste, hydrocarbon pollutants, solvents, pesticides, detergents, phosphate fertilizers, toxic metals and sediment to its MS4s leading to Canal Creek, El Capital Canal and Black Rascal Creek.

82.  Whether the County of Merced intentionally discharges from its parks, sewage collective systems, preferential pathways, fire department, utility yards, maintenance facilities, building and other sources via its MS4s.

83.  Whether many of the County's discharges are not storm related, but are due to other causes such as fertilizer, runoff during maintenance operations, street cleaning, equipment cleaning and repair, pest control, weed control, water and sewage releases, construction, road repair, building maintenance, gardening and land management.

84.  Whether by the above acts, the County of Merced is discharging pollutants to the waters of the United States, and the County has no NPDES permit covering these types of discharges.

85.  Whether for more than 60 years, the County of Merced has utilized pesticides, including aquatic herbicides to control weeds, mosquitos and other pests in MS4s and waters of the United States.

86.  Whether in addition to the pesticides themselves, pesticide products contain other chemicals such as surfactants solvents, metals and the like which all contribute to the pollutants being added to the target waters.

87.  Whether the County of Merced has ever had an NPDES permit for these discharges prior to the adoption of the statewide general NPDES permit for discharge of aquatic

1   pesticides for aquatic weed and pest control in waters of the

2   United States (Aquatic Pest Permit) and the general NPDES permit

3   for discharges of aquatic pesticides to surface water of the

4   United States for vector control (Vector Permit).

5           88.   Whether either the County does not have a

6   currently valid aquatic pest permit or vector permit, or the

7   County's use and application of pesticides violates the

8   provisions of these permits.

9           89.   Whether the County of Merced has failed to

10  implement adequate best management practices in its use of

11  pesticides by failing to employ the best available technology and

12  best conventional technology.

13          90.   Whether the County's discharge of pesticide waste

14  creates or causes conditions of nuisance and pollution.

15          91.   Whether the County's discharges caused or

16  contributed to long-term adverse impacts on beneficial uses.

17          92.   Whether the County's discharges adversely impact

18  human health and the environment.

19          93.   Whether the County's discharge of pesticides are

20  non-compliant with all FIFRA label instructions, DPR and DHS

21  Regulations, as well as any use permits issued by CACs.  The

22  County has failed to minimize the extent and duration of impacts

23  caused by the discharge of pesticide related pollutants, and to

24  demonstrate that following completion of resource or pest

25  managements, the water quality of the receiving waters is

26  equivalent to the pre-application state.

27          94.   Whether there is evidence of the County's

28  violations by the fact that receiving waters are not free of

26

1  toxics outside the treatment area, in and around Plaintiffs'
2  residences and environment.

3       95.  Whether the County's discharges are causing or
4  threatening to cause groundwater in the vicinity in Plaintiffs'
5  residences to contain waste constituents in excess of background,
6  groundwater quality and in excess of applicable water quality
7  objectives.  These exceedences and illegal discharges threaten
8  the beneficial uses of surface and groundwater, pollute the land
9  and endanger the health and safety of the residences of the area
10 including Plaintiffs'.

11      96.  Whether the contamination as identified above with
12 respect to FCWD, MID, County of Merced or the City of Merced
13 resulted from public improvements deliberately designed,
14 constructed, repaired and maintained for the benefit of the
15 public, for which these defendants exercise dominion and control,
16 and whether such contamination damaged the Beachwood Plaintiffs'
17 property resulting in a taking under Article 1, Section 19 of the
18 Constitution of the State of California.

19      97.  Whether on April 4, 2006, dirt embankments along
20 El Capital Canal failed to function as intended and collapsed
21 allowing water to escape the canal and flood the Beachwood
22 Plaintiffs' real and personal property.

23      98.  Whether the County of Merced designed, constructed
24 and maintained Ashby Road located to the south of Beachwood
25 Plaintiffs' property.  Whether Ashby Road is raised above ground
26 level without any means by which flood water might travel
27 underneath or around the roadway, and as a result, Ashby Road
28 obstructed the flow of flood water which had escaped the channel

1  causing it to back up and pool on the Beachwood Plaintiffs' real
2  and personal property.

3        99.   Whether FCWD, MID, County of Merced and/or the
4  City of Merced converted Black Rascal Creek from a natural
5  waterway for use as an irrigation canal and as part of a storm
6  drainage system, such that the quantity of water delivered to El
7  Capital Canal in conjunction with rainfall on April 4, 2006, was
8  such to overtop and collapse the dirt embankment allowing water
9  to escape from the canal and flood Plaintiffs' real and personal
10  property.

11        100.  Whether FCWD, MID, County of Merced and/or the
12  City of Merced failed to adequately design a channel and dirt
13  embankments along El Capital Canal, in that it was reasonably
14  foreseeable that irrigation water, storm drain runoff and
15  rainfall either alone or in combination would exceed the capacity
16  of the canal and overtop so as to flood Plaintiffs' real and
17  personal property.

18        101.  Whether FCWD, MID, County of Merced and/or the
19  City of Merced deliberately constructed and designed dirt
20  embankments on the west side of the El Capital Canal at a height
21  substantially lower than the embankment on the opposite side or
22  east of the canal which resulted in flood waters flowing onto
23  Plaintiffs' real and personal property, instead of with lesser
24  force over the property on both sides of the canal.

25        102.  Whether the conditions described immediately
26  above, resulted from the use of public improvements deliberately
27  designed, constructed, repaired or maintained for benefit of the
28  public, and were substantial factors in causing the Beachwood

1  Plaintiffs' damages and constituted a taking under Article 1,
2  Section 19 of the Constitution of the State of California.

3      103.  Whether the Beachwood Plaintiffs have sustained
4  real and personal property damage, as a result of the
5  contamination and flooding events.

6      104.  Whether the Beachwood Plaintiffs have sustained
7  and will continue to sustain other economic losses due to the
8  flooding and contamination events.

9      105.  Whether Plaintiffs have incurred and will
10  continue to incur attorneys fees, appraisal fees and engineering
11  fees as a result of Defendants' taking under Article 1, Section
12  19 of the Constitution of the State of California.

13      106.  Whether FCWD, MID, City of Merced and/or the
14  County of Merced designed, constructed and maintained along Black
15  Rascal Creek dirt embankments which deteriorated on April 4,
16  2006, resulting in flooding to the Dairy Plaintiffs' real and
17  personal property.

18      107.  Whether the Dairy Plaintiffs are located
19  generally to the north of Black Rascal Creek, between the Creek
20  and Franklin Road.

21      108.  Whether FCWD, MID, City of Merced and/or the
22  County of Merced deliberately designed, constructed and
23  maintained an embankment on the opposite side of the creek such
24  that it was substantially higher than the embankment adjacent to
25  and on the Dairy Plaintiffs' side of the creek, resulting in
26  flood waters flowing with dangerous momentum on Dairy Plaintiffs'
27  property, instead of with lesser force over property on both
28  sides of the creek.

1         109.   Whether the City of Merced and/or the County of

2  Merced designed, constructed and maintained Franklin Road in such

3  a way as it was raised above ground level without a means by

4  which flood water may travel underneath or around the roadway.

5  As a result, Franklin Road obstructed the flow of water and

6  caused it to pond on Plaintiffs' real property.  The condition as

7  described as to Black Rascal Creek constituted public

8  improvements deliberately designed and were substantial factors

9  in causing the Dairy Plaintiffs' injuries which constituted

10  taking under Article 1, Section 19 of the Constitution of the

11  State of California.

12         110.   Whether the Dairy Plaintiffs have sustained real

13  and personal property damage, as a result of the contamination

14  and flooding events.

15         111.   Whether the Dairy Plaintiffs have sustained and

16  will continue to sustain other economic losses due to the

17  flooding and contamination events.

18         112.   Whether Plaintiffs have incurred and will

19  continue to incur attorneys fees, appraisal fees and engineering

20  fees as a result of Defendants taking under Article 1, Section 19

21  of the Constitution of the State of California.

22         113.   Whether the Clean Water Act violations of FCWD,

23  MID, County of Merced and/or City of Merced resulted in property

24  loss and constituted taking under Article 1, Section 19 of the

25  Constitution of the State of California.

26         114.   Whether FCWD, MID, County of Merced and/or the

27  City of Merced deliberately designed, constructed and maintained

28  the embankments along El Capital Canal which diverted the natural

1  flow of water that it escaped Bear Creek to the Thornton/Lopes

2  Plaintiffs' real property.

3        115.   Whether a raised earthen berm deliberately

4  designed, constructed and maintained by the County of Merced ran

5  parallel to Lopes Avenue, dammed or obstructed the flow of waters

6  and caused it to pond on Plaintiffs' real property.

7        116.   Whether FCWD, MID, County of Merced and/or the

8  City of Merced converted Bear Creek from a natural waterway for

9  use as an irrigation canal and part of a storm drain system, such

10 that the quantity of water delivered to Bear Creek in conjunction

11 with the rainfall on April 4, 2006, was such to overtop and

12 collapse a portion of the dirt embankment allowing flooding to

13 the Thornton/Lopes Plaintiffs' real and personal property.

14       117.   Whether the real and personal property damage

15 that was sustained by the Thornton/Lopes Plaintiffs constituted a

16 taking under Article 1, Section 19 of the Constitution of the

17 State of California.

18       118.   Whether the Thornton/Lopes Plaintiffs have

19 sustained real and personal property damage, as a result of the

20 contamination and flooding events.

21       119.   Whether the Thornton/Lopes Plaintiffs have

22 sustained and will continue to sustain other economic losses due

23 to the flooding and contamination events.

24       120.   Whether Plaintiffs have incurred and will

25 continue to incur attorneys fees, appraisal fees and engineering

26 fees as a result of Defendants taking under Article 1, Section 19

27 of the Constitution of the State of California.

28       121.   Whether the MID, County of Merced and/or the City

1   of Merced deliberately designed, constructed and maintained along
2   the Fairfield Channel dirt embankments which failed to function
3   as intended and collapsed allowing water to escape the Fairfield
4   Channel and flood the Yosemite Plaintiffs' real and personal
5   property.

6          122.   Whether the same Defendants deliberately
7   designed, constructed and maintained a raised embankment for a
8   lateral irrigation canal adjacent and behind the south of the
9   Yosemite Plaintiffs' property which served as a dam and
10  obstructed flood water and caused it to pond on the Yosemite
11  Plaintiffs' property.

12         123.   Whether the same Defendants designed, constructed
13  and maintained Kirby Road which was raised above ground level
14  without a means by which flood water might travel underneath or
15  around the roadway.  As a result, Kirby Road obstructed the flow
16  of water and caused it to pond on the Yosemite Plaintiffs' real
17  property.

18         124.   Whether Fairfield Channel was part of an
19  irrigation system, such that the quantity of water delivered to
20  the Fairfield Channel in conjunction with the rainfall on April
21  4, 2006, was such to overtop and collapse a portion of the dirt
22  embankment allowing water to flood the Fairfield Channel and
23  flood the Yosemite Plaintiffs' property.

24         125.   Whether the MID, County of Merced and/or the City
25  of Merced failed to adequately design the channel and the dirt
26  embankments along Fairfield Channel resulting in its collapse.

27         126.   Whether the conduct and/or public structures of
28  the MID, County of Merced and City of Merced resulting in

1  personal and real property damage to Yosemite Plaintiffs and
2  constituted taking under Article 1, Section 19 of the
3  Constitution of the State of California.

4          127.    Whether the Yosemite Plaintiffs have sustained
5  real and personal property damage, as a result of the
6  contamination and flooding events.

7          128.    Whether the Yosemite Plaintiffs have sustained
8  and will continue to sustain other economic losses due to the
9  flooding and contamination events.

10          129.    Whether Plaintiffs have incurred and will
11  continue to incur attorneys fees, appraisal fees and engineering
12  fees as a result of Defendants taking under Article 1, Section 19
13  of the Constitution of the State of California.

14          130.    Whether each of the Defendants failed to exercise
15  due care in the maintenance of the public improvements previously
16  identified so as to cause portions of the embankments to collapse
17  and/or the water to otherwise overtop the embankments.

18          131.    Whether Defendants and each of them, since 1970
19  and continuing to the present, failed to maintain waste water
20  treatment refuse and disposal facilities including sewage
21  collection and conveyance systems, and rainwater or storm
22  drainage systems, such as to cause contamination to soil,
23  groundwater and surface water in and around Plaintiffs' real
24  property.

25          132.    Whether the conditions of the public improvements
26  previously identified constituted a dangerous condition of public
27  property.

28          133.    Whether Defendant Ranchwood Homes developed tract

homes to the north of the Beachwood Plaintiffs and in conjunction therewith designed and constructed a raised earthen berm or barrier that in the course of the flood of April 4, 2006, obstructed and blocked the flood waters so as to cause it to back up and pond on property of the Beachwood Plaintiffs.

134.   Whether Ranchwood Homes acted unreasonably in the design and construction of the earthen berm, including failing to provide a means by which to divert the water away from Plaintiffs' property.

135.   Whether all of the conditions of public and private property as described above constituted a nuisance depriving Plaintiffs of the use and enjoyment of their property.

136.   Whether Plaintiffs are entitled to a declaration that Defendants have violated and are in violation of the Clean Water Act.

137.   Whether the Plaintiffs are entitled to a declaration as to the rights and liabilities of Plaintiffs and Defendants.

138.   Whether injunction should be issued ordering Defendants to operate in compliance with the Clean Water Act, and if applicable, the effluent and receiving water limitations in its NPDES permits as well as state and federal standards of enforceable under the Clean Water Act.

139.   Whether the court should order Defendants to pay civil penalties per violation per day for its violations of the Clean Water Act.

140.   Whether the Court should order Defendants to pay Plaintiffs' reasonable attorneys fees and costs, including expert

1  witness fees as provided by 33 U.S.C. § 1365(d).

2          141.   Whether Plaintiffs should be awarded general

3  damages according to proof.

4          142.   Whether Plaintiffs should be awarded special

5  damages, including but not limited to real and personal property

6  damages, decreased market value, stigma damages, loss of

7  habitability, cost of repair, loss of use and enjoyment of

8  property, wage loss, loss of past and future income, loss of

9  rental income, business interruption losses, medical and related

10 expenses, medical monitoring costs, cleanup costs and relocation

11 expenses.

12         143.   Whether Plaintiffs are entitled to interest on

13 damages.

14         144.   Whether Plaintiffs are entitled to attorneys fees

15 and costs of suit incurred, including engineering and appraisal

16 fees pursuant to California Code of Civil Procedure § 1036.

17             Defendants' List

18         145.   Whether any act or omission by any of the

19 Defendants was the cause of the flooding in the Beachwood area.

20         146.   Whether any act or omission by any of the

21 Defendants was the cause of Plaintiffs' claimed damages.

22         147.   Whether there is any "contamination" at the

23 Plaintiffs' properties and, if so, whether it is traceable to

24 Defendant(s) and/or Plaintiffs.

25         148.   Whether any claimed "contaminant" qualifies as a

26 "pollutant" under the Clean Water Act.

27         149.   Whether any of the Plaintiffs have actually

28 suffered any physical injury as a result of any act or omission

1    of Defendant(s).

2        150.   Whether any Defendant owns and/or operates a

3    "point source" as defined by the Clean Water Act.

4        151.   That the County of Merced has in the past and

5    continues to comply with all aspects of the Clean Water Act

6    (CWA).

7        152.   That the County of Merced has taken all necessary

8    steps and procedures to obtain the appropriate NPDES permit(s).

9        153.   That the County of Merced has not discharged any

10   pollutant in violation of the CWA.

11       154.   That the County of Merced has not violated any

12   provisions of regulations or standard of any permit including a

13   NPDES permit.

14       155.   That the County of Merced has not discharged any

15   pollutant from any "point source" into waters of the United

16   States.

17       156.   That the County of Merced knows of no "point

18   source" from which there was any discharge by the County.

19       157.   That the County of Merced has at all times taken

20   all steps to obtain and has made all necessary permits for use of

21   aquatic or vector pesticides or herbicides.

22       158.   That the County of Merced knows of no facility

23   owned or operated by the County which has been identified by the

24   EPA or the State or any one else as a "point source."

25       159.   That the County of Merced has fully complied with

26   all requirements of the R.W.Q.C.B.

27       160.   That the County of Merced has designed and

28   followed "best management practices" and has taken all steps

36

1  necessary to design a "storm water management program."

2        161.   That the County of Merced has not discharged from

3  any "point source" to the vicinity of the Beachwood Plaintiffs.

4        162.   That the County of Merced does not have and it

5  does not control any public improvement, public facility, sewer,

6  water storm drainage or system or a public utility in the area

7  impacted by the April 4, 2006, flood water or in the vicinity of

8  the Beachwood Plaintiffs.

9        163.   That the County of Merced does not have and has

10  not controlled the design, construction or maintenance of the El

11  Capital Canal, Black Rascal Creek, Bear Creek Canal, Fairfield

12  Canal or lateral.

13        164.   That the County of Merced has not designed,

14  constructed or converted any natural water way into an irrigation

15  system or storm water system including Black Rascal Creek, El

16  Capital Canal, Bear Creek or Cana [sic] Creek.

17        165.   That the County of Merced has not discharged any

18  water or pollutant in the vicinity of the Soares Dairy

19  Plaintiffs, whether or not from a "point source."

20        166.   That the County of Merced has at all times, not

21  operated its wastewater treatment facility and its collection

22  system in accordance with its permits and does not and has not

23  operated said facility or systems in the vicinity of the

24  Plaintiffs or in the vicinity of any area of the April 4, 2006,

25  flood waters.

26        167.   That the County of Merced's handling of the

27  waters which occurred from the flood that occurred in April of

28  2006, was reasonable and did not result in any damage to any of

1  the Plaintiffs including by other flood waters or alleged

2  contamination from those waters.

3       168.  That the County of Merced has not caused any

4  damage to any of the Plaintiffs from any alleged contamination of

5  groundwater or surface water at or near Plaintiffs' residences or

6  businesses.

7       169.  That the County of Merced has done nothing which

8  would lead to a "taking" as defined by Article 1, Section 19 of

9  the Constitution of the State of California.

10      170.  The County of Merced contends that the Plaintiffs

11  have not suffered any damages as a result of any contamination

12  and that they have failed to mitigate damages sustained by them

13  as a result of flooding which occurred in April 2006.

14      171.  The County of Merced contends that the Plaintiffs

15  who suffered damage, if any, as a result of flooding that

16  occurred in April 2006, were fully aware of the likelihood of

17  such flooding and, nonetheless, accepted the risk associated with

18  such flooding.

19      172.  The County of Merced contends that the Plaintiffs

20  and each of them failed to mitigate any damages that they claim

21  to have suffered.

22      173.  The County of Merced contends that the actions of

23  Plaintiffs and each of them, contribute to any damage suffered by

24  them.

25      174.  The County of Merced is immune from prosecution

26  of all State claims pursuant to Government Code Sections 835.4,

27  820.2, 830.6 and 831.2.

28      175.  The County of Merced contends that the Plaintiffs

38

1  and each of them are barred by the statutes of limitations set

2  forth in Government Code Section 338(j) and 28 U.S.C. § 2462.

3         176.   The County of Merced contends that some of the

4  Plaintiffs' actions are barred as a result of their failure to

5  file the appropriate claim as required by Government Code

6  Sections 900 and 901, et seq.

7         177.   The County of Merced contends that Plaintiffs do

8  not have standing to bring an action under the Clean Water Act.

9         178.   The County of Merced contends that some of the

10 Plaintiffs have entered into a flood easement which prevents them

11 from pursuing an action for damages which they claim to have

12 suffered as a result of any flooding which may have occurred.

13        179.   The County of Merced contends that claims which

14 have been brought by the Plaintiffs for Equitable Relief and are

15 barred by the doctrines of laches and unclean hands.

16        180.   The County of Merced contends that the

17 Plaintiffs' claims are barred because they have failed to exhaust

18 their administrative remedies.

19        181.   The County of Merced at all times acted in good

20 faith.

21        182.   The County of Merced is not and has not

22 discharged any pollutants from any MS4s or from any "point

23 source" whether storm drainage or not.

24        183.   The County of Merced complied with all NPDES

25 Phase I permit requirements.

26        184.   Whether Ranchwood Homes developed tract homes to

27 the north of the Beachwood Plaintiffs.

28        185.   Whether Ranchwood Homes designed and constructed

a raised earthen berm or barrier that in the course of the flood of April 4, 2006, obstructed and blocked the flood water so as to cause it to back up and pond on the property of the Beachwood Plaintiffs.

186.   Whether Ranchwood Homes acted unreasonably in the design and construction of the alleged earthen berm or barrier including, but not limited to, a failure to provide a means by which to divert the water away from the Beachwood Plaintiffs' property.

187.   Whether a raised earthen berm or barrier designed or constructed by Ranchwood Homes was the legal cause of the injuries alleged by the Beachwood Plaintiffs.

188.   Whether Plaintiffs' real and personal property have sustained and will continue to sustain damages, including, but not limited to damage, to structures, foundations, walls and personal contents resulting in decreased market value, stigma damage and loss of habitability of their residences as a result of an unreasonable flood barrier for which Ranchwood Homes is legally responsible.

189.   Whether the Beachwood Plaintiffs have further incurred and will continue to incur costs of repair for this damage.

190.   Whether an unreasonable flood barrier designed or constructed by Ranchwood Homes legally caused the Beachwood Plaintiffs' real property to flood and has and will continue to be contaminated with pollutants, such that Plaintiffs have been prevented from use and enjoyment of their properties.

191.   Whether as a legal cause of the alleged

unreasonable flood barrier as alleged in the complaint,
Plaintiffs have suffered and will continue to suffer economic
losses, including wage loss, loss of past and future income, loss
of rental income, relocation expenses, clean-up costs, and
business losses.

192.   Whether as a legal cause of the alleged
unreasonable flood barrier as identified in the complaint,
Plaintiffs have suffered and will continue to suffer personal
injuries related to the flooding as previously alleged.

193.   Whether the Beachwood Plaintiffs have incurred
and will continue to incur medical expenses, including medical
monitoring costs.

194.   Whether as a legal result of the alleged
unreasonable flood barrier as identified in the complaint,
Plaintiffs have suffered and will continue to suffer emotional
distress, anxiety, fear of illness, depression and other
psychological, emotional and mental injuries resulting from the
contamination and flooding as alleged above.

195.   Whether Ranchwood Homes, through its employees,
agents and contractors, since 1970 and continuing thereafter,
have owned operated, constructed, managed, maintained, supervised
and controlled the sewage and storm drain system and sewage
treatment plants identified in Plaintiffs' complaint.

196.   Whether Ranchwood Homes legally caused the
discharge of pollutants into surface and subsurface waters, the
close proximity of sewage treatment plants to the irrigation
system, the inability to completely segregate the storm drain and
sewage systems and the permeability of the dirt embankments along

1    the irrigation system contaminated the ground water and soil in

2    the vicinity of the Plaintiffs.

3         197.   Whether Plaintiffs were unaware of this ongoing

4    contamination alleged in their complaint until October of 2006.

5         198.   Whether Ranchwood Homes, through its employees,

6    agents and contractors, whose identities are presently unknown,

7    owned, operated, constructed, managed, maintained, supervised,

8    and controlled the roadways, levees, irrigation channels, water

9    levels of adjoining channels, laterals, creeks of the irrigation

10   system, raised berms, and/or raised flood barriers as alleged in

11   Plaintiffs' complaint, so as to cause water to escape from the

12   irrigation canals, flood Plaintiffs' property and pond on it.

13        199.   Whether the alleged ownership, operation,

14   construction, management, maintenance, supervision, and control

15   of the storm and sewage treatment systems, sewage treatment

16   plants, roadways, levees, irrigation channel, water levels of

17   adjoining channels, laterals and creeks of the irrigation system,

18   contaminated the ground water in the vicinity of Plaintiffs,

19   flooded Plaintiffs' property, and allowed water to pond on it,

20   constituted a nuisance under California Civil Code Section 3479

21   in that it deprived Plaintiffs of the quiet enjoyment of their

22   property.

23        200.   Whether Plaintiffs' real and personal property

24   sustained and will continue to sustain damages, including, but

25   not limited to, damage to structures, foundations, walls and

26   personal contents resulting in decreased market value, stigma

27   damage and loss of habitability of their residences.

28        201.   Whether Plaintiffs have incurred and will

42

1    continue to incur costs of repair for their property.

2         202.   Whether as a legal cause of the alleged nuisance,

3    Plaintiffs' real property was flooded and has and will continue

4    to be contaminated with pollutants, such that Plaintiffs have

5    been prevented from use and enjoyment of their properties to

6    their damage.

7         203.   Whether as a legal result of the alleged

8    nuisance, Plaintiffs have suffered and will continue to suffer

9    economic losses, including, but not limited to, wage loss, loss

10   of past and future income, loss of rental income, relocation

11   expenses, clean-up costs and business losses.

12        204.   Whether as a legal cause of the alleged nuisance,

13   Plaintiffs have suffered and will continue to suffer personal

14   injuries related to contamination and flooding as previously

15   alleged.

16        205.   Whether Plaintiffs have incurred and will

17   continue to incur medical expenses.

18        206.   Whether as a legal result of the alleged

19   nuisance, Plaintiffs have suffered and will continue to suffer

20   emotional distress, anxiety, fear of illness, depression and

21   other psychological and emotional injuries resulting from the

22   contamination and flooding.

23        207.   Plaintiffs disagree with Defendants' statement of

24   undisputed facts.

25   VI.  Legal Issues.

26        A.   Uncontested.

27        1.   Jurisdiction exists under 28 U.S.C. § 1331 and 42

28   U.S.C. § 1983 and 28 U.S.C. § 1343.  Jurisdiction is also invoked

1  under 28 U.S.C. § 1367 as supplemental claims are asserted under
2  California law.

3      2.    Venue is proper under 28 U.S.C. § 1391 and the
4  provisions of 28 U.S.C. § 1343.

5    B.    Contested.

6      1.    Whether the Federal Clean Water Act applies to
7  non-surface waters.

8      2.    The nature and extent that a natural act
9  (substantial rainfall) will shield Defendants from Plaintiffs'
10  claims.

11      3.    The extent to which various Plaintiffs' claims are
12  barred by the appropriate statutes of limitations, claims filing
13  requirements and standing.

14      4.    Whether Defendants FCWD, AA&A Associates, Inc.,
15  Merced Irrigation District, Merced Irrigation District, Drainage
16  District No. 1, the County of Merced or the City of Merced have
17  violated and continue to violate the Clean Water Act by
18  violations of the terms of their NPDES Permits, if one has been
19  issued to the entity.

20      5.    Whether Defendants FCWD, AA&A Associates, Inc.,
21  Merced Irrigation District, Merced Irrigation District, Drainage
22  District No. 1, the County of Merced or the City of Merced have
23  violated and continue to violate the Clean Water Act by
24  discharging pollutants to waters of the United States without a
25  NPDES permit authorizing such discharges.

26      6.    Whether each of the violations by Defendant FCWD,
27  AA&A Associates, Inc., Merced Irrigation District, Merced
28  Irrigation District, Drainage District No. 1, the County of

1  Merced or the City of Merced in excess of their NPDES Permits

2  constitute separate actionable violations of the Clean Water Act.

3          7.    Whether Defendants Merced Irrigation District,

4  Merced Irrigation District, Drainage District No. 1, the County

5  of Merced or the City of Merced were required to apply for

6  coverage under the statewide general NPDES permit for discharge

7  of aquatic pesticides for aquatic weed and pest control in waters

8  of the United States ("Aquatic Pest Permit").

9          8.    Whether Defendant County of Merced was required to

10  apply for a NPDES Clean Water Act 402(p) permit as part of the

11  first tier applicants.

12          9.    Whether Plaintiffs' 60-day Notice letters

13  contained sufficient information to permit Defendants FCWD, AA&A

14  Associates, Inc., Merced Irrigation District, Merced Irrigation

15  District, Drainage District No. 1, the County of Merced or the

16  City of Merced to identify the standards violated, the activities

17  constituting the violations, the general dates and approximate

18  locations of the violations, as required under 40 C.F.R.

19  § 135.3(a).

20          10.   Whether Plaintiffs have standing.

21          11.   Whether Plaintiffs are entitled to requested

22  injunctive relief.

23          12.   Whether penalties apply and if so in what amount.

24          13.   Whether Plaintiffs are prevailing parties and

25  therefore entitled to attorney fees and costs.

26  VII.  Case Schedule.

27      1.    All parties agree that they shall have ten (10) days to

28  respond to the Amended Complaint.

45

1  VIII.   Consent to Magistrate Judge Jurisdiction.

2       1.   The parties have not consented to transfer the

3  case to the Magistrate Judge for all purposes, including trial.

4  IX.   Corporate Identification Statement.

5       1.   Any nongovernmental corporate party to any action in

6  this court shall file a statement identifying all its parent

7  corporations and listing any entity that owns 10% or more of the

8  party's equity securities.   A party shall file the statement with

9  its initial pleading filed in this court and shall supplement the

10 statement within a reasonable time of any change in the

11 information.

12 X.   Discovery Plan and Cut-Off Date.

13      1.   At the meeting of defense and Plaintiffs' counsel on

14 June 14, 2007, Plaintiffs proposed the parties stipulate to the

15 appointment of a special pretrial master under Federal Rules of

16 Civil Procedure, Rule 53, for purposes of coordinating the timing

17 and sequence of discovery as well as resolving any discovery

18 disputes.   Defendants did not feel the appointment of a special

19 master was warranted.   It was agreed that in this Pre-Trial

20 Conference Statement, Plaintiffs would set forth their position

21 as to why a special master would best serve the interests of the

22 court and the parties, and Defendants other than AA&A Associates,

23 Inc., would set forth their position as to why such appointment

24 was not warranted.

25      2.   The Defendants believe that the Court should assist the

26 parties in a general discovery schedule and dates by which party

27 depositions are taken.   It is also believed that the designation

28 of liability experts at a date which is relatively early may

1  facilitate settlement and may also allow the parties to assess

2  motions for summary judgment which could serve to reduce the

3  number of claims and parties that will go forward to trial.

4        A.    Plaintiffs' Position Regarding Need for Appointment of

5              Master Pursuant to Federal Rules of Civil Procedure,

6              Rule 53, for Purposes of Coordinating Discovery.

7        1.    Under Rule 53, this court has the authority to appoint

8  a special master to "address pre-trial and post-trial matters

9  that cannot be addressed effectively and in a timely manner by an

10  available district judge or magistrate judge of the district."

11  (Rule 53(a)(1)(C)).

12        2.    The parties have not agreed as to the necessity for and

13  when any special master should be appointed.  This will be

14  addressed in a future scheduling order.

15        3.    Plaintiffs contend a special master should be appointed

16  for the following reasons.

17        4.    The appointment of a special master in this action is

18  warranted by the following factors: (1) the sheer number of

19  Plaintiffs in this action which is currently 450 but will exceed

20  1,500 with the addition of the Baltimore Air Coil claims; (2) the

21  number of parcels of property affected by this litigation which

22  is currently around 200 but will exceed 500 with the addition of

23  the Baltimore Air Coil claims; (3) by the complex environmental

24  issues resulting from Defendants' violations of the Clean Water

25  Act as well as other actions which have led to chemical and

26  biological contamination of the soil and groundwater at or near

27  Plaintiffs' properties; (4) by the number of party Defendants and

28  the causation and liability interplay between these various

47

1   public and private entities in relation to Plaintiffs' damages;

2   and (5) the significant amount of expert involvement and analysis

3   necessary for the evaluation of liability, causation and damages.

4       5.   As a result of these factors, statutory provisions

5   relating to the sequence, timing and limitations associated with

6   discovery would not appear to result in the most efficient use of

7   judicial resources nor the resources of the parties.  The

8   appointment of a special master to carefully craft case and issue

9   specific pre-trial orders; resolve discovery disputes; monitor

10  the progress of this litigation through frequent status

11  conferences; assist the parties in relationship to the unique

12  issues related to complex environmental matters; and to

13  facilitate appropriate mediation or other case resolution

14  activity, would result in the most effective utilization of the

15  court's and parties' resources.  Given the number of parties to

16  this litigation, the percentage of the costs incurred by each

17  party through use of a special master, would not appear to be so

18  great as to present any hardship to the parties.

19      6.   While this Court and Magistrate Judge are more than

20  capable of performing each of the functions identified above, it

21  is believed that given the court's already congested calendar and

22  workload, that these matters could be done more effectively and

23  in a more timely fashion through the appointment of a special

24  master.

25      7.   Plaintiffs proposed Attorney William L. Nagle to act as

26  a special master in this case.  For over 13 years, Mr. Nagle has

27  served as a special master/mediator by court appointment in

28  numerous state and federal courts.  While Mr. Nagle's duties have

1    primarily focused on complex construction defect litigation, he

2    has worked as a special master in hundreds of environmental

3    contamination cases as well, including Superfund sites.  He also

4    has experience in subsidence and flood related cases involving

5    significant property damage.  Plaintiffs have been in contact

6    with Mr. Nagle in relationship to the possibility of serving as a

7    special master in this litigation, and Mr. Nagle has confirmed he

8    has no conflicts as defined under Rule 53(a)(2).  Mr. Nagle's

9    curriculum vitae outlining his qualifications, is attached to the

10   Joint Mandatory Scheduling Statement as Appendix A.

11        B.    Defendants' Position Regarding Coordinating Discovery

12        1.    The Defendants recognize that this will be a difficult

13   case to manage but the attorneys in this matter are all very

14   experienced and professional.  This Court has the ability and

15   tools to control this litigation and the Defendants request that

16   the parties and their attorneys be given the opportunity to

17   conduct discovery before the Court appoints a Special Master and

18   forces the parties to incur unnecessary expense.  Further, the

19   test for appointment of a pretrial master is whether a judge or

20   magistrate judge is unable to handle the pretrial matter in an

21   effective and timely fashion.  (See FRCP 53(a)(1)(C)).  To date,

22   there have been no disputes between counsel, nor is there any

23   indication that the Magistrate Judge cannot effectively

24   administer this case.

25        2.    While numerous Plaintiffs make the case large, size does

26   not necessarily create complexity such that a special master's

27   services are needed.  All size means is that whatever the issues

28   (either complex or simple), more people have them.  Defendants

1  will propose a standardized list of interrogatories to be served

2  on all Plaintiffs that will identify the basic claims being made

3  which will likely obviate the need to depose everyone.  This

4  approach has been adopted through Case Management Orders by State

5  and Federal Courts in recent Welding Rod cases which also contain

6  hundreds of Plaintiffs.  If through the course of this case

7  either side can demonstrate either individually or by mutual

8  agreement that a Special Master is necessary that would be the

9  appropriate time to make the reference.

10  3.  If it becomes necessary to appoint a Special Master,

11  the City of Merced and FCWD would ask the Court to consider the

12  appointment of a Master who is local and who may be less

13  expensive than Mr. Nagle.  Specifically, these Defendants would

14  propose Nicholas DiBiaso or Don Fischbach.

15  4.  Defendant AA&A Associates, Inc., has no opposition to

16  the appointment of a special master for the purposes outlined by

17  Plaintiffs, and has no opposition to the selection of William

18  Nagle as Special Master.

19  5.  In the event this court determines that a special master

20  is necessary and effective in this matter, which is disputed by

21  these Defendants, neither MID nor MIDD1 will stipulate to the use

22  of Mr. Nagle as a special master.  The firm representing these

23  two Defendants has a great deal of knowledge concerning Mr. Nagle

24  and his methodology in conducting special master procedures.

25  About one half of the litigation of that firm involves

26  construction defect litigation and it has worked with Mr. Nagle

27  on several occasions.  It is not unusual to see multiple special

28  master sessions ongoing simultaneously on one day with Mr. Nagle

1    as special master dividing his time between the multiple sessions

2    which we find unacceptable.  This practice also makes it

3    especially difficult to get Mr. Nagle on the phone should a

4    discovery dispute arise.  There are other issues that impact

5    costs and discovery procedures that we do not wish to detail

6    here, absent further order of the court.  If the court orders the

7    use of a special master, then MID and MIDD1 will have suggestions

8    as to who may be appropriate for this task.

9         6.   Initial Rule 26 disclosures shall be made by all

10   parties on or before August 13, 2007.

11        7.   For additional parties, the parties agree that their

12   Rule 26 Disclosures will be made on or before October 15, 2007.

13   Thereafter, commencing October 20, 2007, any party may propound

14   limited discovery directed at identification of parties and

15   claims.  The disclosures and discovery shall be reciprocal.

16   Disclosures shall be made quarterly for the first year from

17   October 15, 2007, through October 15, 2008, and semi-annually

18   thereafter.

19        8.   The parties agree that in this case, Rule 26 shall be

20   amended to provide that reciprocal Rule 26 disclosures shall be

21   made quarterly commencing January 15, 2008, and thereafter to

22   provide information concerning any supplemental or new

23   information pertaining to all claims and defenses.

24        9.   The next Scheduling Conference in this case shall be

25   held December 7, 2007, at 8:45 a.m. in Courtroom 3.

26        C.   <u>Non-Expert Discovery Cut-Off</u>

27        1.   At this juncture, the parties are not able to provide

28   any firm dates with regard to expert and non-expert discovery,

1   but will re-address these issues as the litigation progresses.

2        D.   <u>Disclosure of Expert Witnesses</u>

3        1.   At this juncture, the parties are not able to provide

4   any firm dates with regard to expert and non-expert discovery,

5   but will re-address these issues as the litigation progresses.

6        E.   <u>Cut-Off For Expert Witness Discovery</u>.

7        1.   At this juncture, the parties are not able to provide

8   any firm dates with regard to expert and non-expert discovery,

9   but will re-address these issues as the litigation progresses.

10       F.   <u>Proposed Discovery Limits</u>

11       1.   Given the complex nature of this litigation, the

12  parties anticipate that statutory provisions relating to the

13  sequence, timing, limitations and other procedural issues related

14  to discovery will have to be modified.  Specific issues will be

15  addressed by the parties as this litigation progresses.

16       G.   <u>Need for A Protective Order</u>

17       1.   At this juncture, the parties are unaware of any

18  specific need for a protective order relating to discovery,

19  although the parties agree that this issue can be re-addressed as

20  the need arises.

21       H.   <u>Proposals Relating to the Timing, Sequencing, Phasing</u>

22            <u>or Scheduling of Discovery</u>

23       1.   Given the complex nature of this litigation, the

24  parties anticipate that statutory provisions relating to the

25  sequence, timing, limitations, and other procedural issues

26  related to discovery will have to be modified.  Specific issues

27  will be addressed by the parties as this litigation progresses.

28  ///

**I.    Discovery Outside Of the United States**

1.    At this juncture, the parties are unaware of any specific need for any foreign depositions, although the parties agree that this issue can be re-addressed as the need arises.

**J.    Whether Parties Anticipate Video and/or Sound Recording of Depositions**

1.    All parties agree that video and/or sound recording of depositions may be required in this litigation.  The parties agree that proper notice to all parties as to the intended use of video and/or sound recording depositions will be provided to all counsel.

**K.    Proposed Date for a Mid-Discovery Status Report and Conference**

1.    The parties are in agreement that a further Case Management Conference in this matter is warranted.  The parties would request a second Case Management Conference be scheduled by the court (or in conjunction with the duties of a Special Master) within the next 180 days.

**L.    Discovery Issues Relating to Electronic, Digital and/or Magnetic Data**

1.    The parties have carefully reviewed the court's order setting Mandatory Scheduling Conference which outlines the parties' responsibilities as to the preservation of electronic, digital and/or magnetic data.  The specific timing, sequence and production procedures related to the electronic digital and/or magnetic data will be further addressed by the parties and/or a special master as this litigation progresses.

///

53

1  **M.** <u>Pre-Trial and Trial Dates</u>

2  **1.** Plaintiffs and Defendants have agreed that at this

3 juncture it is unrealistic to provide this court with a trial

4 date or any dates related to dispositive or non-dispositive

5 motions.  The parties will be ready to readdress this issue in

6 conjunction with the subsequent scheduling conference as

7 previously referenced in this statement.

8  **N.** <u>Settlement Possibilities</u>

9  **1.** None at this early stage of litigation.

10  **O.** <u>Jury/Non-Jury</u>

11  **1.** Plaintiffs' Complaint presents both jury and non-jury

12 issues.  Plaintiffs have demanded a jury in this action.  The

13 City of Merced and FCWD demand a jury trial in this matter.

14  **P.** <u>Estimated Time for Trial</u>

15  **1.** At this juncture, no reasonable estimate can be made as

16 to the length anticipated for trial in this action.

17  **Q.** <u>Bifurcation</u>

18  **1.** At this juncture, the parties have not identified any

19 specific issues in relationship to bifurcation, but agreed to

20 preserve this issue to be addressed in further scheduling

21 conference and/or pre-trial statements.

22  **R.** <u>Related Matters</u>

23  **1.** Plaintiffs have filed a Notice of Related Case

24 pertaining to *California Sports Fishing v. Diablo Grande, Inc.*,

25 1:00-cv-5979 OWW DLB.

26  **S.** <u>Common Document Repository</u>.

27  **1.** The parties have agreed that all documents pertaining

28 to this case shall be stored in a common depository with a

1  custodian mutually agreeable to all parties.  All parties shall

2  have reasonable access to and the ability to copy and otherwise

3  access electronic data stored in the repository in accordance

4  with the rules that they develop and will provide the Court by

5  stipulation to be incorporated into an order governing the

6  establishment and the maintenance of a document repository for

7  this case.

8

9  IT IS SO ORDERED.

10  **Dated:    July 24, 2007**                    **/s/ Oliver W. Wanger**
                                          UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28