**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ABARCA, RAUL VALENCIA, *et al.*,<br><br>                Plaintiffs,<br><br>    v.<br><br>FRANKLIN COUNTY WATER DISTRICT,<br><br>                Defendants. | 1:07-CV-0388 OWW DLB<br><br>MEMORANDUM DECISION AND ORDER RE COUNTY OF MERCED'S REQUEST TO STRIKE PLAINTIFFS' REQUEST FOR STIGMA DAMAGES (DOC. 258) |

## I.  INTRODUCTION

In this case, approximately 2200 Plaintiffs seek damages relating to two occurrences:  (1) an April 2006 flood; and (2) alleged contamination from the former site of a cooling tower manufacturing facility in Merced, California.  Defendants include municipalities, facility operators, water districts, and developers.  Before the court for decision is Defendant County of Merced's (the "County") request to strike Plaintiffs' request for stigma damages. Doc. 258.  The City of Merced, Doc. 269, Merced Irrigation District and Merced Drainage District, Docs. 277 & 300, and Franklin County Water District, Doc. 288 & 293, join the County's motion.

1

## II. STANDARD OF DECISION

Federal Rule of Civil Procedure 12(f) provides that "redundant, immaterial, impertinent, or scandalous matters" may be "stricken from any pleading." Fed. R. Civ. Pro. 12(f). The disposition of a motion to strike lies within the discretion of the district court; such motions are disfavored and infrequently granted. *Legal Aid Serv. of Or. v. Legal Serv. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008)*; see also Stabilisierundfonds Fur Wein v. Kaiser*, 647 F.2d 200, 201 (D.C. Cir. 1981).

## III. DISCUSSION

A. **Threshold Issues.**

1. **Rule 12(g)'s Limitation on Further Motions**.

Plaintiffs argue that the County and the joining Defendants should be estopped from raising the arguments set forth in this motion to strike, as this motion "could have and should have" been raised with regard to their prior motions filed in August of 2008. Doc. 309 at 3. Here, the City of Merced previously filed a Rule 12 motion to dismiss the fourth amended complaint. Doc. 135, filed Aug. 29, 2008. The County, Doc. 150, and Merced Irrigation District and Merced Drainage District No. 1, Doc. 142, joined the City's motion. Franklin County Water District filed its own, similar, Rule 12 motion. Doc. 147. These motions were granted, and Plaintiffs were permitted the opportunity to file an amended complaint. Doc. 209, filed Nov. 13, 2008. Plaintiffs filed a fifth amended complaint ("FAC") on December 30, 2008. Doc. 229.

As a general rule, "[a]n amended complaint is subject to all

of the same challenges as the original complaint in an action," Judge William W. Schwarzer, et al., *Cal. Prac. Guide: Fed. Civil Proc. Before Trial* at 8:1554 (2009)(citing *Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000)). However, Federal Rule of Civil Procedure 12(g)(2) provides that "[e]xcept as provided in Rule 12(h)(2) or (3), a party who makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from the earlier motion."[1] Rule 12(h)(2) specifically provides that defenses based upon "[f]ailure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." Rule 12(h)(3) provides that the court may dismiss an action "at any time" if it determines that it lacks subject matter jurisdiction. Neither Rule 12(h)(2) nor 12(h)(3) specifically exempt Rule 12(f) motions to strike from Rule 12(g)(2)'s consolidation requirement.

There is authority to support the proposition that a motion to strike may appropriately be asserted at any time during a lawsuit. Rule 12(f) permits a court to act on a motion to strike "(1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed,

---

[1] Relatedly, Rule 12(h)(1) provides that "[a] party waives any defense listed in Rule 12(b)(2)-(5) by: (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or (b) failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading or an amendment allowed by Rule 15(a)(1) as a matter of course."

3

within 20 days after being served with the pleading." *Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1399-1400 (7th Cir. 1991), affirmed a district court's consideration of an untimely motion to strike, because Rule 12(f) provides the court with the authority to consider the issue of its own accord <u>at any time</u>." However, *Williams* did not concern a motion to strike brought <u>after</u> another Rule 12 motion. Some authority suggests that Rule 12(g)'s bar against successive Rule 12 motions applies to Rule 12(f) motions to strike. *See* 2 James Wm. Moore, et al., Moore's Fed. Prac. ¶12.21 (rule 12(g)'s consolidation requirement applies to Rule 12(f) motions to strike); *see also FRA S.p.A. v. Surg-O-Flex of Am., Inc.*, 415 F. Supp. 421, 427-28 & n.5 (finding rule 12(f) motion to be "untimely" under Rule 12(g) in light of prior Rule 12 motion); *Cima v. Wellpoint Healthcare Networks, Inc.*, 2007 WL 1068252, *3 (S.D. Ill., Apr. 6, 2007)(declining to rule on this ground but noting some limited authority supports the position that Rule 12(g) applies to Rule 12(f) motions)

It is helpful to consider the purpose of Rule 12(g), which was "drafted by the Advisory Committee to prevent the dilatory motion practice fostered by common law procedure and many of the codes whereby numerous pretrial motions could be made, many of them in sequence-a course of conduct that often was pursued for the sole purpose of delay." 5c, Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. 3d § 1384.

> At the same time, Rule 12 is designed to protect parties from the unintended waiver of any legitimate defense or objection. Indeed, the only persons to whom Rule 12(g) presents a hazard are motion minded lawyers who, from force of habit or lack of good faith, cannot close their pleadings or come to issue without attempting to make numerous motions.

> Simply stated, the objective of the rule is to
> eliminate unnecessary delay at the pleading stage.
> Subdivision (g) contemplates the presentation of an
> omnibus pre-answer motion in which defendant advances
> every available Rule 12 defense and objection he may
> have that is assertable by motion. He cannot delay the
> filing of a responsive pleading by interposing these
> defenses and objections in piecemeal fashion but must
> present them simultaneously. Any defense that is
> available at the time of the original motion but is not
> included, may not be the basis of a second pre-answer
> motion.

*Id*.

Although finding Defendants' motion to strike to be untimely under Rule 12(g) would serve that rule's purpose of eliminating unnecessary delay at the pleading stage, Rule 12(f) also permits the court to, *sua sponte*, consider whether to strike material from a pleading, even if prompted to do so by an untimely motion, *Williams*, 944 F.2d at 1400. Accordingly, because the Rules do not clearly bar consideration of this motion, it will be considered.

### 2. Plaintiffs' "Expedited Briefing Schedule" Argument.

Plaintiffs' argue that Defendants should not "benefit from an expedited briefing schedule where they never informed the parties or the court [of] their intention to bring motions unrelated to any new matter in the [FAC]." Doc. 309 at 4. Specifically, Plaintiffs point to a colloquy during the January 7, 2009 scheduling conference, in which the parties agreed to an briefing schedule related to the filing of motions as to the new claims in the fifth amended complaint:

> THE COURT: Well, I am very happy to consider it, but I
> think at this point, based on what we've just gone
> through, do you think – let's assume that its going to

5

|  | take at least – if we took it just from December 30, the parties normally, if a complaint has been amended as of right, you would have ten days under the federal rules. However, as to those new claims, those would not necessarily be of right, so we would be getting within the ten days motions to strike or to dismiss those claims as unauthorized under the court's prior orders and the Federal Rules of Civil Procedure and the case management order that's in place. |
|---|---|

MR. MARDEROSIAN: But that's, of course, on the assumption that there are those motions. There may not be those motions.

THE COURT: The defendants have said in their papers that there are going to be those motions.

MR. MARDEROSIAN: That's still –

THE COURT: Based on the ones who are acutely most interested and affected. And so what I'm saying is that my proposal and suggestion is going to be that we establish a reasonable time for taking those claims on the merits excepting not the efficacy of the claims, but because the amendment has been made. We're not going to fight about the fact the amendment has been made, but I'm going to give the defendants reasonable time to respond to the merits of those claims, to challenge them. And that's going to take at least, I'm assuming, another 30 days, at which time then all plaintiffs and all claims are identified. We have the universe.

Tr. 36-38.

During that scheduling conference, Mr. Lewis, attorney for the BAC defendants, was the only defense attorney who indicated intent to file a motion to dismiss. Plaintiffs assert that, based on the above-quoted colloquy, they reasonably understood that the motions to dismiss would be related only to the new claims being added to the fifth amended complaint or the new Resource Conservation and Recovery Act ("RCRA") and Clean Water Act ("CWA") notices. Based on that assumption, Plaintiffs agreed to "shorten time" to file their opposition to such motions. *See id.* at 66-67. But it is not clear what Plaintiffs' mean by

6

"shorten time." February 9, 2009 was set as the deadline for Defendants' to file responses, including motions to dismiss, to the FAC. *Id*. at 67. Plaintiffs were given until February 24, 2009 to file oppositions, with the hearing set for March 9, 2009. *Id*. This arrangement, which permitted Plaintiffs to file oppositions 13 days prior to the initial hearing date, is more <u>liberal</u> than the <u>normal</u> briefing schedule, which requires oppositions to be filed 14 days before the hearing on this motion. *See* Local Rule 7-230. The Scheduling Conference Order did not limit the motions Defendants could bring in response to the FAC and did not in any way suggest that the normal briefing schedule would be modified.

B. <u>Availability of Stigma Damages.</u>

The Fifth Amended Complaint ("FAC") seeks special damages for "stigma." FAC 76:8. The County argues that this form of damage is not independently available under California law, but is only recoverable as a component of diminution of value when a plaintiff brings a claim for permanent trespass or nuisance. The County asserts that Plaintiffs have not alleged claims of permanent trespass or nuisance and, accordingly, may not seek damages for perceived stigma. Doc. 258-2 at 2.

The parties, despite some contrarian commentary, are largely in agreement as to the state of California law on this subject. The seminal California case on the availability of stigma damages is *Santa Fe Partnership v. ARCO Products Co.*, 46 Cal. App. 4th 967 (1996), which concerned an action by property owners against adjacent landowners for damages caused by chemical contamination

of plaintiff's property.  Plaintiffs sought post-remediation "stigma" damages.  The court <u>acknowledged</u> that California law <u>provides</u> that such damages may be recoverable as diminution of value damages and/or damages for future harm where the nuisance or trespass is deemed to be <u>permanent</u>.  *Id*. at 968.  However, to the extent that plaintiffs' claims were for permanent trespass and/or nuisance, any such claims were barred by the statute of limitations.  *See id*. at 972.  Under existing California law, the *Santa Fe* court concluded that damages for diminution of value were not available in a continuing nuisance or trespass case.  *Id*. at 973-78.  The court also rejected plaintiffs' request "for a good faith extension of the law" to continuing nuisances.  *Id*. at 978.  *See also Bartleson v. United States*, 96 F.3d 1270, 1275 (9th Cir. 1996) (citing Santa Fe for the proposition that "[d]amages for diminution in property value due to stigma have been recognized by the California courts in cases of permanent nuisance," but not continuing nuisance).

Plaintiffs do not seek to have the law permitting stigma damages extended to continuing nuisance claims.  Instead, they assert that the FAC alleges a "general nuisance claim" that is not designated as either "permanent" or continuous.

"Where a nuisance is of such character that it will presumably continue indefinitely[,] it is considered <u>permanent</u>, and the limitations period runs from the time the nuisance is created." *Phillips v. City of Pasadena,* 27 Cal. 2d 104 (1945). "On the other hand, if the nuisance may be discontinued at any time[,] it is considered <u>continuing</u> in character." *Id*.  In such cases "every repetition of a continuing nuisance is a separate

8

wrong for which the person injured may bring successive actions for damages until the nuisance is abated, even though an action based on the original wrong may be barred." *Id.; see also Baker v. Burbank- Glendale- Pasadena Airport Auth.*, 39 Cal. 3d 862 (1985). "In case of doubt as to the permanency of the injury the plaintiff may elect whether to treat a particular nuisance as permanent or continuing." *Baker*, 39 Cal. 3d at 870.

"The cases finding the nuisance complained of to be unquestionably permanent in nature have involved solid structures, such as a building encroaching upon the plaintiff's land." *Mangini v. Aerojet-General Corp.,* 230 Cal. App. 3d 1125, 1145-46 (1991). In contrast, "[t]he classic example of a continuing nuisance is an ongoing ... disturbance, ... caused by noise, vibration or foul odor." *Vowinckel v. N. Clark & Sons*, 216 Cal. 156, 158 (1932). The key question is whether the nuisance may be discontinued or abated. *Mangini,* 230 Cal. App. 3d at 1146.

Where the statute of limitations might bar a permanent nuisance action, but not a continuing nuisance claim, a court may demand that a Plaintiff amend his complaint to clearly allege facts showing a continuing nuisance. *Mangini*, 230 Cal. App. 3d at 1148. As Defendants point out, in a case where any permanent nuisance claim might have been time-barred, a complaint alleging release of hazardous chemicals into soil and groundwater may be construed as a continuing nuisance claim, because that "is the type of nuisance that can be discontinued or abated." *Enns Pontiac, Buick, & GMC v. Flores*, 2008 WL 4539474 (cited by Defendants, Doc. 335 at 5). *Enns* did not consider whether those

9

same facts might, alternatively, state a claim for permanent nuisance. Where a plaintiff does not make an election in the complaint, the issue of whether the nuisance may be discontinued or abated is often a matter of factual dispute. *See Mangini v. Aerojet*, 230 Cal. App. 3d 1125, 1148 (1991); *Shamisian v. Atlantic Richfield Co.*, 107 Cal. App. 4th 967, 980-81 (2003). There is no requirement that Plaintiffs specifically elect between continuing and permanent nuisance theories at the pleading stage. *See, e.g., Shamisian*, 107 Cal. App. 4th at 980 (denying defendant's motion for summary judgment, concluding that there was a triable issue of fact as to whether the alleged nuisance is a continuing one).

Here, the nuisance claim in the FAC alleges, in pertinent part:

> 238. The public entity defendants and DOES 1 - 50, and each of them, through their employees, agents and contractors, whose identities are presently unknown, since 1970 and continuing thereafter, owned, operated, constructed, managed, maintained, supervised and controlled the sewage and storm drain system and sewage treatment plants identified above, such that the discharge of pollutants into surface and subsurface waters, the close proximity of sewage treatment plants to the irrigation system, the inability to completely segregate the storm drain and sewage systems and the permeability of the dirt embankments along the irrigation system contaminated the ground water and soil in the vicinity of the plaintiffs. Plaintiffs were unaware of this ongoing contamination until October of 2006.
>
> 239. Further, the public entity defendants and DOES 1 - 50, and each of them, through their employees, agents and contractors, whose identities are presently unknown, owned, operated, constructed, managed, maintained, supervised, and controlled the roadways, levees, irrigation channels, water levels of adjoining channels, laterals, creeks of the irrigation system, raised berms, and/or raised flood barriers as previously identified and described, so as to cause

10

water to escape from the irrigation canals, flood plaintiffs' property and pond on it.

240. The aforementioned ownership, operation, construction, management, maintenance, supervision, and control of the storm and sewage treatment systems, sewage treatment plants, roadways, levees, irrigation channel, water levels of adjoining channels, laterals and creeks of the irrigation system, contaminated the ground water in the vicinity of plaintiffs, flooded plaintiffs' property, and allowed water to pond on it, constituting a nuisance under California Civil Code § 3479 in that it deprived plaintiffs of the quiet enjoyment of their property.

241. Defendants RANCHWOOD HOMES, RANCHWOOD PROPERTIES, RANCHWOOD CONTRACTORS, HOSTETLER INVESTMENTS, EL CAPITAN ESTATES, HOLLYWOOD PARK ESTATES, EL CAPITAN MEADOWS and RANCHWOOD RESIDENTIAL purchased property and developed, promoted and sold trac[t] homes to the north of the BEACHWOOD PLAINTIFFS known as the EL CAPITAN ESTATES and the HOLLYWOOD PARK ESTATES subdivision. In conjunction with the purchase, design, construction and development of these subdivisions, RANCHWOOD HOMES, RANCHWOOD PROPERTIES, RANCHWOOD CONTRACTORS, HOSTETLER INVESTMENTS, EL CAPITAN ESTATES, HOLLYWOOD PARK ESTATES, EL CAPITAN MEADOWS and RANCHWOOD RESIDENTIAL designed and constructed elevated pads upon which the homes in the subdivisions sat. The raised elevation of the building pads constituted a berm or barrier that in the course of the flood of April 4, 2006, obstructed and blocked the flood water so as to cause it to backup and pond on the property of the BEACHWOOD PLAINTIFFS located south and at a lower elevation then the elevated pads of the subdivisions identified above.

242. Further, the design and construction of the elevated pads within the subdivisions identified above, contained no means by which to allow flood waters flowing from the south through the BEACHWOOD PLAINTIFFS' properties to be diverted away from plaintiffs properties or otherwise disbursed into the natural flow of the water, but instead caused the flood waters to backup against the elevated pads and flow back into the BEACHWOOD PLAINTIFFS' properties. The construction of the elevated building pads by RANCHWOOD HOMES, RANCHWOOD PROPERTIES, RANCHWOOD CONTRACTORS, HOSTETLER INVESTMENTS, EL CAPITAN ESTATES, HOLLYWOOD PARK ESTATES, EL CAPITAN MEADOWS and RANCHWOOD RESIDENTIAL which obstructed and blocked the flood water of April 4, 2006, constitutes a nuisance under California Civil Code § 3479, in that it deprived the BEACHWOOD PLAINTIFFS of the quiet enjoyment of their property by increasing flood damages sustained as a

result of the April 4, 2006 flood.

243. As further alleged in PLAINTIFFS' claims for relief under the CWA and RCRA alleged above, defendants FCWD, MID, County of Merced, City of Merced, and DOES 1 - 50, and each of them, have owned and operated wells and other public facilities which have caused pollutants to be discharged to surface and ground waters via defendants' conduits such as sewer lines, utilities and the like, facilitating pollutant migration and discharge to waters of the United States and contributing to the past or present handling, storage, treatment, transportation or disposal of hazardous waste which may present an imminent and substantial endangerment to health or the environment of the PLAINTIFFS.

244. Defendants MERCK, AMSTED, BAC, TRACK FOUR, INC., , MEADOWBROOK and DOES 51 - 100, and each of them, through their employees, agents and contractors, whose identities are presently unknown, failed to exercise due care with regard to their ownership of the site (as previously described in plaintiffs' claim for relief under the Clean Water Act and the Resource Conservation and Recovery Act, negligence, and trespass incorporated within this claim for relief) and/or activities conducted on the site by these companies which among other things, violate the provisions of CWA and RCRA and have contributed to the discharge of pollutants into waters of the United States and to the past or present handling, storage, treatment, transportation, or disposal of hazardous waste which has or may present an imminent or substantial endangerment to plaintiffs' health and the environment surrounding plaintiffs' real property.

245. In or about 1984, defendants MERCK and BAC, by and through their managing agents, directors and officers, were informed that activities carried on at the BAC facility had resulted in the contamination of soil and groundwater. The constituents of concern identified at that time included Arsenic, hexavalent chromium and Copper. These constituents were used by defendants in their wood processing activities performed at the facility. This contamination, and its extent were further investigated on behalf of MERCK, BAC, and AMSTED in 1987 by J.H. Kleinfelder & Associates, hired by defendants, and in 1988 by Dames & Moore on behalf of AMSTED. Notwithstanding defendants' knowledge of the contamination and potential for exposure to the contaminants, defendants MERCK, BAC and AMSTED continued to utilize hexavalent chromium and Copper in its wood processing activities up to including 1991. The continued use of these chemicals in the same manner even after it was discovered that

12

the chemicals were in fact contaminating soil and groundwater, and that there was a potential for airborne contaminants to reach residents in the vicinity of the BAC facility, resulted in further contamination and further exposure of plaintiffs to the adverse health risks associated with these chemicals.

246. In addition, the 1987 Kleinfelder Report specifically advised MERCK and BAC that sediment located in a 1.5 acre storm water retention pond located on the facility had Arsenic, hexavalent chromium and copper above background levels. It was confirmed that the source of the contamination was the wood treatment chemicals used at the facility.

247. Further in 1988, defendants MERCK, BAC and AMSTED were informed through the California Regional Water Quality Control Board the 1.5 acre storm water pond at the BAC facility was found to contain water with high concentrations of Arsenic, Chromium (both total and hexavalent), and Copper in amounts greater than drinking water standards. Further, the levels found exceeded the maximum Regional Board effluent permit levels for storm water runoff at industrial sites. These defendants were further informed that this same pond connected by way of a pipe to the adjacent El Capitan drainage canal, where it was estimated that the pond spilled approximately .155 million gallons per day of water to the drainage canal during the rainy season (December/March). These defendants were further informed that drainage from the pond to the canal was increased as a result of drainage through the BAC facility directed by the COUNTY OF MERCED. The Regional Board concluded that the flushing action of the pond may have resulted in the canal as being the "main pollutant pathway" in the area. Notwithstanding this information, defendants MERCK, AMSTED and BAC continued to utilize the pond in its wood processing activities and to permit the discharge of contaminated water into the El Capitan Canal until the pond was "clean-closed" in or about 1991.

248. In addition, as early as 1991, contaminated soil from the BAC facility, 10,000 tons from the pond alone, was excavated at the direction of MERCK, AMSTED and BAC. Further, by 1996, some 2,300 pounds of chromium, 1,300 pounds of Arsenic and 3,500 pounds of Copper were excavated with the soil. Workers involved in the soil excavation were required to wear protective masks and clothing. As such, defendants knew of the health and safety risks associated with inhalation or dermal contact with these contaminants. Further, defendants implemented a "dust control" program during excavation due to the health risks associated with airborne particles. Notwithstanding this knowledge,

13

defendants and each of them never notified, warned or otherwise informed any residents, including plaintiffs herein, to take any precautions that may be needed with regard to the health risks associated with the soil excavation.

249. Further, in as early as 1994, MERCK, BAC and AMSTED were made aware through information provided by IT Corporation, a company retained by these defendants to assess the contamination of the BAC facility and health risks associated with the contamination, that among other things that residents could be exposed to contaminants as a result of having a home garden contaminated by deposition of soil particulates onto the plant surfaces and by root translocation of chemicals within the soil and through airborne particulates. These defendants were further informed as to the carcinogenic risks associated with these chemicals and in particular that Arsenic and hexavalent chromium are Class A carcinogens - that is chemicals for which there is sufficient evidence of carcinogenicity in humans. These defendants were further informed of other non-carcinogenic affects of hexavalent chromium exposure including but not limited to allergic contact dermitis reaction.

250. Defendants MERCK, BAC and AMSTED were informed in the Risk Assessment Report that risks from airborne particulates and contact dermatitis would be minimal in light of the fact that the vast majority of the BAC facility was now covered by concrete, asphalt and/or a thin asphalt sealer thereby acting as barriers for direct contact with the surface soils and as barriers to wind erosion, water erosion and rain infiltration. Defendants MERCK, BAC and AMSTED were also informed that exposure as a result of subsurface soils or groundwater was not a source of exposure "because the groundwater control system is controlling the hydraulic movement of the contaminated water and will not allow this water to migrate beyond the property boundaries."

251. However, at the time of this report, defendants MERCK, BAC and AMSTED knew that significant portions of bare soil had existed at the BAC facility prior to the installation of the concrete, asphalt or thin asphalt sealer at the facility. Indeed, large sections of the facility where the treated lumber "air-dried" and excess chemicals dripped into the ground, were uncovered for years, thus making this surface soil vulnerable to direct contact, wind erosion, water erosion and rainwater infiltration, thereby contributing to the migration of these chemical constituents beyond the facility's boundaries.

252. Further, at the time of this report

14

defendants MERCK, BAC and AMSTED knew that the groundwater control system utilized at the facility was in fact not maintaining hydraulic control of the contaminated water plume, and in fact that it had migrated beyond property boundaries, both to the north and the south. Indeed, these defendants were specifically informed that the very process being used to "remediate" the contamination, was contributing to the spread of the contaminated groundwater plume beyond the site's boundaries. This information was specifically communicated to defendants and their managing agents, directors and officers by the California Regional Water Control Board.

253. Notwithstanding defendants knowledge as set forth above, defendants and each of them named above continued to engage in conduct which caused and contributed to the migration of contaminants beyond the facility's boundaries; never informed any of the residents in the area including plaintiffs herein, of any potential health risks associated with the contamination emanating from the facility; never requested any risk assessment or other investigation or analysis as to the health risks associated with exposure to residents from past activities at the BAC facility; never advised any residents in the area including plaintiffs herein that their own home gardens could be contaminated or a source of contamination; never advised residents that the El Capitan Canal may have been a major pollutant pathway for the contaminants; nor made any effort to assess the actual health affects on residents and plaintiffs herein with regard to their exposure to the contaminants emanating from their facility operations.

***

256. As a legal result of the nuisances identified above, plaintiffs real and personal property sustained and will continue to sustain damages, including, but not limited to damage to structures, foundations, walls and personal contents, decreased market value, stigma damage and loss of habitability of their residences, all in an amount according to proof. Plaintiffs have further incurred and will continue to incur costs of repair for this damage, in an amount not yet ascertained.

257. As a legal cause of the nuisances hereinabove alleged, plaintiffs' real property was flooded and has and will continue to be contaminated with pollutants, such that plaintiffs have been prevented from use and enjoyment of their properties all to their damage, in an amount according to proof.

> 258. As a further legal result of nuisances as alleged above, plaintiffs have suffered and will continue to suffer economic losses, including, but not limited to wage loss, loss of past and future income, loss of rental income, relocation expenses, clean-up costs and business losses, all in an amount according to proof.
>
> 259. As a further legal cause of the nuisances identified above, plaintiffs have suffered and will continue to suffer personal injuries. As such, plaintiffs have incurred and will to continue to incur medical and related expenses and medical monitoring expenses, all in an amount according to proof.
>
> 260. As a further legal result of the nuisance identified above, plaintiffs have suffered and will continue to suffer emotional distress, anxiety, fear of illness, depression and other psychological and emotional injuries resulting from the contamination and flooding as alleged above.

Plaintiffs maintain that the question of whether the alleged nuisance is "permanent or continuing depends upon the opinions of expert consultants as to whether, given the scope of the contamination, it can ever be completely remediated or whether there will always be residual contamination which permanently interferes with plaintiff's health and use and enjoyment of their property." Doc. 309 at 8. No allegation in the complaint forecloses Plaintiffs from later electing to have their claim treated as a permanent, rather than a continuing nuisance. As stigma damages may be awarded as part of diminution of value in a continuing nuisance claim, it is not appropriate to strike Plaintiffs' request for stigma damages at this time. These motions are more effectively addressed on summary judgment.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to strike the FAC's prayer for stigma damages is DENIED.

SO ORDERED

Dated: May 18, 2009

                                                  /s/ Oliver W. Wanger
                                                  Oliver W. Wanger
                                              United States District Judge