UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ABARCA, RAUL VALENCIA, et al., | ) | 1:07-cv-0388 OWW DLB |
| | ) | |
| Plaintiffs, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW RE: |
| v. | ) | MOTION TO EXCLUDE TESTIMONY |
| | ) | OF CAMILLE SEARS AND NEED |
| MERCK & CO., INC., et al., | ) | FOR FED.R.EVID. 706 EXPERTS |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

Following the hearing on Defendants Merck & Co., Inc.'s, Amsted Industries, Inc.'s, Baltimore Aircoil Company, Inc.'s, and TrackFour, Inc.'s (collectively, the "BAC Defendants") *Daubert* motions, the following Findings of Fact and Conclusions of Law are entered.

## I.  FINDINGS OF FACT

1.   On June 1, 2010, the BAC Defendants moved pursuant to Federal Rules of Evidence 702 and 703 to exclude the testimony of Plaintiffs' expert witness Camille Sears.  The parties submitted voluminous declarations and exhibits, and the Court held approximately four days of hearings on Defendants' motion and related motions to exclude evidence and for partial summary

1

1   judgment.

2       2.   Ms. Sears is an atmospheric scientist and
3   meteorologist.  Ms. Sears acknowledges that she does not consider
4   herself an expert in the fields of chemistry, hydrogeology,
5   geochemistry, wood treating/wood science, or soil science.   (See
6   10/13/10 Hearing Transcript (rough) at 85:15-23; 86:10-12, 16-24;
7   87:3-18; 88:1-89:4).

8       3.   The relevant science and field of expertise is air
9   emissions and air modeling. Chemistry and geochemistry also
10  apply.

11      4.   Ms. Sears prepared a mathematical model that Plaintiffs
12  have offered as evidence that hexavalent chromium and arsenic
13  were transported in air from the former Baltimore Aircoil Company
14  facility located in Merced County, California ("the BAC Site") to
15  Plaintiffs' residences.  Ms. Sears modeled the period from 1969
16  through 1993 to support her opinion that residents of the BAC
17  Site were exposed to elevated air concentrations of hexavalent
18  chromium and arsenic during that period.

19      5.   Plaintiffs have not adduced a date or a model
20  suggesting that any area of Plaintiffs' residences was exposed by
21  air transmission of those contaminants during the period 1994 to
22  the present.

23      6.   Ms. Sears' model purports to estimate air emissions of
24  hexavalent chromium and arsenic from dust stirred up by forklifts
25  driving on the treated wood storage area on the Site during the
26  period 1969-1991.  Wood treatment was conducted in a cylindrical
27  pressure vessel ("retort") at the BAC Site.  From 1969 to 1980, a
28  chromium- and arsenic-containing solution known as chromated

2

1   copper arsenate or "CCA" was applied to the wood under pressure
2   in the retort.   From 1980 to 1991, an acid copper chromate or
3   "ACC" solution was used that did not contain arsenic.   After the
4   wood was removed from the retort, it was left to dry on a drip
5   pad and then was transferred to the treated wood storage area.
6   The retort and adjacent drip pad area were paved with asphalt and
7   concrete; the treated wood storage area was approximately 95
8   percent paved and 5 percent unimproved natural ground surface.

9         7.    Ms. Sears assumed that wood-treating solution dripped
10   onto the treated wood storage area, dried to form "silt," and was
11   later disturbed by forklifts that drove on the site.

12         8.    Ms. Sears used an emission algorithm published by the
13   U.S. Environmental Protection Agency ("EPA") known as AP-42,
14   Section 13.2.1, to model how much dust would be emitted into the
15   air by forklifts operating at the BAC Site.   The inputs to the
16   AP-42 algorithm include (i) a particulate emission factor; (ii) a
17   particle size multiplier for the particle size range and units of
18   interest; (iii) a road surface silt loading factor in grams per
19   square meter; (iv) the average weight in tons of the vehicles
20   traveling the road; and (v) an emission factor for 1980s vehicle
21   fleet exhaust, brake wear and tire wear.

22         9.    The AP-42 algorithm was based on tests of "freely
23   flowing traffic" with vehicle speeds between 10 and 60 miles per
24   hour on paved highways.

25         10.   Ms. Sears' application of AP-42 to the BAC Site has
26   been challenged because, as she testified, vehicles traveling at
27   constant speeds in excess of 10 miles per hour were not present
28   in the retort or wood storage areas of the former BAC Site;

                                3

1  rather, the Site was traversed by forklifts traveling at less

2  than 10 miles per hour that stopped and started frequently.

3      11.   Ms. Sears has not cited any authority that applies AP-

4  42, Section 13.2.1, to model stop-and-go operations of forklifts

5  traveling at average speeds of less than 10 miles per hour.

6      12.   Based on the evidence presented on this motion, it

7  remains to be determined whether AP-42, Section 13.2.1 to model

8  historical operations at the BAC Site, without adjustment for

9  vehicle speeds, the type of traffic, and surface conditions at

10 the Site, is consistent with generally acceptable scientific

11 standards and principles and recognized by other experts in the

12 field of air emissions and modeling.

13     13.   Ms. Sears also made several assumptions as part of her

14 model:

15          (1) Ms. Sears assumed that all of the hexavalent

16 chromium and arsenic that dripped onto the surface of the treated

17 wood storage area was present in the form of particles smaller

18 than 10 microns in diameter.  However, the BAC Defendants'

19 expert, Dr. Scott Fendorf, a geochemist and the chair of the

20 Environmental Earth Sciences Department at Stanford University,

21 submitted a declaration that chromium and arsenic would not

22 adhere appreciably to any native silt particles of that size, and

23 that the size of chromium- and arsenic-containing particles at

24 the BAC Site that might form by evaporation of CCA or ACC

25 solutions would be significantly larger, in the range of 100

26 microns.  In response to Dr. Fendorf's declaration, Plaintiffs

27 submitted the declaration of Dr. Patrick Sullivan, also a

28 geochemist.  The BAC Defendants objected to Dr. Sullivan's

**4**

declaration because the opinions expressed in it were not
disclosed in Dr. Sullivan's expert report or deposition.
However, for the purposes of these Findings of Fact, Dr. Sullivan
does not support Ms. Sears' assumption that evaporation of the
wood-treating solution would result in the formation of particles
that are less than 10 microns in diameter.  Rather, he opines
that evaporation of the solution "*could result* in a particle
distribution *closer to the size distribution* used by Camille
Sears."  Sullivan Decl. (Doc. 783) ¶ 20 (emphasis added).  This
testimony raises questions about Ms. Sears' assumption that all
of the Site particles were less than 10 microns in diameter.  Ms.
Sears is not a soil scientist and admitted that she did not know
the particle size distribution at the BAC Site.

        (2)  Ms. Sears assumed that 100 percent of the chromium
in surface silts on the treated wood storage area was present in
the form of hexavalent chromium.  Dr. Fendorf stated that
chromium that came into contact with wood during the treatment
process would be primarily in the trivalent form.  Plaintiffs
submitted the declaration of Dr. Frank Agardy in response to Dr.
Fendorf.  Dr. Agardy does not provide his own analysis of the
proportion of hexavalent chromium that would be present in any
drippage but opines that "the *majority* of the solution drippage
is [hexavalent chromium]."  Agardy Decl. ¶ 3 at 3:5 (emphasis
added).

        14.  The BAC Defendants objected to Dr. Agardy's declaration
on the same grounds as Dr. Sullivan's and on the additional
ground that Dr. Agardy is not a chemist or geochemist.  The
validity of Sears' assumption that 100 percent of chromium at the

1  Site was present as hexavalent chromium must be validated.

2      15.  Ms. Sears' model is based on the assumption that one
3  year's worth of drippage of CCA (during the period 1969 to 1980)
4  and ACC (during the period 1980 to 1991) accumulated on the
5  surface of the treated wood storage area at the BAC Site.  Ms.
6  Sears assumed that from 1969 to 1970 a year's worth of CCA
7  solution drippage accumulated on the treated wood storage area
8  and that this same amount of CCA drippage was continuously
9  present in a "steady state" at all times from 1970 until 1980,
10 when the change to ACC solution took place.  She further assumed
11 that from 1980 to 1991 the same one year's worth of drippage of
12 ACC solution was present.

13     16.  Undisputed record evidence is that hexavalent chromium
14 "is highly soluble and would be flushed from the surface by any
15 significant rainfall."  Fendorf Decl. ¶ 5; *see also* Fendorf Decl.
16 Exh. A, Fendorf Report (Doc. 722-3) at 16.  Ms. Sears does not
17 explain how a year's worth of drippage could accumulate on the
18 surface of the treated wood storage area given ordinary rainfall.
19 Ms. Sears' assumptions must be validated as to concentrations of
20 chromium and arsenic in the surface silt at the BAC Site.

21     17.  Plaintiff have defended Ms. Sears' model by arguing
22 that Ms. Sears was forced to make assumptions by the absence of
23 data.  Ms. Sears testified that she could have tested her
24 assumptions by experiment, but did not do so.  (See 10/13/10
25 Hearing Transcript (rought) at 117:22-118:21.)  Ms. Sears did not
26 offer any studies or other evidence from other, similar wood-
27 treating sites in an attempt to verify or validate her
28 predictions.  Ms. Sears testified that she did not test the

output of her model by measuring soil concentrations because the

amounts of hexavalent chromium and arsenic that she predicted

would be deposited on Plaintiffs' properties would likely be so

low as to be undetectable, but Ms. Sears did not perform any

calculation to determine what the probable soil concentrations

would be.  Neither Plaintiffs nor Ms. Sears sampled surface soil

at any of Plaintiffs' properties, and there appears to be no data

showing that there were elevated concentrations of hexavalent

chromium or arsenic in the vicinity of Plaintiffs' residences,

where exposure is alleged to have occurred.  The validity of this

approach must be confirmed.


## II.   CONCLUSIONS OF LAW

A.   Legal Standards.

1.   Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand
the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience,
training, or education, may testify thereto in the form
of an opinion or otherwise, if (1) the testimony is
based upon sufficient facts or data, (2) the testimony
is the product of reliable principles and methods, and
(3) the witness has applied the principles and methods
reliably to the facts of the case.

Fed. R. Evid. 702.

2.   Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993), the trial court must "act as a 'gatekeeper' to

exclude 'junk science' that does not meet Rule 702's reliability

standards."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)

(quoting *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d

1053, 1063 (9th Cir. 2002)).  The trial court may consider all

factors bearing on an expert opinion's reliability, including but not limited (i) whether a scientific theory or technique can be (and has been) tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (iv) whether the technique is "generally accepted" in the relevant discipline. *Daubert*, 509 U.S. at 593-94; *see also Elsayed Mukhtar*, 299 F.3d at 1063 (noting the trial court's "broad latitude" in assessing reliability).

3.    Although Federal Rule of Evidence 703 allows an expert to base his or her testimony on the expert's experience in his or her *own* field, Rule 703 does not allow an expert qualified in one field to offer opinions outside his or her area of expertise. *See, e.g., Sigler v. American Honda Motor Co.*, 532 F.3d 469, 479-80 (6th Cir. 2008) (affirming the district court's decision to exclude testimony of an experienced auto mechanic on the ground that he was not qualified to testify as to "accident reconstruction" or "airbag engineering," despite the fact that the expert was "clearly an expert mechanic"); *Valley View Angus Ranch, Inc. v.  Duke Energy Field Servs., L.P.*, 2008 WL 7489089, at *1 (W.D. Okla. July 22, 2008) (excluding testimony of a qualified hydrogeologist and subsurface remediation expert on the ground that he lacked the expertise to testify on issues related to bioremediation and biodegradation).

4.    Further, "an expert's opinion may not be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors."  *Richter v. Hickman*, 578

**8**

F.3d 944, 987 (9th Cir. 2009) (citation and original alteration omitted); *see also United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004) ("Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable."); *Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) (excluding expert testimony that "was not sufficiently founded on the facts" of the case).  "It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." *Skydive Ariz., Inc. v. Quattrocchi*, 2009 WL 2515616, at *5 (D. Ariz. Aug. 13, 2009) (quoting *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3rd Cir. 2002)); *see also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("[N]othing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong."); *cf. Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (noting that expert testimony "is inadmissible when the facts upon which the expert bases his testimony contradict the evidence").

5.    The proponent of the expert's testimony bears the burden of proving admissibility.  *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  To meet this burden, the party presenting the expert must provide "some objective, independent validation of the expert's methodology" showing that the expert's findings are based on "sound science."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*").  The proponent's failure to meet this burden warrants exclusion of the proffered expert testimony.

*Id.; see also Cooper*, 510 F.3d at 942.

B.   Application of the *Daubert* Factors.

6.   Whether a scientific theory or technique can be (and has been tested:  There is no data regarding the concentrations or particle size distribution of hexavalent chromium or arsenic at the BAC Site.  The validity of Ms. Sears' assumption that 100 percent of the chromium in silts on the surface of the treated wood storage area at the BAC Site was present as hexavalent chromium must be confirmed including, *inter alia*, the particle size distribution used, the model's assumptions regarding the valence state of chromium, and Ms. Sears' predicted concentratons of hexavalent chromium or arsenic in surface silts.

7.   Whether the Sears' modeling technique is based on peer reviewed data, theory and publications.

8.   What is the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation related to hexavalent chromium or arsenic concentrations in soils at the BAC Site or in the vicinity of Plaintiffs' residences.

9.   Whether the Sears technique is "generally accepted" in the relevant discipline concerning air emissions of hexavalent chromium and arsenic from the BAC Site, including whether:

a.   Ms. Sears applied the EPA AP-42 emissions model without adjustment for vehicle speeds, stop-and-go traffic, or other conditions at the BAC site;

b.   Ms. Sears assumed, without any factual support or other apparent justification, that all of the chromium- and

10

1  arsenic-containing particles on the surface of the BAC Site were
2  10 microns in diameter or smaller;

3          c.   Ms. Sears assumed, without any factual support or
4  other apparent justification, that 100 percent of the chromium in
5  surface silts at the treated wood storage area was present as
6  hexavalent chromium; and

7          d.   Ms. Sears assumed, without any factual support or
8  other apparent justification, that one year's worth of drippage
9  of CCA and ACC solution accumulated and was continuously present
10 on the BAC Site throughout the period 1969 - 1993.

11
12                        III.  CONCLUSION

13      Based on the evidence in the record, and for the reasons
14 stated above, the Sears' model and related testimony are
15 potentially confusing, misleading, not understandable to a jury,
16 and/or unreliable, raising questions as to their admissibility
17 under Federal Rules of Evidence 702, 703 and *Daubert* it is
18 necessary that court-appointed experts be utilized.  *See Daubert*
19 *II*, 43 F.3d at 1321, n.17 (citation and internal quotation marks
20 omitted) (observing that "scientific expert testimony carries
21 special dangers to the fact-finding process because it can be
22 both powerful and quite misleading because of the difficulty in
23 evaluating it").

24      To assist the completion of assessment of the reliability
25 and admissibility of Ms. Sears' model and testimony, after input
26 from and consultation with the parties; Drs. Chatten Cowherd,
27 Richard Countess and Kenneth Schmidt have been appointed
28 ///

                                11

1   ///

2   as Federal Rule of Evidence 706 experts.

3

4   IT IS SO ORDERED.

5   Dated:    November 9, 2010            /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28