FEDERAL RULE OF EVIDENCE
706 EXPERT REPORT


In the matter of:
Abarca, Raul Valencia, et al
v. Merck & Co., Inc., et al
Case No. 1:07-cv-D388 OWW DLB


Prepared for
Judge Oliver W. Wanger
United States District Court
Eastern District of California
Fresno, California


by
Kenneth D. Schmidt, Principal
K. D. Schmidt and Associates
Groundwater Quality Consultants
Fresno, California


November 18, 2010

TABLE OF CONTENTS

Page

INTRODUCTION                                          1

SUBSURFACE GEOLOGIC CONDITIONS                       3

HISTORICAL DIRECTIONS OF GROUNDWATER FLOW            4
      Regional                                       5
      Monitor Wells                                  6

AQUIFER CHARACTERISTICS                              7

WATER BUDGET                                         9

MEADOWBROOK WATER COMPANY WELL NO. 2                10

CHROMIUM DISTRIBUTION IN GROUNDWATER                11

QUESTIONS POSED AND ANSWERS                         14
      Assumptions and Construction of the Bartlett Model   15
      Calibration and Validation of the Bartlett Model     18
      Reliability of the Bartlett Model            20

SUMMARY AND CONCLUSIONS                             22

EXPERIENCE AND EXPERT TESTIMONY                     22

COMPENSATION                                        23

REFERENCES                                          23

SIGNING STATEMENT                                   24

ATTACHMENT A   PARTIES QUESTIONS

ATTACHMENT B   SUBSURFACE GEOLOGIC CROSS SECTIONS

Continued:

i

ATTACHMENT C   WATER-LEVEL ELEVATION CONTOURS

ATTACHMENT D   CHROMIUM CONCENTRATIONS IN GROUNDWATER
               IN SOUTH AREA

ATTACHMENT E   SUMMARY OF PROFESSIONAL EXPERIENCE

FEDERAL RULE OF EVIDENCE
706 EXPERT REPORT

INTRODUCTION

This report addresses seventeen questions that were posed to Ken Schmidt by the parties in the case (Attachment A). The case primarily involves chromium contamination of the groundwater near Merced, California area from a former wood treating facility. A groundwater model was developed for the site by R. Douglas Bartlett of Clear Creek Associates, and is termed herein the "Bartlett Model". The questions fall into three categories:

I. Assumptions and Construction of the Model

II. Calibration and Validation of the Model

III. Reliability of the Model.

The Expert Report by Bartlett of December 4, 2009 titled "Groundwater Model Review, Former Baltimore Aircoil (BAC) Facility" describes the Bartlett Model. The Bartlett Model was a revision of an earlier model developed by Arcadis in the mid-2000's. The Arcadis model was modified from one prepared by IT in January 1993. The "Rebuttal Expert Report" by Bartlett of March 16, 2010 describes revisions that he made to his previous model. The Bartlett Model generally relies on a discussion of subsurface geologic conditions provided in an Expert Report by W. Richard Laton of December 2, 2009. The Bartlett Model also re-

lies on a discussion of Meadowbrook Water Co. Well No. 2 (MWC-2) in an expert report by Marvin Glotfelty of December 4, 2009.

Arcadis prepared a "Southern Groundwater Investigation Report" on November 21, 2008.  This southern area, south of Santa Fe Drive, is of key importance when discussing MWC-2. Environmental Engineering & Contracting, Inc. provided a report of November 30, 2009 on sampling of wells in the southern area. The Expert Report by Franklin J. Agardy of December 2009 discusses sources of arsenic and chromium contamination at the BAC facility.  The expert report of Daniel B. Stephens of February 26, 2010 contains a substantial amount of data on hydrogeologic conditions in the vicinity of the BAC site and describes the results of additional groundwater modeling.  The Phase 1 Report by Joseph C. Scalmanini of February 24, 2010 provides information on the Merced Irrigation District operations and groundwater quality in the vicinity of the site.  Annual reports by Arcadis on groundwater monitoring at the BAC site were also reviewed.  These reports and expert depositions provide much of the hydrogeologic and groundwater quality information that I reviewed for this report.

There are six categories of hydrogeologic information that comprise the conceptual hydrogeologic framework in the vicinity of the BAC site.  These are:

1.   Subsurface geologic conditions

2.   The historical directions of groundwater flow

3.   Aquifer characteristics

4.   Water budget

5.   The construction and influence of pumping MWC-2

6.   The distribution and mobility of chromium in the
     groundwater.

There is considerable disagreement between the parties experts
over these topics.

## SUBSURFACE GEOLOGIC CONDITIONS

The Merced vicinity is in the east part of the San Joaquin
Valley and the BAC site is near the east edge of a regional
confining bed (the Corcoran Clay).  Unconsolidated alluvial
deposits, generally comprised of alternating layers of sand,
gravel, silt, clay, and sometimes cobbles are present within the
upper 200 feet of the subsurface.  Surficial and buried hardpan
layers or soil horizons have also been identified.  Except for
the Corcoran Clay, the individual fine-grained layers are
generally discontinuous from place to place.  When the U.S.
Geological Survey previously mapped the east edge of the Corcoran
Clay, few electric logs were available for test holes or wells.
Now, more data are available that can be used to map the extent

4

of this clay.  Stephens evaluated logs in the vicinity of the BAC site and provided a more accurate delineation of the extent of the Corcoran Clay.  I have made similar more  detailed delineations in comparable parts of the San Joaquin Valley, including in the Turlock and Salida areas.  Also, my firm was involved with the installation of deep monitor wells at two One-hour Martinizing sites in Merced.  I generally agree with Stephens' delineation of the extent of the Corcoran Clay.

Near the east edge of the Corcoran Clay, the clay is relatively thin (less than about ten feet thick).  In such areas, the clay cannot be expected to be impermeable, but still restricts the  vertical flow of the groundwater.

Some coarse-grained strata (sand or coarser materials) are present at most locations within the uppermost 100 feet of the subsurface in the vicinity of the BAC site.  In the past several decades, most large-capacity (ie. irrigation, industrial, and public supply) wells were drilled to depths below the Corcoran Clay in order to obtain adequate water production.  Attachment B contains subsurface geologic cross sections that were utilized in this report.


## HISTORICAL DIRECTIONS OF GROUNDWATER FLOW

Two types of water-level maps are available for the vicini-

ty.  One type is termed "regional" and such maps have normally been prepared by the California Department of Water Resources, San Joaquin District, based on semi-annual (spring and fall) water-level measurements in supply wells.  These maps provide some of the only information on water-level elevations  for the time period prior to when monitor wells were installed and water levels were measured at and near the BAC facility.  Bartlett provided water-level elevation contours for 1969-2008 in Appendix A of his report.  Prior to 1986, these maps were based on the regional well measurement network.  The later maps were based on water-level measurements for both monitor wells and wells in the regional network.

Regional

Whereas water-level measurements in monitor wells are representative of water levels in relatively narrow depth intervals (ie. 20 feet or less), water-level measurements for most supply wells are representative of water levels in much greater depth intervals.  A number of wells in the regional network were apparently supply wells that tapped strata both above and below Corcoran Clay.  The water-level measurements in these wells don't necessarily represent water levels in strata only above the Corcoran Clay.  Water levels in deeper wells tend to be more

influenced by well pumpage than do water levels in shallow wells.
Thus regional water-level measurements should be interpreted with
caution.

The water-level maps in the Bartlett report consistently
indicate a southwestern direction of groundwater flow prior to
1974 and a westerly direction during 1975-82. These maps were
based on the regional network. Beginning in 1986, a north-
westerly direction of flow was usually indicated, apparently
based on measurements both in monitor wells at the site and in
wells in the regional network for the rest of the area. In local
areas, pumping of extraction wells for the BAC facility has
influenced the direction of groundwater flow.


Monitor Wells

Stephens delineated three sand units above the Corcoran Clay
in the vicinity of the BAC facility. Stephens also showed water-
level elevation maps based on measurements for the BAC monitor
wells. The direction of groundwater flow in the upper sand unit
was primarily to the northwest from 1986-1990. It is likely that
the  direction of groundwater flow in the upper sand unit was
influenced primarily by sources of recharge, as opposed to well
pumpage. By 1991, the uppermost of these units (the upper sand
unit) had been dewatered. After the deeper monitor wells tapping

the middle sand unit where installed, the direction of ground-
water flow beneath the south half of the BAC site was generally
to the southwest.  Beneath the north half of the BAC site, the
direction of groundwater flow in this unit was primarily to the
north.  The direction of groundwater flow in the middle sand unit
is indicated to be influenced more by pumping than were the water
levels in the upper sand unit.  The direction of groundwater flow
in the middle sand unit in the south part of the area wasn't
clearly established prior to 1994, but in my opinion was probably
to the southwest.  Attachment C shows water-level elevation maps
for the BAC vicinity that were used for this report.


## AQUIFER CHARACTERISTICS

Hydraulic conductivity is an important parameter in evalu-
ating groundwater flow and chromium transport in the subsurface.
Bartlett used uniform hydraulic conductivity by layer (five
layers), based on "measured values derived from slug tests,
aquifer tests by Shaw, and specific capacity data".  Bartlett
(page 13 of Expert Report) stated that "The best type of test to
use to measure the hydraulic conductivity of an aquifer is a
pumping test...".  He then stated: "To our knowledge, a formal
aquifer test hasn't been conducted at the site".

Bartlett relied primarily on hydraulic conductivity

estimates derived from specific capacity data.  These conduc-
tivity values were about ten times larger than values derived
from slug tests.  Stephens relied primarily on hydraulic con-
ductivity values from the slug tests and one pump test, supple-
mented by a recharge mound evaluation, which I independently
confirmed.

I have reviewed the results of an aquifer test that was
conducted at the BAC site.  The results were provided in Appendix
E of the "Additional Field Investigation Report, BAC-Pritchard
Facility (February 1993)" by IT Corporation.  A 12-hour pump test
was conducted on October 12,1992, using OW-1 as the pumped well
and OW-2 and EW-1 as observations wells.  The pumping rate for
the test averaged 7.5 gpm.  Each of the wells used for the test
tapped 15 feet of saturated deposits of the middle sand unit of
Stephens.  The IT Corporation interpretation of the test results
was problematic.  I have reviewed the modified Jacob plots for
the test, and independently estimated the horizontal hydraulic
conductivity.  My review of the test results indicates an average
value of 320 gpd per square foot.

There are two types of hydraulic conductivity.  The first is
the horizontal hydraulic conductivity of coarse-grained deposits,
which is important in lateral rates of groundwater and contamin-
ant flow.  The values for lateral hydraulic conductivity of

coarse-grained deposits are in considerable dispute by the parties experts.  The second type is the vertical conductivity of fine-grained or other deposits that inhibit the vertical flow of groundwater.  I found no evidence that the vertical conductivity was directly determined at or near the BAC site (ie. such as from a leaky aquifer test).

<u>WATER BUDGET</u>

In developing a groundwater model, reliable estimates of the various components of the water budget are needed to provide meaningful results.  In irrigated areas, which were common and are still common in the vicinity of the BAC site, important components are irrigation water deliveries from canals, crop evapotranspiration of applied water, canal seepage, and pumpage from irrigation wells (including  Merced Irrigation District wells).  Irrigation districts in the San Joaquin Valley commonly have service areas, were irrigated lands are served with canal water.  Also, there are other lands in the districts that aren't served with canal water.  Irrigation on the latter type of lands usually relies primarily on pumpage from private irrigation wells.  Irrigation of lands in the service areas relies much less on well pumpage.

Types of crops can be determined by crop surveys and his-

torical crop surveys are usually available from the California Department of Water Resources (DWR) and or local irrigation districts. Consumptive use values vary substantially, according to the crop type. Such values are available from DWR publications for most crops. Locations of active irrigation wells can usually readily be determined by a field survey in specific areas. If irrigation well pumpage is not measured, other means are available to determine this. Many irrigation districts have estimates of canal seepage. Deep percolation is considered to be the water applied for irrigation minus the crop consumptive use of applied water. In most irrigated areas, this is the main source of recharge.

There is no indication that these important factors were specifically evaluated and quantified for use in the Bartlett Model. His estimate for recharge of precipitation is also questionable, given conditions at and near the site.


MEADOWBROOK WATER CO. WELL NO.2

The Expert Report of December 4, 2009 by Marvin Glotfelty contains substantial information on MWC-2. This well was drilled in 1960 and was an open-bottomed well, cased with a 14-inch diameter casing to 98 feet in depth and an open hole to 130 feet in depth. The casing was indicated to be unperforated. The well

was subsequently deepened to at least 143 feet in depth and a 12-inch diameter perforated casing was installed, extending from 80 to 132 feet in depth.  Below 132 feet in depth, the well is open bottomed (not cased).  A TV survey of MWC-2 was conducted on August 5, 2009.  Downward flow of groundwater was observed at several depths.  In order to successfully complete an open-bottomed well, the casing must be landed in a clay.  Information that I have reviewed indicates that the outer well casing was likely landed into the Corcoran Clay or an equivalent.  Although holes could have been present in the outer casing, there is no documentation of this.  My opinion is that most of the water pumped from MWC-2 was from below the Corcoran Clay.  A relatively small part of the pumpage likely came from above the Corcoran Clay.

<u>CHROMIUM DISTRIBUTION IN GROUNDWATER</u>

Arcadis (November 21, 2008) described the reculls of the "Southern Groundwater Investigation".  Table 1 of that report summarizes chromium concentrations in water from four extraction wells and six monitor wells in the area south of or near Santa Fe Drive.  Records for some of these wells extend back to 1994 (Attachment D).  This information is considered extremely im-portant relative to chromium concentrations in water from  MWC-2.

MW-23, 23D, and 24 are indicated to be between the area of
contaminated groundwater at the BAC site and MWC-2.  The records
for MW-23 and 24 extend from March 1994 to September 2009.  Total
chromium concentrations in water from MWC-23 usually ranged from
less than 3 to about 15 ppb, or 0.003 to 0.015 mg/l.  Total
chromium concentrations in water for the nearby deeper monitor
well MW-23D (perforated from 78 to 93 feet in depth) ranged from
4 to 23 ppb, or 0.004 to 0.023 mg/l, in 2008-09.  Total chromium
concentrations in water from MWC-24 usually ranged from less than
3 to 26 ppb, or 0.003 to 0.026 mg/l, in 2008-09.  The two south-
ernmost extraction wells are EW-6 and EW-7.  Available records
for these wells extend from June 1994 to September 2008.  Records
for EW-6 indicate total chromium concentrations usually ranged
from less than 3 to 18 ppb (0.03 to 0.018 mg/l), except for two
samples in mid 2007, which are not considered representative.
Hexavalent chromium concentrations in water from this well were
usually much higher than the total chromium concentrations prior
to 2007.  Since the "total chromium" concentrations showed be
equal to or greater than the hexavalent chromium concentrations,
chromium results for this well are inconsistent.  Records for EW-
7 indicate total chromium concentrations ranging from less than 3
to 10 ppb (0.003 to 0.010 mg/l), except for one sample in April
1995.  Except for two samples (August 1994 and July 1996),

hexavalent chromium concentrations ranged from 1 to 33 ppb (0.001 to 0.033 mg/l).

Stephens (Figures F-19a-h) showed chromium concentrations in the middle sand unit and lower sand unit when the highest measured concentrations and greatest plume extent were apparently present (in February 1995 and July 1996).  The southwesterly chromium plume appeared to extend toward MWC-2, but not all the way to this well.  This southwesterly plume was relatively narrow near MW-23 and MW-24 (less than about 200 feet wide), and chromium concentrations in the middle sand unit were 12 ppb (0.012 mg/l) or less.  Once groundwater pumpage from the southerly extraction wells began, chromium concentrations in the groundwater in the vicinity of the extraction wells subsequently decreased.  The total chromium concentrations in the lower sand unit at MW-23D ranged from 4 to 18 ppb (0.004 to 0.023 mg/l) in 2008-09.  Tables of chromium concentrations and copies of chromium plume maps are provided in Attachment D.

A considerable constraint to the southerly flow of hexavalent chromium in groundwater toward MWC-2 is the area of reduced or anaerobic groundwater associated with petroleum hydro-

carbon contaminated groundwater at and near the A&M Market.
Under anaerobic conditions, hexavalent chromium can be reduced
to trivalent chromium, which is much less mobile in the
groundwater.

Considering the texture of the deposits and other factors,
chromium may have been transported at a greater rate to the
southwest in the lower sand unit than in the middle sand unit.
This is consistent with the fact that pumping of MWC-2 may have
enhanced the downward migration of chromium toward the well.
However, there is no evidence that chromium from the BAC site
resulted in concentrations greater than the MCL 0.05 mg/l or 50
ppb in water from MWC-2.  The greatest measured concentrations
were 12 ppb or 0.012 mg/l.

Lastly, there were two open-bottomed supply wells at the BAC
site, which tapped groundwater below the Corcoran Clay or its
equivalent.  Sampling results for these wells indicated very low
concentrations of total chromium.

## QUESTIONS POSED AND ANSWERS

The questions posed to Ken Schmidt are fully reproduced in
Attachment A.

<u>Assumptions and Construction of the Bartlett Model</u>

<u>Question No. 1</u>. Uniform release of chromium.

<u>Answer</u> No. Precipitation varies substantially from year to year. The chromium release to groundwater depends on the depth to groundwater and the amount of precipitation.  Neither of these were constant, so the release to groundwater shouldn't have been constant.


<u>Question No. 2</u>. No continuing source of chromium

<u>Answer</u> Based on the evidence that I have reviewed, some of the chromium should have continued to reach the groundwater after 1991.  The significance is that of the total release of chromium to the groundwater, more release would have been assumed for 1970-91 then actually occurred.


<u>Question No. 3</u>. Use of SUTRA and Arcadis Models.

<u>Answer</u> Yes and No.  Bartlett's report (page 11) refers to the "original IT Shaw model developed in the early 1990's" (the SUTRA model).  The use of the model was probably in compliance, because the model apparently simulated the southerly chromium plume as of the early 1990s.  However, the purpose of the earlier model was different (ie. the focus was not on MWC-2), and a number of revisions were thus necessary.

Question No. 4. Revision of Arcadis Model

Answer No.  First, the modeled area should have been extended
farther south, so that all the influences on MWC-2 could  be
encompassed.  The revisions made were necessary, but not
comprehensive enough.  Additional changes were needed in terms
of quantification of items in the water budget, such as crop
consumptive use, canal seepage, and irrigation well pumpage.
Also, improved estimates of hydraulic conductivity, based on
several aquifer tests, were absolutely needed in the south area.


Question No. 5. MWC-2 Construction and Features

Answer No.  Bartlett assumed that too much of the historial
pumpage from this well came from above the Corcoran Clay.
Records indicate that the casing in the well was landed in a
clay, and the well drew most of its pumped water from below this
clay throughout the history of pumping.


Question No. 6. Lithological, hydrological, and aquifer
information

Answer No.  My opinion is that the site specific lithologic
information used in the Bartlett Model, particularly with respect
to the extent of the Corcoran Clay, is incorrect.  For the most
part, I agree with Stephens' representation of the subsurface

geologic conditions at and near the BAC site.  This is based on 1) my experience in the Merced area and elsewhere in the San Joaquin Valley at locations near the east edge of the clay,  2) my experience with deep monitor well construction in Merced, and 3) my review of subsurface geologic cross sections provided by the various experts.

The hydrologic information used to develop this model is deficient in a number of instances.  First, historical recharge from deep percolation of irrigation return flow and canal seepage wasn't adequately addressed.  Second, lateral groundwater inflows to and outflows from the modeled area weren't substantiated in different layers of interest in evaluating MWC-2.  Third, important hydraulic conductivity values for the offsite area were not adequately determined by aquifer testing.


<u>Question No. 7</u>.   Impediment to Transmissivity

<u>Answer</u> No. Transmissivity only applies to the lateral flow of groundwater.  Based on subsurface geologic cross section A-A' in the Stephens report, there is no impediment to transmissivity between the contaminant plume and MWC-2.  However, transmissivity doesn't pertain to the vertical flow of groundwater or contaminants through fine-grained deposits, and in my opinion doesn't pertain to the construction of MWC-2.  That is, vertical flow

also has to be considered.  When this is considered, there were impediments to flow into the well.

Question No. 8.   Hydraulic Conductivity

Answer No.  Hydraulic conductivity was not directly determined in the offsite area.  Aquifer testing in the area south of Santa Fe Drive was absolutely needed for this determination.  The values used for the lateral hydraulic conductivity in the Bartlett Model are too large, based on my independent evaluation of the on-site pump test and other factors.

Calibration and Verification of the Bartlett Model

Question No. 9.  Water Well Modeling and State Well Data

Answer In my experience "water well modeling" in the sense of computer modeling is almost unheard of.  There are several types of well data relevant to the regulations and practices of the State of California.  First, a well completion report is to be provided to the Department of Water Resources for construction of new wells, well modifications, and well destruction.  Second, if the State regulates the water system (ie. a state large water system), then well pumpage, well records, and water quality test results are to be provided to the State Department of Health Services.  The generally recognized standards and practices are

to appropriately use this information, along with other relevant information.  The assumptions that were used in the "well modeling" are highly questionable.


<u>Question No. 10</u>.  Flow Calibration

<u>Answer</u> No.  The model wasn't calibrated to replicate historical groundwater flow directions in all of the relevant layers, including strata below the Corcoran Clay.


<u>Question No. 11</u>. Transport Calibration

<u>Answer</u> No.  The modeled chromium concentrations didn't match the representative results of actual monitoring for a number of monitor wells or for MWC No. 2 in the southerly area.


<u>Question No. 12</u>. Aquifer Behavior

<u>Answer</u> No.  Aquifer behavior was not addressed adequately, including: 1) influence of pumpage from irrigation wells in the vicinity, 2) recharge from precipitation, 3) recharge from deep percolation of irrigation return flow, 4) canal seepage, 5) vertical hydraulic conductivities of fine-grained strata, and 6) horizontal hydraulic conductivities in off-site areas.


<u>Question No. 13</u>. Variance in Chromium Concentrations

<u>Answer</u> My opinion is that these differences are primarily due to the following:

1. For MWC-2, the difference is due to an over estimate by Bartlett of the amount of groundwater pumped from this well that came from above the Corcoran Clay.  It is also due to a lack of consideration of the percent of the plume water that could be pumped from the well, considering the width of the southerly plume and the full circumference of the expected cone of depression due to pumping of MWC-2.

2. For the southerly monitor wells, the primary reasons appear to be associated with a) varying groundwater flow directions, b) retardation of hexavalent chromium transport due to the petroleum hydrocarbon contamination at the A&M site, c) the use of values for horizontal and vertical conductivity that are too high, and d) incorrect values for items in the water budget.


<u>Reliability of the Bartlett Model</u>

<u>Question No. 14</u>. Groundwater Modeling

<u>Answer</u> Probably not.  If the question was slightly revised as follows: "Was it in accordance with generally accepted standards and principals of groundwater hydrology?", the answer would be no.  In terms of impacts on MCW-2 water quality, there were alternative approaches for such as evaluation.  For example,

some of the disputes over the data could have been addressed by specific field tests, such as:

   1. More properly conducted and interpreted aquifer tests, particularly in the southern area.

   2. An aquifer test at MCW-2, and demonstrating the zone of capture for this well for different depth intervals.
There are a number of data gaps including:

   1. Information on the direction of groundwater flow and chromium concentrations in groundwater in different depth intervals in the southerly area prior to when the southerly monitor wells were installed.

   2. Relatively infrequent sampling of water from MWC-2 for chromium prior to 2007.

   3. Historical pumpage from irrigation wells in the area, which  could have influenced the direction of groundwater flow.

   4. Amounts of lateral and vertical groundwater flow in the various layers.
While modeling can provide some information, my opinion is that it was overrelied upon and was expected to provide more inform-ation than is feasible.


Question No. 15. Modeled Chromium Simulations in MWC-2
Answer No.  The simulated concentrations greatly deviated from

measured concentrations.


Question No. 16. Modeled Chromium Transport Simulations

Answer No.  The Bartlett model did not match the actual chromium

concentrations in water from MWC-2 or selected monitor wells in

the southern area (see Attachment D from Expert Report of Joe

Scalmanini).


Question No. 17. Model

Answer No.  The model does not accurately portray the historical

extent of chromium contamination in the aquifer or the chromium

concentrations in water from MWC-2 (see declaration of Constance

Ferris).

### SUMMARY AND CONCLUSIONS

My opinion is that the Bartlett model cannot be used to

determine the historical chromium concentrations in water pumped

from MWC-2.  This is because of a number of factors, but

primarily is due to 1) the use of values for hydraulic

conductivity that are too high, and 2) the assumption of too much

water from above the Corcoran Clay being pumped from MWC-2.


### EXPERIENCE AND EXPERT TESTIMONY

I am a certified hydrogeologist in California and have more

than 44 years of work experience in groundwater, primarily in the San Joaquin Valley.  I have provided trial testimony in courts of California and Arizona in approximately 15 cases.  I have been deposed about 140 times during the past four decades.  A summary of my professional experience is provided in Attachment E.

## COMPENSATION

My hourly rate is $250 per hour, except for depositions and court testimony, which is billed at $375 per hour.  Out-of-pocket expenses are billed separately.

## REFERENCES

Agardy, F. J., 2009, "Expert Report, Abarca, et al. v Merck, Merced, California".

Arcadis, 2006, "Extraction System Optimization, Waste Discharge Requirements Order No. 5-00-197, Former Baltimore Aircoil Company (BAC), Inc. facility, Merced, California".

Arcadis, 2008, "Southern Groundwater Investigation Report, Former Baltimore Aircoil Facility, Merced California", 8p.

Bartlett, R. D., 2009, "Expert Report, Groundwater Model Review, Former Baltimore Aircoil Facility, Merced, California", 36p.

Bartlett, R. D., 2010, "Rebuttal Expert Report", 27p.

Bean, D. M., 2010, Expert Report, Bartlett Groundwater Model Review, Former Baltimore Aircoil Facility", 8p.

Environmental Engineering & Contracting, Inc. 2009, "Northern Merced Area Background Report for Chromium and Arsenic", 5p.

Environmental Engineering & Contracting, LLC, 2009, "Former Baltimore Aircoil Company Facility and Meadowbrook Water Company Groundwater Sampling and Well Survey Report", 13p.

Ferris, C., 2010, "Declaration Regarding Meadowbrook Water Company of Merced, Inc.'s Exhibits 1.1-22 and L.1-3.

Glotfelty, M., 2009, "Expert Report, Meadowbrook Water Company, Well No. 2 and Joe Bernardo (Rocha) Dairy Farm Irrigation Well".

IT International Corporation, 1992, "Off-site Well Survey, BAC-Pritchard Facility", Merced, California.

IT Corporation, 1993, "Groundwater Flow, Contaminant Transport and Interim Groundwater Control Modeling", BAC-Pritchard Facility, Merced, California.

IT corporation, 1993 "Report of Waste Discharge, BAC-Pritchard Facility, Merced, California.

IT corporation, 1993, "Additional Field Investigation Report, BAC-Pritchard Facility, Merced, California", Appendix E Aquifer Test Analysis Report, 15p.

IT Corporation, 1999, "Off-site Well Survey Update Report", Former Baltimore Aircoil Facility, Merced, California, 19p.

Laton, W. R., 2009, "Expert Report, Abarca, et al v Merck, Merced, California", 27p.

Laton, W. R., 2010, "Rebuttal Expert Report", 25p.

Scalmanini, J. C., 2010, "Phase I Report in the Matter of Abarca, et al v. Merck", 28p.

Stephens, D. B., 2010, "Expert Report, Raul Valencia Abarca, et al v Merck Co. Inc., et al, 94p.

## SIGNING STATEMENT

This report provides the information that I relied

upon and the opinions that I developed, pursuant to the Court

order.

_Kenneth D. Schmidt_
Kenneth D. Schmidt

_November 18, 2010_
November 18, 2010

Executed in Bakersfield, California.