UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABARCA, RAUL VALENCIA, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>FRANKLIN COUNTY WATER DISTRICT,<br><br>　　　　　　　　Defendants. | 1:07-CV-0388-OWW-DLB<br><br>MEMORANDUM DECISION AND ORDER RE: DEFENDANT MEADOWBROOK WATER COMPANY'S MOTIONS FOR SUMMARY JUDGMENT ON GROUNDWATER PATHWAY (Doc. 671); DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF DOUGLAS BARTLETT (Doc. 685) |

## I. INTRODUCTION.

Plaintiffs allege that Meadowbrook Water Company ("Meadowbrook) delivered contaminated water from the BAC Site to the Plaintiffs' homes and properties.  The present motion concerns Plaintiffs' negligence, trespass, and nuisance claims that allege that Meadowbrook failed to exercise due care with regard to its water delivery operations and that those operations discharged pollutants from Meadowbrook Well No. 2 ("MWC-2").[1]  Plaintiffs' claims against Meadowbrook concern only the groundwater pathway. It is undisputed that Meadowbrook had no ownership or control over the alleged source of contamination, the BAC site.

---

[1] Plaintiffs' opposition includes multiple incorrect citations to the record.  Many citations were to evidence that did not exist.  Such errors burdened a court managing a docket of over 1,200 criminal and civil cases.

1

Before the court for decision is Meadowbrook's motion to summarily adjudicate Plaintiffs' negligence, trespass, and nuisance claims. Defendant Meadowbrook moves to dismiss these claims on grounds that *Hartwell Corporation v. Superior Court*, 27 Cal.4th 256 (2002) and *In re Groundwater Cases*, 154 Cal. App. 4th 659 (2007) bar the claims as a matter of state law. According to Meadowbrook, these two cases stand for the proposition that a public water utility is only liable for third party damages in narrow and specific circumstances, none of which are established here. Meadowbrook also files a *Daubert* motion to exclude Bartlett's groundwater flow model predicting elevated concentrations of hexavelant chromium in MWC-2. Meadowbrook's arguments mirror those contained in the BAC Defendants' motion, i.e., it argues that the model is scientifically unreliable and not relevant to the issue of Meadowbrook's liability for damages as a state regulated water supplier.

## II. FACTUAL AND PROCEDURAL BACKGROUND.[2]

This lawsuit relates to a now-closed cooling tower manufacturing facility (the "BAC site") that was operated by entities formerly owned by the BAC Defendants.[3] Plaintiffs,

---

[2] The background of this case is covered in *Valencia v. Merck & Co.*, 2009 WL 2136384 (E.D. Cal. July 15, 2009), *Abarca v. Franklin County Water Dist.*, 2009 WL 1393511 (E.D. Cal. May 18, 2009), and *Affholter v. Franklin County Water Dist.*, 2008 WL 4911406 (E.D. Cal. Nov. 13, 2008).

[3] Four separate entities comprise the BAC Defendants: (1) Merck & Co; (2) Amsted Industries, Inc.; (3) Baltimore Aircoil Company, Inc.; and (4) Track Four, Inc.

2

current or former residents of neighborhoods near the BAC Site,[4] allege that two contaminants from the BAC Site migrated from the facility via groundwater, surface water, and air pathways to locations where plaintiffs were exposed to them. Also named as defendants are various municipalities, water districts, and developers, including the Franklin County Water District, Merced Irrigation District, the City and County of Merced, and the Meadowbrook Water District.

Plaintiffs commenced this civil action on March 8, 2007. In August 2009, in response to the alleged lack of admissible evidence of general exposure to contaminants from the BAC site, the Court issued an "Order Modifying Scheduling Conference Order," establishing a first phase of discovery to focus on "whether contaminants from the former [] BAC Site, Franklin County Water District or the April 2006 Flood have ever reached any location where plaintiffs could have been exposed to them, and if so, when such contaminants arrived, how such contaminants arrived at the location, how long they were present, and at what levels they were present." (Id. at 1:14-1:28.) Meadowbrook argues that Plaintiffs have failed to meet their "Phase 1" or "general exposure" burden, entitling it to summary judgment.

On May 28, 2010, Meadowbrook filed its motion for summary judgment on Plaintiffs' negligence, trespass, and nuisance claims. (Doc. 678.) The substance of Meadowbrook's Rule 56 motion is that Plaintiffs' claims are jurisdictionally barred under *Hartwell* and

---

[4] The former BAC Site is located at 3058 Beachwood Drive, Merced, California.

3

*In re Groundwater Cases*.

On June 1, 2010, Meadowbrook moved to exclude the testimony of Douglas Bartlett, Plaintiff's groundwater modeler, pursuant to Federal Rule of Evidence 702 and two United States Supreme Court cases, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). (Doc. 685) In particular, Defendants challenge Bartlett and Sears' expert testimony on grounds that it cannot pass *Daubert*'s "gatekeeping" requirement. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) ("The trial court acts as a 'gatekeeper' to exclude expert testimony that does not meet the relevancy and reliability threshold requirements.") (citation omitted).

Plaintiffs opposed the motions on July 1, 2010. Plaintiffs first argue that the *Hartwell* and *In re Groundwater Cases* are inapplicable under the Phase 1 Order; *arguendo*, if they are considered, Meadowbrook's misconduct distinguishes both cases. As to the Daubert motion, which is relevant to the Rule 56 analysis, Plaintiffs argue that Meadowbrook's motion to exclude certain expert testimony fails because their criticisms go to the weight of the testimony, not its admissibility.

### A. <u>The BAC Defendants' Related Motions</u>

On June 1, 2010, the BAC Defendants filed motions for partial summary judgment and to exclude the testimony/model of Douglas Bartlett.[5] According to the BAC Defendants, Bartlett's testimony

---

[5] The motions were nearly identical with respect to the groundwater pathway issue and the alleged inadequacies of the Bartlett groundwater model. Plaintiffs' claims against Meadowbrook

4

and groundwater model are inadmissible for a number of reasons but primarily because he excludes 46 years of sampling data (49 tests) from the MWC-2 and 16 years of sampling data from monitoring wells surrounding the BAC Site. Characterizing Bartlett's model as "contradicting reality," the BAC Defendants claim that Plaintiffs "have produced no data, documents, or percipient witness testimony that could establish exposure to hexavelant chromium or arsenic from the BAC Site through MWC-2 water, and the results of analyses of water from MWC-2 refute plaintiffs' claims that such exposure occurred." The BAC Defendants asserted that the *actual* testing data shows that total chromium concentration at MWC-2 never exceeded 12 ug/l, less than one quarter of the MCL for total chromium. The BAC Defendants also argued that MWC-2 never captured hexavelant chromium beyond background levels.

Meadowbrook's arguments mirror those advanced by the BAC Defendants in their motions for partial summary judgment and to exclude Bartlett's testimony.[6] In support of its motion to exclude, Meadowbrook submits the testimony of David Bean, a hydrogeologist and groundwater modeling expert. He opines that Bartlett's model is not calibrated to any well water sampling data from the network of monitoring and extraction wells installed

---

relate only to its ownership and operation of MWC-2, not the owner of the contaminant source.

[6] Bartlett's model is the only evidence supporting Plaintiffs' claim that MWC-2 was contaminated with hexavelant chromium. Specifically, Bartlett's model attempts to simulate groundwater flow and the transport of dissolved chromium from the BAC facility to areas off-site during the period 1969-2008. This includes MWC-2, as well as other monitoring wells near the BAC site and the Beachwood neighborhood.

during the remediation of the BAC Site, nor from Meadowbrook wells, including MWC-2.  There is little correlation between simulated and observed chromium concentrations (actual data vs. model predictions).  Bean provides a number of scattergrams and simulations to demonstrate the extent of the disparity, i.e., to demonstrate its unreliability.  Bean opines that there is a complete "disconnect" between the actual data and Bartlett's model, and discusses the number of scientific processes that are excluded from Bartlett's model (adsorption, diffusion, etc.)

Plaintiffs' response to Meadowbrook's motion is identical to their opposition to the BAC Defendants' motion.  They argue that the existing sampling data is unreliable and therefore should be excluded.  They also argue that the data and expert opinion can "co-exist," i.e., that the issue should go to a jury to determine "the credibility of the evidence."

By a separate decision, it has been determined that the degree of variance between Bartlett's model and the well data requires a factual foundation to decide the truth and efficacy of Bartlett's grounds for minimizing most of the observed test data.  The BAC Defendants' Daubert motion was denied subject to an express reservation to exclude the model after hearing all evidence concerning the model at trial.  That subject of the BAC Defendants' motion for partial summary judgment on groundwater contamination was also denied without prejudice.

That Memorandum Decision is incorporated by reference and applies with equal force to Meadowbrook's current motions for summary judgment and to exclude the testimony of Douglas Bartlett.  A scientific factual dispute remains as to the admissibility of the

6

Bartlett model, which was proffered to demonstrate chromium contamination via the groundwater pathway (specifically, in MWC-2 from 1969 to present). Those portions of Meadowbrook's motions are for the same reasons DENIED without prejudice.

B.  *Hartwell and In re Groundwater Cases - A Jurisdictional Bar?*

It is undisputed that Meadowbrook is a public utility as defined by Article XII, Section 3, of the California Constitution. Meadowbrook argues that *Hartwell* and *In re Groundwater Cases* bar claims for damages against a public utility unless Plaintiffs are able to establish "continuing violations of water quality standards to provide water to their customers."

*Hartwell* and *In re Groundwater Cases* analyze whether section 1759 of the Public Utilities Code limits the jurisdiction of judicial review of the Public Utility Commission's regulatory authority and decisions. Section 1759 provides in relevant part:[7]

> No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.

In *Hartwell*, 27 Cal. 4th 256, plaintiffs sued water companies regulated by the Public Utilities Commission ("PUC" or

---

[7] The California Constitution also confers plenary power on the Legislature to "establish the manner and scope of review of commission action in a court of record...." (Cal. Const., art. XII, § 5.) In the exercise of that power, the Legislature has chosen to limit the jurisdiction of judicial review of the PUC's decisions.

"Commission"), alleging that they had provided contaminated well water to the plaintiffs.[8] The Commission had adopted California Department of Health Services ("DHS") standards for water safety and followed those standards in determining what measures the water companies should undertake to maintain water purity. *Id*. at 272, 276. The California Supreme Court reviewed § 1759 in light of its legislative and regulatory history and concluded that the trial court did not have jurisdiction to hear a challenge to the regulatory standards. However, the court held that the trial court did have jurisdiction to hear damage suits arising out of violations of regulatory standards.

The California Supreme Court summarized its ruling in *Hartwell*:

> *Hartwell* found some claims alleged in the civil action to be barred because their adjudication would interfere with the regulatory authority of the PUC, but that other claims would not result in such interference and therefore were not precluded by section 1759. The decision concluded, for example, that because the PUC relied upon certain water quality standards as a benchmark in approving water rates charged by public utilities, challenges in the civil action to the adequacy of those standards, and claims for damages allegedly caused by unhealthy water permitted by the standards, would interfere with broad and continuing regulatory programs of the PUC such as ratemaking for public utilities. In addition, the PUC had provided a safe harbor for utilities meeting these water quality standards, and our decision observed that a determination by the superior court that the existing standards were inadequate would undermine this policy of the PUC by holding the utilities liable for damages caused by their failure to undertake action that the PUC repeatedly had determined was not required. Similarly, claims in the civil action seeking injunctive relief for current

---

[8] In Hartwell, Plaintiffs specifically alleged that: (1) several water utilities met regulatory standards but plaintiffs were injured nonetheless; and (2) that the water utilities violated regulatory standards.

8

> violations of water quality standards were precluded by section 1759, because an injunction predicated upon a finding of such violations would conflict with the decision of the PUC that the defendant utilities presently were in compliance with the standards, and that no further inquiries or evidentiary hearings regarding compliance were required.
>
> In contrast, the decision in *Hartwell* concluded that claims in the civil action for damages allegedly caused by water that did not satisfy applicable water standards were not preempted by section 1759-even though the PUC had issued a decision including a finding that, for the previous 25 years, water provided by the defendant utilities substantially did comply with the water standards. In concluding that this prior PUC pronouncement regarding past compliance with water quality standards did not prelude these particular civil claims, our decision relied upon the following circumstances: (1) the investigation by the PUC that led to the decision was characterized by the commission as a process designed to gather information, rather than as a rulemaking proceeding; (2) even though information gathered in the investigation and reported in the decision might have resulted in a rulemaking or enforcement proceeding against the utilities, the finding by the PUC that the utilities had complied with water quality standards did not constitute "part of a broad and continuing program to regulate ... water quality" and thus the program "was not part of an identifiable 'broad and continuing supervisory or regulatory program of the commission' [citation] related to such routine PUC proceedings as ratemaking [citation] or approval of water quality treatment facilities"; and (3) the civil action sought damages for injuries caused by water that had failed to meet water standards in prior years, whereas any finding by the PUC regarding past compliance would be relevant only to a future remedial program designed to halt current and ongoing violations, rather than to redress injuries for past violations, because the PUC could not provide such relief for past violations.
>
> In sum, <u>we determined in *Hartwell* that the claims for damages in the civil action might result in a jury award based upon a finding that public water utilities violated water quality standards, and that although such a finding would be contrary to a pronouncement in a single prior PUC decision, such a finding or damage award would not hinder or frustrate the declared supervisory and regulatory policies of the PUC</u>.

*People ex rel. Thomas J. Orloff v. Pac. Bell*, 31 Cal. 4th 1132, 1147-48 (2003)(internal citations and footnotes omitted)(emphasis

9

added). In essence, *Orloff* explains that claims are barred under *Hartwell* only if they would hinder or frustrate the supervisory and/or regulatory policies of the PUC.

Consistent with this approach, the California Appellate Court in *In re Groundwater Cases*, 154 Cal. App. 4th 659, rejected the contention that evidence of any exceedence of a numerical standard would constitute a "violation":

> [T]he touchstone for determining whether there has been a "violation" within the meaning of *Hartwell* is whether the PUC-Regulated Defendants have failed to comply with the regulatory standards and policies set by DHS and the PUC. When viewed in these terms, it becomes apparent that plaintiffs are mistaken in their contention that any exceedance of an MCL, AL, or other numerical standard constitutes a "violation" as that word was used in Hartwell [...]
>
> <u>Imposing liability on water suppliers for isolated exceedances of numerical standards would conflict with the regulatory system established to deal with drinking water quality</u>. That scheme expressly permits DHS to allow water suppliers to continue to deliver water even after an MCL exceedance has been detected. Under Health and Safety Code section 116655, if DHS determines that any person has violated or is violating the SDWA, DHS has discretion to issue an order that may include a number of requirements [...] In addition, MCLs are not rigid requirements. DHS has the authority to exempt public water systems from compliance with an MCL if the agency makes certain required findings. (See Health & Saf.Code, ¤ 116425, subd. (a).) One of those findings is that "granting of the exemption will not result in an unreasonable risk to health." (Health & Saf.Code, ¤ 116425, subd. (a)(3).) In such circumstances, DHS may permit a public water system to continue delivery of drinking water despite its noncompliance with an MCL. <u>Thus, a mere exceedance of or noncompliance with a given MCL does not constitute a "violation" of the regulatory scheme</u>.
>
> DHS's regulations also expressly permit the continued delivery of water after detection of an MCL exceedance. For organic chemicals, if the detected level exceeds the applicable MCL, the water supplier is required to report the exceedance to DHS and to conduct further sampling. (Cal.Code Regs., tit. 22, § 64445.1, subd. (c)(5).) If an organic chemical is detected and the concentration exceeds ten times the MCL, the water supplier must

> notify DHS and conduct resampling within 48 hours to confirm the result. (Cal.Code Regs., tit. 22, § 64445.1, subd. (c)(7).) Only if the average concentration in the original and confirmation samples exceeds ten times the MCL is the supplier required to cease delivery of water. (Cal.Code Regs., tit. 22, § 64445.1(c)(7)(B).)
>
> Thus, both the California SDWA and DHS's regulations contemplate that water suppliers may continue to deliver water despite isolated exceedances of MCLs. Were we to permit the imposition of liability on water suppliers based upon individual exceedances of MCLs or ALs, we would expose water suppliers to damage awards for doing something that is expressly permitted by both the Health and Safety Code and by DHS and PUC regulations. Such a holding would plainly conflict with the PUC regulatory program that "provide[s] a safe harbor for public utilities if they comply with the DHS standards," and would directly contravene *Hartwell*. [citation]

*Id*. at 685-86 (emphasis added). While the decision in *In re Groundwater Cases* explains that imposing liability for isolated exceedances of numeric standards would hinder or frustrate the intentionally flexible regulatory scheme established to deal with drinking water quality, it does not clearly circumscribe the range of evidence that meets *Hartwell's* exception to the general rules protecting the regulatory schemes.

According to Meadowbrook, the California Department of Health Services inspected its operations from 1964-2009 and, during this time period, approved Meadowbrook's water system operations. Meadowbrook has never been ordered to cease operations.[9] But,

---

[9] Plaintiffs maintain that Meadowbrook concealed sampling records, sampled infrequently, and only sampled in times of "low production." Plaintiffs suggest that "any lack of corrective action taken against Meadowbrook by a regulatory agency for distributing contaminated water should not be considered dispositive of claims against the Company but instead, should be considered further evidence of the effectiveness of Meadowbrook's concealment." Without addressing Plaintiffs' alegation of concealment, *Orloff* establishes that the prior findings of a regulatory agency are not

11

*Orloff* explains that a damages claim is not barred by *Hartwell* simply because it might result in a jury verdict "contrary to a pronouncement in a single prior PUC decision." 31 Cal. 4th at 48. Plaintiffs seek to present evidence that would support a finding of persistent violations of the relevant numeric standards.[10]

The entirety of this alleged evidence to avoid the regulatory scheme comes from Mr. Bartlett and Dr. Laton. If their testimony is accepted by the trier of fact that there is hexavalent chromium and/or arsenic persistently present in the Meadowbrook Well levels above the relevant numeric standards, this would not interfere with or derogate any policy or objective of the PUC or the regulatory scheme to assure the safe operation of privately owned public entity water suppliers under rules and regulations formulated and enforced by the PUC.

C.  *Conclusion*

For all these reasons the quasi-immunity of the PUC's regulatory scheme is not at risk and will remain intact to protect its policies and objectives unless plaintiffs prove the fraudulent

---

dispositive of the viability of a damages claim under *Hartwell*.

[10] Plaintiffs focus on the alleged reliability of the existing data in their opposition. Plaintiffs argue that the data provided by Meadowbrook to the DHS is "unreliable and specious" and that there "is no quality assurance/quality control information for any of these so called samples." If proved, this would potentially establish for purposes of Hartwell, a pattern of non-compliance and violations of water quality standards by fraud, conduct not protected by and not devisive of the regulatory scheme. Such evidence is offered to demonstrate persistent violations of numeric pollutant standards to support damages claims under *Hartwell* and *In Re Groundwater Cases*.

1  violations of water quality standards they allege.
2       The motions to: (1) exclude Bartlett's testimony is DENIED
3  WITHOUT PREJUDICE; (2) the motion for summary judgment on
4  groundwater contamination is DENIED; and (3) the motion for summary
5  judgment under *Hartwell* and *In re Groundwater Cases* is DENIED.

8  IT IS SO ORDERED.                    /s/ OLIVER W. WANGER
9  Dated January 5, 2011                United States District Judge

13