UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABARCA, RAUL VALENCIA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FRANKLIN COUNTY WATER DISTRICT, <br><br> Defendants. | 1:07-CV-0388-OWW-DLB <br><br> MEMORANDUM DECISION RE: BAC DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: SURFACE WATER AND SURFACE SOIL PATHWAYS |

I. INTRODUCTION.

The background of this case and relevant legal standards are described in the "Memorandum Decision and Order Re: BAC Defedants' Motion for Partial Summary Judgment [and] Daubert Motions," decided January 5, 2011, Doc. 982, and incorporated by this reference.[1]

II. DISCUSSION.

A. *Surface Water Pathway*

   1. *Introduction*

To demonstrate contaminant exposure via surface water, Plaintiffs theorize that contaminated water from a BAC retention pond migrated to an off-site canal and then to the Beachwood

---

[1] Additional background can be found in *Valencia v. Merck & Co.*, 2009 WL 2136384 (E.D. Cal. July 15, 2009), *Abarca v. Franklin County Water Dist.*, 2009 WL 1393511 (E.D. Cal. May 18, 2009), and *Affholter v. Franklin County Water Dist.*, 2008 WL 4911406 (E.D. Cal. Nov. 13, 2008).

1

neighborhood. Specifically, Plaintiffs allege that contaminated water from the retort area (at the former BAC site) migrated to the retention pond at the former BAC Site, then moved through a pipe connecting the pond to the El Capitan Canal, and, finally, flowed from the canal to the Beachwood neighborhood with the April 2006 flood waters.[2] Plaintiffs also claim they were exposed to contaminants as a result of "fishing and swimming in the [El Capitan] Canal."

Plaintiffs' claims depend on the premise that contaminated water at the BAC site remains in a static state during its migration through organic material in several waterways and in the canal. This assumption is sharply disputed by the BAC Defendants' expert, geochemist Scott Fendorf, Ph.d., who opines that a substantial volume of organic materials present in the retention pond and the canal itself reduced hexavalent chromium to the less toxic and less mobile trivalent chromium. Dr. Laton, Plaintiff's hyrdologist, rejoins that Fendorf's opinions are unfounded and "misleading" because the "reduction statement is the reduction of chromium in soil, not surface water." He further opines that the 2008 and 2009 testing efforts revealed elevated chromium concentrations and that contamination from the BAC Site flowed into the El Capitan Canal "for twenty years prior to cleanup of the pond." This disagreement, among others, demonstrates a scientific dispute of fact that cannot be determined as a matter of law.

---

[2] The El Capitan Canal is operated by the Merced Irrigation District ("MID").

**2**

## 2.  *<u>Merits</u>*

Defendants contend that Plaintiffs do not satisfy their Phase 1 burden on the surface water pathway because there is no evidence that any contaminant migrated from the BAC retention pond to the El Capitan Canal. According to Defendants, "no hexavalent chromium has been detected in the El Capitan canal and the concentrations of arsenic in the canal are within drinking water standards." Defendants also argue that the BAC Site did not flood in April 2006.[3]

To support their motion, Defendants submit the expert testimony of Dr. Scott Fendorf, a geochemist and chair of the Environmental Earth System Science Department at Stanford University. Dr. Fendorf's report focuses on the properties of hexavalent chromium, namely that "geochemical conditions in the stormwater retention pond at the BAC site and the adjacent drainage canal are ideal environments for promotion [of] reduction of Chromium VI [hexavalent chromium] to Chromium III [trivalent chromium]." (Doc. 677-5 at ¶ 8.) It is undisputed that Chromium III (trivalent chromium) is less toxic than Chromium VI (hexavalent chromium).[4]

Dr. Fendorf specifically delineates the existence and impact of "highly conducive" reductive conditions at the pond and canal:

---

[3] On December 29, 2010, defense counsel stated: "I'll also represent that the BAC site, while it had some large puddles on it, did not flood. It was not flooded in the April 2006 flood." (ROUGH RT, Dec. 29, 2010, 184:20-184:23.)

[4] On December 29, 2010, during summations, counsel for the BAC Defendants and Plaintiffs referred to several aerial photos showing the presence of organic matter at the relevant locations.

3

> The anaerobic, wetland environment of the pond and the canal, both of which are rich in organic matter, is highly conducive to the reduction of chromium (VI) to chromium (III). Once reduced, the chromium (III) forms solids that are effectively inert and will not be re-oxidized to chromium (VI) to any significant extent under the conditions present in the pond and the canal.

(Id.)

Dr. Fendorf further analyzes the reductive conditions at the El Capitan Canal:

> Chromium that moves through the water column, is not reduced in the pond, and thereafter enters the canal, would encounter a similar geochemical environment in the canal. The canal has similar wetland attributes, thus leading to further reduction of any remaining chromium (VI) to chromium (III). In fact, the pond and canal provide nearly optimal geochemical conditions to arrest chromium(VI) and transfer it into the chromium (III) state.

(Id. at ¶ 10.)

Dr. Fendorf states that soil samples taken from the storm water pond and pond water column confirm the reduction of hexavalent chromium to trivalent chromium:

> Analyses of the sediments and soils in the pond demonstrate that chromium (VI) has been reduced significantly to chromium (III) in both the pond sediments and in the pond water column. Dames & Moore analyzed six soil samples collected from the stormwater retention pond in 1989 and found that all had greater than 95 percent reduction of total chromium, with an average reduction of 99 percent. Even a sample with 2,000 milligrams of chromium per kilogram of soil had better than 99 percent reduction (with only 0.5 mg/Kg chromium (VI) remaining).
>
> Dames and Moore also found that the concentration of chromium (VI) in the pond water dropped from 250 micrograms per liter near the inlet (where storm water from the BAC Site entered the pond) to below detection at the outlet pipe (where water could exit the pond and enter the canal). Accordingly, the anaerobic environment of the wetland/pond is highly conducive to the reduction of chromium (VI) to chromium (III), based on both the aqueous phase data from the pond water

>       column and the solid phase data from the pond
>       soils/sediments.

(Id. at ¶ 9.)

Defendants assert that the significance of Dr. Fendorf's opinions is that:

>       [O]ne cannot extrapolate from concentrations of
>       hexavalent chromium present in the pond to
>       concentrations in the canal or elsewhere downstream
>       because any hexavalent chromium in the pond and the
>       canal will undergo reduction to trivalent chromium.

(Doc. 677-1 at 24:13-24:16.)

Defendants next rely on specific sampling evidence near the Beachwood neighborhood to demonstrate an absence of surface water contamination. According to Dr. Stephens, a geologist retained by the BAC Defendants, soil samples from the Beachwood neighborhood are within background levels for total chromium and arsenic:

>       In the Beachwood neighborhood, Merck's and Amsted's
>       consultant, ERM, collected surface soil samples in
>       February 2009. Four shallow soil samples, less than 6
>       inches deep, were collected from two locations: the
>       Gospel Defenders Church at 2909 Beachwood Drive and the
>       Franklin County Water District office at 2115 North
>       Drake Avenue.  The samples were analyzed for arsenic,
>       chromium, hexavalent chromium, copper, and
>       pentachlorophenol ("PCP").  The maximum concentrations
>       found in these soils were 5.4 milligrams per kilogram
>       ("mg/kg," equivalent to parts per million) for arsenic,
>       26.2 mg/kg for total chromium, non-detect for hexavalent
>       chromium (at a detection limit of 0.001 mg/kg), 19.6
>       mg/kg for copper, and non-detect for PCP (at a detection
>       limit of 58.7 micrograms per kilogram [ìg/kg]).  One
>       soil sample showed a potential detection for hexavalent
>       chromium, but that detection was not confirmed when the
>       sample was reanalyzed using a more sensitive method with
>       a lower detection limit.
>
>       [T]he results of the testing at GDC and FCWD [] show
>       that the entire range of concentrations of chromium and
>       arsenic detected at GDC and FCWD are well within the
>       published background concentrations in California and
>       the United States.

5

(Doc. 697 at ¶¶ 17-19.)

Dr. Stephens further opines that before the BAC stormwater pond was clean-closed in 1992, sampling at the pond was below actionable levels. He also states that any water flowing to the El Capitan Canal from the retention pond is diluted by existing canal water:

> Before the BAC stormwater pond was closed in 1992, one sample of stormwater discharge to the irrigation canal was collected with the following results: 11 micrograms per liter (ìg/L) for arsenic, 180 ìg/L for total chromium, non-detect for hexavalent chromium (at a detection limit of 50 ìg/L), and 410 ìg/L for copper (Dames & Moore, 1989). These results are above drinking water standards, but water leaving the BAC stormwater pond via the culvert would likely be highly diluted by other water in the El Capitan Canal. Between 1992 and 2007, after cleanup and closure of the stormwater pond, 25 stormwater discharge samples were collected from the BAC pond (CRWQCB, 2009; Merck, 2006). With the exception of one chromium sample in 1994, concentrations of all metals of concern in these samples have been well below current California drinking water standards.

(Doc. 697-5 at ¶ 26.)

In sum, according to Defendants, in the past eighteen years, no actionable hexavalent chromium has been detected in the El Capitan Canal and the concentrations of arsenic in the canal are within drinking water standards. In addition to this test data revealing an absence of contamination, there is undisputed expert testimony that the hexavalent chromium in the retention pond and canal reduces to trivalent chromium given the presence of organic matter.

Plaintiffs rely on two alleged facts to support their Phase 1 burden concerning surface water exposure: (1) an alleged pathway between the BAC retention pond and the El Capitan irrigation canal through an open pipe; and (2) the pre-1991 detections of hexavalent

6

chromium in the retention pond.  According to Plaintiffs, taking these two facts together, one can infer that contaminated water from the retention pond migrated to the canal, where it migrated to the Beachwood neighborhood with the April 2006 flood waters.

During oral argument on December 29, 2010, Plaintiffs' counsel stated that Dr. Laton, Plaintiffs' hydrologist, provided "an opinion as to the level of chromium that he believed existed in the canal on the day of this flooding." (Rough RT, Dec. 29, 2010 at 169:7-169:8.) Specifically, Dr. Laton opines that the El Capitan Canal contained high levels of chromium contamination for "more than twenty years." According to Laton, the chromium contamination in the El Capitan Canal reached 1,491 ug/l because "the pond water was allowed to flow unimpeded into the EL Capitan Canal." (Doc. 778 at ¶ 27.)

The substance of Dr. Laton's opinions is that Defendants "misled" the Court because Dr. Fendorf analyzed soil samples not surface water samples:

> The defendants are attempting to mislead the court, by stating in their discussion of surface water that more than 99 percent of chromium found in the stormwater retention pond had been reduced to trivalent chromium. In fact, what Fendorf is referring to with his 99 percent reduction statement is the reduction of chromium in soil, not surface water. The real data is undisputable. Total chromium in the pond water was detected as high as 1,490 ug/l in 1989, well above drinking water MCL of 50 ug/l for total chromium.

(Doc. 778 at ¶ 28.)

Dr. Laton also minimized the impact of the 2008 and 2009 samples, and criticized the credibility of the testing efforts of by the BAC Defendants:

> The defendants also argue that chromium has not been

7

>**detected above drinking water standards in canal samples collected downstream of the pond. What the defendants fail to advise the Court is that these samples were collected in 2008 and 2009, almost 20 years after the pond had been cleaned. They provide no data for concentrations in the canal water during the period between 1969 and 1991 when the chemicals of concern were being released into the environment. In fact, the Merck defendants never sampled the canal at any time. This is inexcusable in light of the fact that Merck was well aware of the connection of the pond to the canal and the extraordinary levels of contamination documented in that pond.**

(Id. at ¶ 29.)

Dr. Laton further stated:

>**I have also seen no evidence that Merck ever attempted to collect any offsite environmental testing data in the Beachwood neighborhood including soil, sediment or tap water samples.**

(Id at ¶ 31.)

The evidence introduced by the parties on surface water pathway is conflicting and susceptible of at least two reasonable scientific interpretations. According to Dr. Laton, the contaminated water from the retention pond flowed unimpeded into the EL Capitan Canal for twenty years, at concentrations reaching 1,491 ug/l (chromium) and 630 ug/l (hexavalent chromium). No testing was done prior to 1992 and since, allegedly inadequate testing. Dr. Laton minimizes Dr. Fendorf's soil analysis, opining that soil sampling does not demonstrate the high frequency of chemical reduction described in Dr. Fendorf's expert report.[5] Dr.

---

[5] Defendants argue that Dr. Laton does not address or explain the reduction of hexavelant chromium to trivalent chromium or the dilution of chromium in the water pathways, i.e., Dr. Fendorf's opinions are not disputed. However, Dr. Laton opines that the soil samples were not sufficient to establish the level of reduction identified by Dr. Fendorf.

8

Laton's opinions concerning Merck's credibility, diligence and testing efforts, are marginally relevant to the scientific inquiry, and are not expressed in terms of an applicable standard of scientific care. Drawing inferences in Plaintiffs' favor, if Laton's foundation for and opinions are believed, a dispute arguably exists whether contaminated water from the retention pond reached the El Capitan Canal during the relevant time period.

Laton's opinions concerning the 2009 testing at the FCWD and GDC also demonstrate a factual dispute. Plaintiffs' interpretation of test results is that contamination *was* present during the relevant time-frame; Laton opines that the testing was twenty years tardy and, in any event, is not scientifically sound to exclude the likelihood that chromium contamination reached the El Capitan Canal at actionable levels during the relevant time-frame. Although these tests were within background levels, below the California MCL for total chromium, no samples were taken at the El Capitan Canal or connected water pathway to exclude the presence of alleged contamination. The issue of reasonable scientific contamination is disputed. In view of Dr. Laton's competing scientific observations and opinion, the surface water pathway issues cannot now be decided as a matter of law.

The purpose of Phase 1 was to identify the scientific evidence and determine general exposure of contamination via specified pathways, including surface water. This is an exceedingly close call in view of Dr. Fendorf's expert opinions re: the impact of organic matter on hexavelant chromium (reduction to trivalent chromium), however, a jury must decide whether Dr. Laton's scientific disagreement has any merit. On the current record, this

scientific factual dispute as to the surface water pathway cannot be decided as a matter of law.

Defendants' motion for partial summary judgment on the surface water pathway is DENIED.

B. *Surface Soil Pathway*

As the determination of the surface soil pathway turns on the admissibility and the Sears' air model, as well as the expert testimony of Dr. Laton, the motion is DENIED for the same reasons identified in those Memorandum Decisions. There are scientific factual disputes concerning whether contaminant material from the BAC Site migrated and settled - via airborne and flood pathways - on Plaintiffs' property.

### III. CONCLUSION.

For the reasons stated:

1. The BAC Defendants' motion is DENIED as to the surface water pathway; and
2. The BAC Defendants' motion is DENIED as to the surface soil pathway.

IT IS SO ORDERED.

Dated:   January 6, 2011                         /s/ Oliver W. Wanger
                                         **UNITED STATES DISTRICT JUDGE**