**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ABARCA, RAUL VALENCIA,** *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>**FRANKLIN COUNTY WATER DISTRICT,**<br><br>    Defendants. | 1:07-CV-0388-OWW-DLB<br><br>**MEMORANDUM DECISION RE: DEFENDANT CITY OF MERCED'S MOTION FOR SUMMARY ADJUDICATION (Doc. 669.)** |

**I. INTRODUCTION.**

Before the court for decision is Defendant City of Merced's motion to summarily adjudicate Plaintiffs' fifth, sixth, seventh, eighth, ninth, eleventh, and thirteenth causes of action.[1] According to the City, Plaintiffs have failed to present any admissible evidence of exposure to contaminants from the BAC site, via either groundwater or surface water, which was required under "Phase 1" of the Court's "Order Modifying Scheduling Conference Order." (Doc. 540.) As set forth in that Order, the first phase of discovery was to focus on "whether contaminants from the former

---

[1] The City moves to summarily adjudicate the groundwater contamination portions of the fifth, sixth, seventh, and eighth causes of action. Plaintiffs' remaining three claims against the City are as follows: (1) inverse condemnation; (2) nuisance; and (3) dangerous condition of public property. The elements for these latter causes of action are reproduced in Plaintiffs' opposition to the City's motion, Doc. 806. No other claims are identified by either party.

1

[] BAC Site, Franklin County Water District or the April 2006 Flood have ever reached any location where plaintiffs could have been exposed to them, and if so, when such contaminants arrived, how such contaminants arrived at the location, how long they were present, and at what levels they were present." (Id. at 1:14-1:28.) By this motion, the City asserts that Plaintiffs have not met their "Phase 1" or "general exposure" burden, entitling it to summary adjudication.

## II. FACTUAL AND PROCEDURAL BACKGROUND.

This lawsuit relates to a now-closed cooling tower manufacturing facility (the "BAC site") that was operated by entities formerly owned by the BAC Defendants.[2] Plaintiffs, current or former residents of neighborhoods near the BAC Site,[3] allege that two contaminants from the BAC Site migrated from the facility via groundwater, surface water, and air pathways to locations where plaintiffs were exposed to them. Also named as defendants are various municipalities, water districts, and developers, including the Franklin County Water District, Merced Irrigation District, the City and County of Merced, and the Meadowbrook Water District.

Plaintiffs commenced this civil action on March 8, 2007. Plaintiffs allege that Defendant City Merced maintained a pumping

---

[2] Four separate entities comprise the BAC Defendants: (1) Merck & Co; (2) Amsted Industries, Inc.; (3) Baltimore Aircoil Company, Inc.; and (4) Track Four, Inc.

[3] The former BAC Site is located at 3058 Beachwood Drive, Merced, California.

station which imported storm water from other areas of Merced directly into the Black Rascal Creek/El Capitan convergence which added to the volume and velocity of the flood waters which carried both the chemical and biological contamination into the Beachwood neighborhood. Plaintiffs' claims against the City concern the groundwater and surface water pathways only.

On May 28, 2010, the City of Merced filed its motion for summary adjudication. (Doc. 669-1.) The motion was advanced as a "joint motion" with the County of Merced, however, the County's portion of the Rule 56 motion is not discussed here.[4]

The City argues Plaintiffs do not satisfy their Phase 1 burden on the surface water pathway because there is no evidence that any contaminant migrated from the BAC retention pond to the El Capitan Canal. As to the groundwater pathway, the City asserts that "there is no evidence that the City [] contributed to the groundwater contamination [...] none of the Plaintiffs' addressed whether any of the City's [] activities contributed to the chemical groundwater contamination from the BAC Site or caused biological groundwater contamination from the FCWD Facility." (Doc. 669-1, 5:18-5:27.)

Plaintiffs opposed the motions on July 1, 2010. (Doc. 806.)

---

[4] The City and County of Merced's filed separate replies to the Plaintiffs' opposition. At oral argument, the City requested a ruling "on the papers." The County did not make a similar request.

Despite this express divergence, no effort was made to limit, separate, or distinguish the arguments, separate statement of UDFs, evidence, and/or expert opinions advanced in the original joint motion. No supplement was filed identifying the distinct or different scientific evidence and expert opinion supporting the City's motion. The separate replies still refer to "the City and the County." This was not helpful in view of the voluminous briefing and complex subject matter in this case.

3

1 | According to Plaintiffs, they "have submitted substantial evidence supporting both the fact of this chemical migration to locations where plaintiffs were exposed to them, but also substantial evidence that the County and City and facilities over which they had either ownership or control, caused and contributed to the migration of these chemicals." (Id. at 5:7-5:10.)

### III. <u>LEGAL STANDARD</u>.

Summary judgment/adjudication is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). "[A] non-movant must show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

## IV.   DISCUSSION

### A.   *Surface Water Pathway*

The substance of the Plaintiffs' allegations is that the City's pumping station conveyed imported storm water from other areas of Merced directly into the convergence of Black Rascal Creek/El Capitan, which was allegedly contaminated with water from

5

the BAC Site.[5]  This "imported storm water" allegedly added to the

---

[5] Plaintiffs also allege that the City is liable on the surface water pathway based on its membership in the "Merced Storm Water Group":

> Further, the County and City, by reason of their membership in the Merced Storm Water Group ("Storm Group") and the Merced Streams Group ("Streams Group"), had control over the El Capitan Canal. This canal was one of the facilities specifically overseen by both the Storm Group and the Streams Group Indeed, as early as 1989, the MID's El Capitan Canal, was identified by the Regional Board as a "main pollutant pathway" from the BAC Facility. This occurred through the connection of the El Capitan Canal to the highly contaminated storm drainage pond located on the southeast corner of the BAC site. For decades, contaminants from the pond flowed unimpeded into the El Capitan Canal and then directly into the Beachwood and Thornton Lopes neighborhoods via a culvert installed between the pond and the canal. This canal also flowed directly into the Black Rascal Creek that ran adjacent to the Soares Dairy to the southwest of the BAC. Plaintiffs' hydrological expert James Schaaf has opined that approximately 0.141 million gallons of contaminated water flowed from the pond into the canal per day from December through March. This occurred starting at least in 1969 and continues up to the present.
>
> Plaintiffs' hydrogeologist Dr. W. Richard Laton has further opined that between 1969 and 1991, the average concentration of chromium, primarily in the form of hexavalent chromium, flowing into the canal was 581.8 ppb. This amount is over 10 times the current California MCL for total chromium; is nearly 100 times higher than established background concentrations for total chromium in water; and is over 200 times higher than established background concentrations for hexavalent chromium After 1991, when the BAC ceased its wood treating operations at the facility and after the pond had been remediated, the daily average of chromium contamination in the pond which flowed to the canal was 22.3 ppb-still nearly 4 times the background for total chromium and 8 times background for hexavalent chromium.

(Doc. 806:6-806:28.)

6

volume and velocity of the flood waters which carried contamination into the Beachwood neighborhood:

> As to the City, it maintained a pumping station which imported storm water from other areas of Merced directly into the Black Rascal Creek/El Capitan convergence which added to the volume and velocity of the flood waters which carried both the chemical and biological contamination into the Beachwood neighborhood. The expert reports and deposition testimony of Plaintiffs' expert James Robert Schaaf, Ph.D., P.E., specifically describes the manner and mechanism resulting in the collapse of the El Capitan canal bank and specifically the portion referenced as "man made Black Rascal" resulting in harm to the Plaintiffs. It is also important to note that after the breach occurred, and as the canal water began to flow into the Beachwood neighborhood, the pumping station designed, owned, operated and maintained by the City of Merced, pumped additional flood water into Black Rascal Creek which then flowed into the El Capitan canal and through the breach that had occurred as a result of the subject flooding event and then into the Beachwood neighborhood resulting in further harm to the Plaintiffs.

(Doc. 806, 15:26-16:9.)

Plaintiffs' allegations against the City rely on the theory that contaminated water from the retort area (at the former BAC site) migrated to the retention pond at the former BAC Site, then moved through a pipe connecting the pond to the El Capitan Canal, and, finally, flowed from the canal to the Beachwood neighborhood with the April 2006 flood waters. The City allegedly contributed to the volume and extent of the flooding. In order to satisfy its Phase 1 burden on the surface water pathway against the City, Plaintiff must demonstrate the existence of BAC contaminants at the El Capitan Canal during the relevant time-frame.

Plaintiffs' claims depend on the premise that contaminated water at the BAC site remains in a static state during its migration through organic material and several waterways and the

canal. This assumption, and other scientific evidence and opinion relating to the surface water pathway, was analyzed in the related, but not identical, Rule 56 motion filed by the BAC Defendants. That Memorandum Decision is incorporated by this reference.

There, it was determined that Plaintiffs' hydrologist, Dr. Laton, created a scientific dispute of fact that could not be determined as a matter of law. As fully explained in that Memorandum Decision:

> The evidence introduced by the parties on surface water pathway is conflicting and susceptible of at least two reasonable scientific interpretations. According to Dr. Laton, the contaminated water from the retention pond flowed unimpeded into the EL Capitan Canal for twenty years, at concentrations reaching 1,491 ug/l (chromium) and 630 ug/l (hexavalent chromium). No testing was done prior to 1992 and since, allegedly inadequate testing. Dr. Laton minimizes Dr. Fendorf's soil analysis, opining that soil sampling does not demonstrate the high frequency of chemical reduction described in Dr. Fendorf's expert report. Dr. Laton's opinions concerning Merck's credibility, diligence and testing efforts, are marginally relevant to the scientific inquiry, and are not expressed in terms of an applicable standard of scientific care. Drawing inferences in Plaintiffs' favor, if Laton's foundation for and opinions are believed, a dispute arguably exists whether contaminated water from the retention pond reached the El Capitan Canal during the relevant time period.
>
> Laton's opinions concerning the 2009 testing at the FCWD and GDC also demonstrate a factual dispute. Plaintiffs' interpretation of test results is that contamination was present during the relevant time-frame; Laton opines that the testing was twenty years tardy and, in any event, is not scientifically sound to exclude the likelihood that chromium contamination reached the El Capitan Canal at actionable levels during the relevant time-frame. Although these tests were within background levels, below the California MCL for total chromium, no samples were taken at the El Capitan Canal or connected water pathway to exclude the presence of alleged contamination. The issue of reasonable scientific contamination is disputed. In view of Dr. Laton's competing scientific observations and opinion, the surface water pathway issues cannot now be decided as a matter of law.

(Doc. 984 at 8:14-9:21)(footnote omitted).

This language and analysis apply with equal force to the City's motion.

The City argues the that opinions of Plaintiffs' remaining experts - Dr. Schaaf, Mr. Rawson and Dr. Sert - are similarly flawed. The City alleges that, like Laton, these experts "gave conclusory, unsupported opinions on contaminants in the flood and surface waters, but failed to provide any quantification of the amounts of chemical or biological contamination. (Doc. 669-1 at 12:10-12:13.) A review of the relevant deposition testimony demonstrates that the City's concerns are valid, but only to the extent that these experts independently opined on the specific level of contamination in the El Capitan Canal or in the Beachwood Neighborhood post-April 2006. They were not retained for that purpose; these experts are engineers or hydrologists retained to opine on flood discharge and surface water movement, not chemical contamination or exposure at certain points in time.

The City's final argument is that there is no evidence that any surface water run-off from the BAC Site reached the Beachwood neighborhood as a result of the levee breach. The City supports this argument with the expert testimony of Jeff Haltiner, a hydrologist, who opines:

> During the period of Beachwood flooding (levee overtopping: 02:00 to 07:00 and levee washout: 07:00-16:30 on April 4th), the rising water in the El Capitan Canal greatly inhibited the downstream movement of water from the BAC pond. These flows were stored in the El Capitan Canal upstream of Santa Fe Drive, in the canal upstream of the FCWD access road (middle reach), BAC pond, and rice field areas, and only gradually released as water levels dropped downstream. Between

9

>approximately 17:15 on April 3rd and 11:30 on April 4th, water levels in El Capitan Canal upstream of Santa Fe Avenue prevented out flow from the pond.
>
>Once the flow direction reversed in the El Capitan Canal, the predicted downstream flow velocities were sufficiently low to indicate that water from the BAC ponds would not have reached the location of the Beachwood levee breach during the period of overtopping/washout.

(Doc. 670-14, J. Haltiner Expert Report, Pt. I. pg. 8.)

Mr. Haltiner also opines that by the time the water from the BAC Pond reached the area of the El Capitan Canal, the levee had been repaired. (See Doc. 670-15, J. Haltiner Expert Report, Pt. II, pg. 15.) ("Based on the low velocity in El Capitan Canal from the time the BAC Pond began discharging (11:30) to the time the breach was repaired (five hours later at 16:30), it would have required approximately 10 hours for BAC Pond water to reach the breach [...] [t]his analysis indicates that water from the BAC Pond did not reach the breach prior to the 16:30 time of repair.")

Plaintiffs rejoin that soil samples taken at the (FCWD") and Gospel Defender Church ("GDC"), which did not flood, demonstrate significantly higher concentrations of chromium and arsenic. These arguments were addressed in the Memorandum Decision on the BAC Defendants' motions and are not reproduced here except to note that these tests were within background levels, below the California MCL, for total chromium.

Despite this "higher concentration" argument, Plaintiffs have a proof problem. One of Plaintiffs' flood discharge experts, Dr. Schaaf, stated at his deposition that it was unlikely wastewater from the FCWD Facility ever entered the canal. (See Dec. J. Schaaf at 170:9-170:12)("Yeah, it's -- it's -- let me tell you what you my

opinion would be today. It's probable that water flowed in. It's not probable that water came out.). Mr. Sert, a geotechnical engineer retained for a similar purpose, testified that "the 2006 floodwater flows carried contaminated silt from the site into the storm water retention pond." However, the City objected to the use of his testimony because it is based on independent - and unauthorized - photographs and inspections of Plaintiffs' property.

Although Plaintiffs' evidentiary showing is exceedingly marginal to rebut Mr. Haltiner's expert opinions, it cannot be decided as a matter of law on the current record. The admissibility of Drs. Schaaf and Sert's expressed testimony can be addressed *in limine*.

For the reasons explained above and those contained in the Memorandum Decision on the BAC Defendants' motions, the City's motion is DENIED on the surface water pathway.

B.  *Groundwater Pathway*

The City argues that there is no evidence - expert, scientific or otherwise - that it contributed to groundwater contamination or had on impact on the migration of BAC facility groundwater plumes. According to the City, there is not a single expert opinion concerning the City's impact on alleged groundwater contamination:

> None of Plaintiffs' experts addressed whether any of the City's or County's facilities contributed to the chemical groundwater contamination from the BAC Site or caused biological contamination from the FCWD facility.

(Doc. 669-1 at 9:24-9:27.)

A review of the relevant expert declarations and testimony confirms the City's contentions. Neither Ms. Sears, an air

modeler, nor Dr. Laton, a hydrologist, opined that the City contributed to groundwater contamination. The only two other possible sources for expert opinion, Mr. Bartlett and Dr. Agardy, did not mention the City or its alleged operations/contributions in their expert opinions, depositions, or Daubert hearing testimony (Bartlett only). Dr. Agardy's contribution was the "mass calculation" of contaminant used in Dr. Sears and Mr. Bartlett's model. Mr. Bartlett modeled the movement of groundwater underneath the Beachwood neighborhood, specifically, the movement of alleged contaminated groundwater into Meadowbrook Well No. 2. There was no independent calculation or modeling exercise referencing the City's alleged role as a contributory source concerning groundwater contamination.

Conversely, the City submits the declaration of John Lambie, a hydrologist, who opines that the City (and other Public Entity Defendants) did not have a "measurable impact" on the migration of the BAC facility groundwater plumes. The City summarized Mr. Lambie's opinions as follows:[6]

> 1) Actions of the public entity defendants with respect to groundwater have had no measurable impact on the migration of the BAC facility groundwater plumes of chromium and arsenic [...]
>
> 3) Actions of MID to operate the El Capitan Canal and store and hold surface water behind Crocker Dam seasonally throughout the years has not and did not materially contribute chromium and arsenic to groundwater from the BAC facility; and
>
> 4) The FCWD ponds have not and do not impact groundwater or surface water with the alleged pollutants put forth in Robert Rawson's Expert

---

[6] A review of Mr. Lambie's expert report, (Doc. 670-5), reveals that the City provides an accurate summary of the opinions.

Report.

(Doc. 669-1 at 11:14-11:26.)

There is no indication in the record that Mr. Lambie's opinions are opposed, particularly as to his first opinion. The remaining opinions are less relevant, but included to resolve any uncertainty or ambiguity in the briefing. To the extent Plaintiffs' allegations concern City's alleged membership in the "Merced Storm Water Group," that issue is examined in § IV(C), *infra*.

For the reasons explained above and based on the opinions of Mr. Lambie, the City's motion is GRANTED on the groundwater pathway.[7]

### C. *Duty to Warn*

It is unclear how Plaintiffs' "duty to warn" arguments impact the Phase 1 inquiry. Plaintiffs argue in their opposition that the City of Merced had a "duty to warn" the Beachwood residents of the "massive contamination from the BAC facility of which they were well aware." To the extent understood, this duty applies to all

---

[7] Plaintiffs also alleged that the City is liable for contamination via an air pathway. However, Plaintiffs' expert, Camille Sears, did not opine on the City's activities or their impact on surfaces at the BAC Site. She did not opine on any potential contribution by the City of Merced to potential air pollution. There is a failure of proof on the air pathway. The City's motion is GRANTED. A similar analysis applies to the allegations against the City concerning exposure to the Yosemite Plaintiffs. (See Doc. 807, No. 19.) As to the Thornton-Lopes and Soares Plaintiffs, they support their arguments with expert opinion and evidence, including the declaration of Dr. Laton. This establishes a scientific dispute of fact. As to these Plaintiffs, the City's motion is GRANTED in part and DENIED in part.

13

California municipalities or, separately, is based on the City's operation of the pumping facility and/or membership in the "Merced Storm Water Group." Plaintiffs explain:

> Further, the County and the City had responsibilities as public agenc[ies] to warn this vulnerable neighborhood with regard to the massive contamination emanating from the BAC facility of which they were well aware. Although the they did not create the contamination, their actions and inaction clearly led to the spread of these contaminants and thus, the creation and maintenance of a nuisance within this neighborhood. The County and the City could and should have utilized it's authority to insist that contamination at the BAC facility be remediated in such a manner to limit exposures to the residents and likewise, should have insisted that the residents they served be fully advised as to potential health ramifications as a result of exposure to the contaminants. This is especially so for the County's Office of Environmental Health charged with the protection of the public from the very types of contamination confirmed as emanating from the BAC Facility. These public entities clearly failed in their duties to these residents.

(Doc. 806, at 7:1-7:11.)

It is unclear how these arguments impact the current analysis in that the purpose of Phase 1 was to test the scientific evidence and determine general exposure of contamination via specified pathways, not to determine whether certain municipal notice requirements were followed. This uncertainty is compounded because Plaintiffs do not cite a statute or regulation creating a duty to warn. Assuming, *arguendo*, that such a duty exists, Plaintiffs do not analyze how a duty applies to the City of Merced, when it is acknowledged that neither the BAC facility nor the Beachwood neighborhood are located within the City's boundaries. It is also represented that the City was unaware of the alleged BAC contamination and was not involved in the cleanup by state regulators.

The City's motion is GRANTED as to any "duty to warn" claims or arguments to the extent that are relied upon to establish "general exposure," i.e, Plaintiffs' Phase 1 burden.

### V.  CONCLUSION.

For the reasons stated:

1) The City's motion is DENIED on the surface water pathway;

2) The City's motion is GRANTED on the groundwater pathway;

3) The City's motion is GRANTED on any alleged "duty to warn" claims;

4) The City's motion is GRANTED on the air pathway; and

5) The City's motion is GRANTED in part and DENIED in part with respect to the Yosemite, Thornton-Lopes and Soares Plaintiffs.

IT IS SO ORDERED.

Dated:   January 6, 2011                    /s/ Oliver W. Wanger
                                      **UNITED STATES DISTRICT JUDGE**