1  | Gary T. Drummond, Esq., SBN 47709
   David A. Gifford, Esq., SBN 85909
2  | M. Elisabeth Gifford, Esq., SBN 117022
   Stevens, Drummond & Gifford
3  | 1910 Olympic Boulevard, Suite 250
   Walnut Creek, California 94596
4  | Tel:   (925) 944-5550
   Fax:  (925) 256-9669

5

6  | Attorneys for Defendant Meadowbrook Water
   Company of Merced, Inc.

7

8

9  | UNITED STATES DISTRICT COURT

10  | EASTERN DISTRICT OF CALIFORNIA

11

12  | RAUL VALENCIA ABARCA,, et al.,

13  |          Plaintiffs,

14  |    vs.

15  | MERCK & CO., INC., et al.,

16  |          Defendants.

17

Case No.  1:07-CV-0388-OWW DLB

18

19  | MEADOWBROOK WATER COMPANY'S
NOTICE OF MOTION AND MOTION IN LIMINE
20  | TO EXCLUDE EVIDENCE AND ARGUMENT THAT MWC-2
IS AN "ILLEGAL WELL"

21

22  | [MEADOWBROOK WATER COMPANY'S MOTION IN LIMINE NO. 2]

23

24  | Date:              January 27, 2011
   Time:              12:00 p.m.
   Courtroom:     3
25  | Action Filed:   March 8, 2007
   Trial Date:      February 1, 2011

26

27

28  | Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
Evidence and Argument That MWC-2 Is an "Illegal Well"
[Meadowbrook Water Company's Motion in Limine No. 2]
USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE THAT on January 27, 2011, at 12:00 p.m., in

3  Courtroom 3 of the United States District Court for the Eastern District of California,

4  located at 2500 Tulare Street, Fresno, California, or such other location as may be set

5  by the Court, defendant Meadowbrook Water Company of Merced, Inc.

6  ("Meadowbrook") will and hereby does move this Court for an order excluding any

7  and all evidence or argument relating to the argument that Meadowbrook's well 2 is

8  an "illegal well."

9      This motion is made on the grounds that: (1) it is irrelevant to the Phase 1

10  general exposure trial and unduly prejudicial pursuant to Federal Rules of

11  Evidence 402 and 403; (2) unsubstantiated hearsay offered to prove the truth of the

12  matter stated pursuant to FRE 801 and 802; and (3) based on opinion testimony

13  unsupported by sufficient facts and not the proper subject of expert testimony pursuant

14  to FRE 702.

15      Meadowbrook's motion is based on this Notice of Motion and Motion, the

16  accompanying Memorandum of Points and Authorities, the complete files and records

17  in this action, and such other evidence as may be offered at the hearing on this motion.

18

19  DATED: January 14, 2011        Respectfully submitted,

20                                 STEVENS, DRUMMOND & GIFFORD

21

22                    By:  _David A. Gifford_____

23                                 DAVID A. GIFFORD
                                   Attorneys for Defendant MEADOWBROOK

24                                 WATER COMPANY OF MERCED, INC.

25

26

27

28  Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
    Evidence and Argument That MWC-2 Is an "Illegal Well"
    [Meadowbrook Water Company's Motion in Limine No. 2]
    USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                    2

MEMORANDUM OF POINTS AND AUTHORITIES

I.    Introduction

Defendant Meadowbrook Water Company of Merced, Inc. ("Meadowbrook") anticipates plaintiffs intend to introduce evidence and present argument that Meadowbrook well number 2 ("MWC-2") was extended without a permit by a well contractor under the Merced County well ordinance enacted in 1975.

All references, arguments and suggestions that MWC-2 is "illegal", an "illegal well" or was "illegally deepened" should be excluded as (1) irrelevant to the Phase 1 general exposure trial and unduly prejudicial pursuant to Federal Rules of Evidence 402 and 403; (2) unsubstantiated hearsay offered to prove the truth of the matter stated pursuant to FRE 801 and 802; and (3) based on opinion testimony unsupported by sufficient facts and not the proper subject of expert testimony pursuant to FRE 702.

II.   Absent Proof as to Whether or Not and When MWC-2 Was Extended, the Merced County Well Ordinance Is Irrelevant.

According to the records of the California Department of Public Health MWC-2 was installed in 1960. The Merced County Ordinance, Chapter 9.28 "Wells", cited by plaintiffs in opposition to MWC's summary judgment motion, was adopted in 1975, fifteen years after MWC-2 was installed.[1]  Plaintiffs concede the date of any extension

---

[1]   Opposition to summary judgment, p. 6:27-28 [Document 804]; and see Ordinance No. 752, p. 8, adopted 6/10/75 (Exhibit A to the Declaration of David A. Gifford in support of Meadowbrook Motion in Limine No. 2. (Hereinafter "Gifford Decl.") )

Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude Evidence and Argument That MWC-2 Is an "Illegal Well"
[Meadowbrook Water Company's Motion in Limine No. 2]
USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                    3

1    is "unknown".[2]  Indeed, plaintiffs' well expert, Marvin Glotfelty, admitted "there are

2    no records, field notes, video surveys, or any other form of documentation to verify

3    the specific timing or characteristics" of any MWC-2 deepening.[3]  Thus, there is no

4    foundation the well ordinance had been adopted at the time of any extension and,

5    therefore, it is irrelevant.

6        The well ordinance is further irrelevant because even if an extension of MWC-2

7    happened after 1975, section 9.28.030 only requires the "well contractor", not the

8    owner, to apply for a permit.   Likewise, section 9.28.035 waives the permit

9    requirement in the case of a public water system operating pursuant to a State

10   Department of Public Health Services permit like Meadowbrook Water Company.[4]

11   Meadowbrook is and has always been DHS approved and permitted to continue

12   operating its water supply system.[5]

13       Finally, even if well 2 was extended after adoption of the county ordinance, the

14   cable tool method of drilling exempts it from the annular seal requirements of Part 5.a

15   of section 9.28.060.[6]  According to plaintiffs' well expert, Marvin Glotfelty, the well

16

17   [2]   Opposition to summary judgment, 6:13 [Document 804].

18   [3]   Marvin Glotfelty, Supplemental Report, p. 2, 4/22/10 (Exhibit B to Gifford
19       Decl.)

20   [4]   Merced County Ordinance No. 1271, adopted 6/28/88, section 9.28.035:
21       "When the State Department of Health Services issues an amended permit
         to a public water system constructing a well, the permit and fee will be
22       waived." (Exhibit C to Gifford Decl.)

23   [5]   Meadowbrook's Separate Statement of Undisputed Material Fact 14 in
24       support of Motion for Summary Judgment 10:21-12:14 [Document 671-3].

25   [6]   Merced County Ordinance No. 1271, section 9.28.060 C. Well Construction
26       5.a (3): "Cable tool wells–Wells constructed by the cable tool method of
         drilling are exempt from the annular seal requirements specified in Part 5.a
27       of this section...." (Exhibit C to Gifford Decl.)

28   Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
     Evidence and Argument That MWC-2 Is an "Illegal Well"
     [Meadowbrook Water Company's Motion in Limine No. 2]
     USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                    4

1 driller, Edward Mitchell, encountered hard rocks, had to drive casing and jet to get
2 the well in and stated: "it was constructed, for all practical purposes, like a cable tool
3 well."[7] Further, Glotfelty testified the drive shoe attached to the original well 2 casing
4 was at a depth of 98 feet and based on the driller's log set in a layer of gray/blue or
5 solid clay extending from 90 to 102 feet deep.[8] Thus, well 2 forms a natural annular
6 seal and meets all conditions for exemption from the artificial annular seal
7 requirements of the county ordinance.[9]

8

9 III.  Plaintiffs Should Be Precluded from Introducing or Referring to
      Evidence of MWC-2 as an Illegal Well Because it Is Based on
10      Inadmissible Hearsay and Improper Expert Opinion Testimony.

11        Whether or not MWC-2 was extended and, if so, when, are factual issues. Yet,
12 plaintiffs only offer an unattributed hearsay statement in a June 1992 IT Corporation
13 field investigation report stating MWC-2 was originally constructed in 1960 and "at
14 a later date...drilled to a total depth greater than 155 feet.  A 12 inch liner was
15 installed to a depth of 155 feet."[10]  The statement should be excluded pursuant to
16 FRE 801 because it does not specifically identify the source of the information, the
17 hearsay declarant, if any, or who the information was told to, if at all.

18        Even if the field investigation report were admissible, plaintiffs should be
19 precluded from arguing MWC-2 is somehow "illegal" because the report does not

20 _____

21     [7]  Glotfelty 11/30/09 report, attachment B., (Exhibit D to Gifford Decl.)

22     [8]  Glotfelty deposition, 63:24-64:3; 67:14-22; 71:20-25, 3/17/10. (Exhibit E
23         to Gifford Decl.)

24     [9]  Murray Einarson deposition, 130:20-131:8; 133:8-20, 4/16/10, (Exhibit F,
25         Gifford Dec.); Merced County Ordinance 9.28.060 C. Well Construction
         5.a (3)(a)-(c). (Exhibit C to Gifford Decl.)
26
     [10]  IT Corporation Group II Field Investigation Report, p. 36, June 1992,
27         (Exhibit G to Gifford Decl.)

28 Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
   Evidence and Argument That MWC-2 Is an "Illegal Well"
   [Meadowbrook Water Company's Motion in Limine No. 2]
   USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                                    5

1   establish when--for purposes of applying the county well ordinance--the extension

2   occurred.   It only says at some "later date" after original construction in 1960.

3   Nothing about the document permits the inference MWC-2 was extended after the well

4   ordinance was adopted in 1975.

5   Nor is there anything in the IT field report to support plaintiffs' unsubstantiated

6   claim based on Mr. Glotfelty's opinions that an extension of MWC-2 "occurred during

7   the same time period that Merck's remediator IT Corporation" was investigating

8   around 1992.[11]   There are simply no facts, let alone sufficient facts, to support an

9   expert opinion as to the date of the alleged extension.   Any such opinion would be

10  pure speculation without foundation.

11  On the contrary, there is documentary evidence perforations existed at MWC-2

12  as of August 1974, before the 1975 county ordinance.   A Merced County Health

13  Department survey and inspection report signed by Roland Brooks, deceased, dated

14  August 1974 states the well was originally drilled in 1960 with "First Perforations at

15  100 feet."[12]   The MCHD well survey and inspection permits the inference that either

16  any modification of MWC-2 occurred before August 1974 and the 1975 well

17  ordinance or it was originally constructed with perforations and never modified at all.

18

19  IV.   The Court Should Exclude Evidence and Argument of MWC-2 as an
       Illegal Well as Unduly Prejudicial Under FRE 403.

20

21  Permitting plaintiffs and their experts to level unfounded charges of an "illegal

22  well" would unfairly prejudice Meadowbrook and invite a verdict on improper bases,

23  such as passion and prejudice.   Rule 403 is intended to prevent such unfair prejudice.

24

25  [11]   Opposition to summary judgment , 6:13; 7:5-7 [Document 804].

26  [12]   MCHD well survey and inspection report, August 1974, MWC 003184,
       8/16/10 Hearing Exhibit L.2-3, Court Exhibit No. 42

27

28  Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
    Evidence and Argument That MWC-2 Is an "Illegal Well"
    [Meadowbrook Water Company's Motion in Limine No. 2]
    USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                          6

1  *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  Unfounded charges of an illegal

2  well could be used to imply fraud or concealment where there is no evidence of it.

3  Unsubstantiated claims of an illegal well are especially prejudicial where plaintiffs did

4  not specifically plead fraud as to Meadowbrook as required by FRCP Rule 9(b).[13]

5  Also, charges of an illegal well are more prejudicial than probative particularly as

6  plaintiffs' groundwater modeling expert, Douglas Bartlett, testified whether or not

7  MWC-2 was extended is irrelevant to his groundwater model.[14]

8

9  V.     CONCLUSION

10         For the foregoing reasons, Meadowbrook respectfully requests the Court grant

11  the motion and issue an order:

12         1.     Excluding from evidence any documents or testimony referring to

13                MWC-2 as "illegal", an "illegal well" and "illegally deepened or

14                extended";

15         2.     Precluding plaintiffs and their counsel from presenting such arguments

16                or evidence; and

17         3.     Directing plaintiffs' counsel to instruct their witnesses not to refer to any

18                such evidence.

19

20

21

22

23  / / /

24

25  [13]  See Meadowbrook Motion in Limine No. 1 to exclude evidence and
          argument of fraud.

26

27  [14]  Bartlett Deposition, 484:10-20, 4/8/10 (Exhibit H to Gifford Decl.)

28  Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
    Evidence and Argument That MWC-2 Is an "Illegal Well"
    [Meadowbrook Water Company's Motion in Limine No. 2]
    USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB                                    7

1       A proposed order is submitted herewith.

2

3   DATED: January 14, 2011          Respectfully submitted,

4                                   STEVENS, DRUMMOND & GIFFORD

5

6                                     By: _____

7                                     DAVID A. GIFFORD
                                  Attorneys for Defendant MEADOWBROOK

8                                     WATER COMPANY OF MERCED, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
     Evidence and Argument That MWC-2 Is an "Illegal Well"
     [Meadowbrook Water Company's Motion in Limine No. 2]
     USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB         8

DECLARATION OF DAVID A. GIFFORD

I, DAVID A. GIFFORD, declare:

1.    I am an attorney at law licensed to practice in the courts of the State of California and the United States District Court , Eastern District of California and am a partner in the Law Offices of Stevens, Drummond & Gifford, attorneys of record for the defendant Meadowbrook Water Company of Merced, Inc. (Meadowbrook). I make this declaration in support of Meadowbrook's Motion in Limine to Exclude Evidence and Argument That MWC-2 Is an "Illegal Well."  All the facts stated herein are within my personal knowledge and if called as a witness, I could completely testify thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of Merced County Ordinance 9.28.035.

3.    Attached hereto as Exhibit B is a true and correct copy of Merced County Ordinance 9.28.060 C. Well Construction 5.a (3).

4.    Attached hereto as Exhibit C is a true and correct copy of excerpts from Marvin F. Glotfelty's Expert Report dated November 30, 2009.

5.    Attached hereto as Exhibit D is a true and correct copy of excerpts from Marvin F. Glotfelty's March 17, 2010 deposition transcript.

Attached hereto as Exhibit E is a true and correct copy of excerpts from Murray Einarson's April 16, 2010 deposition transcript.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration was executed on January 14, 2011, in Walnut Creek, California.

DAVID A. GIFFORD

---

Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude Evidence and Argument That MWC-2 Is an "Illegal Well"
[Meadowbrook Water Company's Motion in Limine No. 2]
USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Meadowbrook Water Company's Notice of Motion and Motion in Limine to Exclude
Evidence and Argument That MWC-2 Is an "Illegal Well"
[Meadowbrook Water Company's Motion in Limine No. 2]
USDC Eastern Dist. Case #: 1:07-CV-0388-OWW DLB

10

**EXHIBIT A**

ORDINANCE NO. 752

AN ORDINANCE ESTABLISHING STANDARDS FOR THE CONSTRUCTION,
RECONSTRUCTION AND DESTRUCTION OF WATER WELLS AND CATHODIC
PROTECTION WELLS WITHIN THE UNINCORPORATED AREAS OF MERCED
COUNTY:  PRESCRIBING PENALTIES FOR THE VIOLATION OF ITS
PROVISIONS:  AND DECLARING THIS ORDINANCE TO BE NECESSARY
FOR THE PRESERVATION OF THE PUBLIC HEALTH, SAFETY, PEACE,
AND GENERAL WELFARE.

THE BOARD OF SUPERVISORS OF THE COUNTY OF MERCED, STATE OF
CALIFORNIA, DO ORDAIN AS FOLLOWS:

Section 1.  Purpose.

The Board of Supervisors of Merced County declare that the
purpose of this Ordinance is to protect the ground waters of the State
for the enjoyment, health, safety and welfare of the people of the
County by regulating the location, construction, maintenance, abandon-
ment and destruction of all wells which may effect the quality and
potability of the underground waters.  It shall be unlawful for any
person to violate any of the provisions of this Ordinance.

Section 2.  Definitions.

A.  Well or Water Well.  As defined in Section 13710 of
the Water Code, well or water well:

". . . means any artificial excavation constructed by any
method for the purpose of extracting water from, or inject-
ing water into, the underground.  This definition shall not
include: (a) oil and gas wells, or geothermal wells construct-
ed under the jurisdiction of the Department of Conservation,
except those wells converted to use as water wells; or (b)
wells used for the purpose of (1) dewatering excavation dur-
ing construction, or (2) stabilizing hillsides or earth
embankments."

B.  Cathodic Protection Well.  An artificial excavation in
excess of 50 feet constructed by any method for the purpose of install-
ing equipment or facilities for the protection electrically of metallic
equipment in contact with the ground, commonly referred to as cathodic
protection.

C.  <u>Contamination</u>.  An impairment of the quality of water to a degree which may create a hazard to the public health through poisoning or the spread of disease.

D.  <u>Pollution</u>.  An alteration of the quality of water to a degree which unreasonably affects (1) such waters for beneficial uses, or (2) facilities which serve such beneficial uses.  Pollution may include contamination.

E.  <u>Annular Seal</u>.  A water-tight seal of cement grout or other approved material placed between the well casing and the side wall of the drilled hole.

F.  <u>Sanitary Seal</u>.  A grout, mastic or mechanical device to make a water-tight joint between the pump and casing or concrete base.

G.  <u>Surface Seal</u>.  A monolithically poured concrete platform constructed around the top of the well casing on thoroughly compacted earth.

H.  <u>Well Pit</u>.  An installation in which the top of the well casing terminates below the ground surface.

I.  <u>First Water Bearing Strata</u>.  The first water aquifer encountered below the ground surface extending down to the impervious layer on which the water table is perched or, in the absence of a well defined layer, an arbitrary depth of 50 feet.

J.  <u>Person</u>.  A natural person, individual, firm, partnership, company, corporation, association, joint venture, joint stock company, organization, club, business trust, lessee, agent, steward, officer, employee, unincorporated association or representative of same.

K.  <u>Health Officer</u>.  The Health Officer of Merced County or his authorized representative.

L.  <u>Abatement Order</u>.  Both mandatory and prohibitory orders requiring or prohibiting the construction, reconstruction, repair or destruction of a well so as to eliminate a nuisance or potential hazard of a well polluting or contaminating the ground water resource.

## Section 3.  Permit Requirements.

The owner of property upon which a well is located or proposed to be located, or his authorized representative, shall apply for and obtain a permit from the Health Officer prior to the construction, reconstruction, deepening or destruction of any well within Merced County.  The application for a permit shall be in the form prescribed by the Health Officer and contain such information as the Health Officer may require.  Every permit issued shall be contingent upon compliance with the requirements specified in this Ordinance and on the permit. For the purpose of this section the term "well" shall include cathodic protection wells.

## Section 4.  Emergency Exemption.

In the event of an emergency, repair of a well may be begun without obtaining a permit.  All emergency work shall comply with the provisions of this Ordinance.  As soon as possible thereafter the owner or his authorized representative shall apply to the Health Officer for a well construction permit and shall, in addition, submit a statement explaining in detail the nature of the emergency.  If the Health Officer finds that the work accomplished does not comply with the provisions of this Ordinance he shall order that such additional work be performed as may be necessary to insure compliance with this Ordinance.

## Section 5.  Water Well Standards.

A.  Except as may be otherwise specified in this Ordinance, the standards for the construction, repair, reconstruction, or abandonment of wells published in Chapter II and Appendixes E, F and G of the Department of Water Resources Bulletin No. 74, "Water Well Standards", State of California and Bulletin 74-1, "Cathodic Protection, Well Standards" or as may be subsequently revised or supplemented, are

-3-

hereby incorporated in and made an applicable section of this Ordinance. The Standards for the distances a well may be placed from a septic tank, leach line, disposal field, seepage pit, or sewerline published in the "Guidelines for Waste Disposal from Land Developments" adopted December 15, 1972, by the California Regional Water Quality Control Board are hereby adopted and applicable.

B.  All wells shall be so constructed as to prevent the entrance of surface water and foreign matter from any source into the well or into any aquifer.

C.  The construction of a well pit is prohibited except in dewatering agricultural areas when discharge is into irrigation facilities only.

D.  All pumping equipment shall be installed with protective devices to effectively prevent the entrance of foreign matter or back siphonage into the well casing.  A properly designed air gap may be considered an acceptable protective device for agricultural wells.

E.  All wells shall have a sanitary seal, surface seal, annular seal and the top of an open casing sealed to prevent contamination or pollution of the ground water resource.  An access opening in the well casing or pump base required for the purpose of disinfecting the well or measuring the water level shall be protected with a threaded, water-tight plug or cap.  Wells requiring air vents shall be installed in an approved manner.

F.  All wells and associated equipment furnishing or in contact with potable water for domestic purposes, shall be disinfected after the construction, installation or repair of the well, pump, or storage equipment and prior to its use or return to operation.

G.  All wells supplying potable water for human consumption or domestic purposes shall be constructed with a fifty (50) foot minimum, continuous, unperforated casing terminating below the first

water strata, except in areas where the only potable water is at a depth of less than fifty (50) feet. In such instances the depth of the annular seal may be reduced if prior approval is granted by the Health Officer and additional precautions as may be specified by the Health Officer are accomplished.

H. The owner shall continuously maintain, in accordance with the provisions of this Ordinance, any well which is in or out of service, so as to be safe and to prevent pollution of any aquifer. A properly maintained out-of-service well shall not be considered to be an abandoned well.

I. All wells penetrating CORCORAN CLAY shall be constructed in a manner such as to prevent the intermixing of waters above and below the CORCORAN CLAY layer. There shall be no perforations above and below the CORCORAN CLAY layer in the same casing.

### Section 6. Exceptions.

A. Agricultural wells which do not penetrate below fifty (50) feet and are not used for domestic purposes or within 300 feet of a domestic well, are exempted from the annular, surface and sanitary seal requirements, however the top of the open casing must be sealed to prevent a safety hazard and foreign objects polluting or damaging the well.

B. Drainage wells used for dewatering agricultural areas, with unrestricted casing perforations and discharging to irrigation facilities only, are exempt from the annular, surface and sanitary seal requirements, however the top of the open casing must be sealed to preclude a safety hazard or foreign objects polluting or damaging the well.

C. The Health Officer may authorize an exception to any provision of these standards (Section 5), when in his judgement, the

Application of such provisions is unnecessary or impose additional requirements if necessary to protect the quality of the underground water resource. Specific conditions or exceptions will be prescribed on the variance permit.

### Section 7.  Well Drillers and Pump Installers.

Wells shall be constructed and pumps installed by contractors licensed in accordance with the provisions of the Contractors License Law of the State of California (Chapter 9, Division 3, Business and Profession Code), unless exempted by the Act.  Nothing herein contained shall preclude a resident or owner from doing his own work.

### Section 8.  Inspection.

A well site and surrounding property may be inspected by the Health Officer at any time prior to the construction or destruction of any well.  Upon completion of the work authorized by a permit, and before the well is used, or upon the destruction of a well, the Health Officer shall make an inspection.

### Section 9.  Abandoned Well.

Every abandoned well shall be considered the property owner's responsibility and shall be destroyed in accordance with the methods prescribed in the standards.  The Health Officer shall have the authority to order the destruction or repair of any abandoned well that is polluted or unsafe or is so located as likely to become polluted.

### Section 10.  Appeals.

A.  Any person whose application for a permit or for an approval has been revoked, denied, modified or additional standards imposed may, within thirty (30) days after the date of such denial, or

revocation, appeal therefrom in writing, to the Board of Supervisors. The Board shall set a date for hearing said appeal and the applicant and the Health Officer notified thereof.  This section does not author-ize appeals to the Board from any action of the Health Officer author-ized or required by State law or regulation.

B.  At the hearing of an appeal to the Board of Supervisors, any interested party may present oral or written evidence.  Following the hearing, the Board shall render a decision upon the appeal and may sustain, modify, or reverse any action of the Health Officer.  The decision of the Board shall be final.

### Section 11.  Permit Fees.

The following fee schedule has been established to partially cover the administrative costs of issuing a permit and installation inspection.

| | | |
|---|---|---|
| A. | New Well Permit and Installation Inspection | $25.00 |
| B. | Reconstruction of Existing Well | $10.00 |
| C. | Abandoned Well Permit and Inspection | None |

### Section 12.  Enforcement.

The Health Officer shall enforce this Ordinance, and may perform all acts necessary or proper to accomplish the purposes of this Ordinance.

### Section 13.  Violation.

Any person violating any of the provisions of this Ordinance shall be guilty of a misdemeanor and upon conviction thereof, shall be punished by a fine not to exceed $500.00 or by imprisonment in the County Jail not to exceed six (6) months or by both such fine and imprisonment.

Section 14. Effective Date.

This Ordinance shall take effect thirty (30) days after its passage and prior to the expiration of fifteen (15) days after the adoption shall be published in a newspaper of general circulation within the County of Merced.

Adopted by the Board of Supervisors of Merced County on June 10, 1975 by the following vote:

AYES: Johnnie J. Ramondini, Chairman, E. G. Nordman, Fred Wack, Al Goman, Pete A. Cassinerio

NOES: None

Absent: None

CHAIRMAN of the Board of Supervisors of the County of Merced, California

(SEAL)

ATTEST:

KENNETH L. RANDOL
COUNTY CLERK AND Ex-Officio Clerk
of the Board of Supervisors of the
County of Merced, California

By_____ Deputy

-8-

**EXHIBIT B**

All Counsel
Re: *Abarca, et a. v. Merck & Co., Inc., et al.*
April 22, 2010
Page 2

       Re:     **Abarca, et al. v. Merck & Co., Inc., et al.**
                United States District Court, Eastern District of California
                Case No. 1:07-CV-0388 OWW DLB

Dear Counsel:

      Pursuant to Federal Rule of Civil Procedure 26(e)(2), enclosed please find the supplemental report of plaintiffs' expert Marvin Glotfelty. The nature of Mr. Glotfelty's supplemental opinions and testimony is self-evident within the substance of his report. Plaintiffs understand however, that defense counsel may wish to re-depose Mr. Glotfelty on the limited issues addressed within his supplemental report. As such, plaintiffs will offer up Mr. Glotfelty for deposition on May 5, 2010, if defense counsel deem a second deposition is necessary. As to the location of the deposition, plaintiffs are amenable to either Los Angeles or San Francisco. Plaintiffs are likewise amenable to discussing other dates for Mr. Glotfelty's deposition, if defense counsel is unavailable on that date.

                    Very truly yours,

                    MARDEROSIAN, RUNYON,
                    CERCONE & LEHMAN

                    Michael G. Marderosian

MGM:nw
Enclosure

cc:     Thomas V. Girardi, Esq. (*via email: tgirardi@girardikeese.com*)
      Stephen G. Larson, Esq. (*Via email: slarson@girardikeese.com*)
      Shawn J. McCann, Esq. (*via email: smccann@girardikeese.com*)
      GIRARDI & KEESE

      Michael J. Bidart, Esq. (*via email: mbidart@sbd-law.com*)
      SHERNOFF, BIDART, DARRAS & ECHEVERRIA

      Jack Silver, Esq. (*via email: warrioreco@yahoo.com*)
      LAW OFFICES OF JACK SILVER

                                  Ex. B

SUPPLEMENT TO TESTIMONY AND REPORTS OF
Marvin F. Glotfelty, R.G.
April 21, 2010

The following information is provided to supplement and clarify my previous reports and my deposition testimony on the issue of the depth of the initial MWC-2 Well casing. Additional review and analysis of historical documents related to this issue prompted the preparation of this supplemental report. The historical records regarding Meadowbrook Water Company Well No. 2 (MWC-2) support my opinion set forth in this report, that the 14-inch diameter casing extends from the ground surface to a depth of approximately 80 feet rather than 98 feet, as previously referenced in my original expert report (dated November 30, 2009) and my rebuttal report (dated March 10, 2010). The information presented herein supports this interpretation and provides rationale and evidence to support my conclusion. My modified interpretation of the depth to the base of the 14-inch diameter Well MWC-2 casing does not otherwise alter my findings or professional opinions, as previously provided in either of my reports or my deposition testimony.

The records of original well construction and subsequent modification of Well MWC-2 are sparse, and in many cases, contradictory. Table 1 is a chronologic listing of the reported borehole and casing depths over the 50-year history of Well MWC-2. Table 1 clearly demonstrates the inconsistency of the records on Well MWC-2, with regard to the well's borehole and casing depth. Unfortunately, when Well MWC-2 was originally installed in 1960, the only documentation of the well construction was the well log. The well log provided information that the original borehole was drilled to approximately 130 feet below land surface (bls), but the depth of the original 14-inch diameter well casing was not recorded at the time of well construction.

Subsequent information regarding the borehole and/or well casing depths can primarily be traced back to a single information source. Essentially all post-construction reports of the borehole and casing depths are based on documents or reports generated directly by Meadowbrook Water Company, or from reports prepared by other entities that appear to rely entirely on information provided by Meadowbrook Water Company. In fact, I have seen no evidence of any independent investigation by any individual or entity confirming the actual physical characteristics of MWC-2, prior to the video survey performed on behalf of the plaintiffs in 2009.

Review of Table 1 indicates that the earlier reports of the 14-inch diameter casing depth (before about 1992) were about 98 to 100 feet bls. Then, in June and September of 1992, two separate reports by the Merck consultant, IT Corporation, indicated Well MWC-2 had been modified by that point in time, with the installation of a 12-inch diameter well liner, and the deepening of the open borehole at the bottom of the well. The term *well liner* refers to a smaller-diameter (12-inch wide) length of steel tubing that was installed within the 14-inch diameter casing and down into the open borehole beneath it. Both 1992 IT Corporation reports indicated that a 12-inch diameter well liner had been installed to a depth of 155 feet, although we now know with certainty (from the August 5, 2009 well video) that the 12-inch liner extends only to a depth of about 132 feet bls. Notwithstanding the casing depth errors in the two IT Corporation reports, these reports clearly document the timing of the well modification. The liner installation and deepening of Well MWC-2 must have occurred prior to the time the first IT Corporation report

was prepared in June 1992. There are no records, field notes, video surveys, or any other form of documentation to verify the specific timing or characteristics of the Well MWC-2 liner installation and deepening from which IT could have made this statement in June 1992. Accordingly, either IT Corporation was informed of the well modification directly by Meadowbrook representatives or others who had knowledge of the modification, or IT Corporation itself had firsthand knowledge of this critical well modification.

The information in the IT reports impeaches the credibility of many of the subsequent reports that were prepared between 1992 and 2009. With only three exceptions (the October 1996 Boyle Engineering report, the August 2000 Well Data Sheet, and the April 2001 MTBE Vulnerability Assessment Form), none of the reports from this 17-year period indicated that the well had been reconstructed by installation of a well liner and deepening of the borehole. The casing depths and borehole depths that were reported in the period from 1993 to 2008 exhibit broad variations that are entirely uncorroborated by supporting data.

Meadowbrook Water Company's Annual Reports to the Office of Drinking Water in the years 1990-1993 did not provide any indication of the deepening, liner installation, or other modifications to Well MWC-2. Also, the Merced County Department of Public Health has no record of the modification to Well MWC-2. The lack of any reports, required permits for well modification, or other expected documentation of Well MWC-2's reconstruction in about 1992 is highly unusual.

A number of facts related to Well MWC-2 during this time period are also highly unusual:

a) The generally undocumented modification of Well MWC-2 was first reported by IT Corporation in the same month that contamination from the BAC site was reported to extend off the BAC site, in a monitoring well drilled at the M&A Market.

b) The modification of Well MWC-2 occurred during the same time period that IT Corporation was underway with its hydrogeologic investigation on behalf of Merck, who had been ordered by the Regional Board to conduct an investigation of the vulnerability of off site wells around the BAC facility.

c) The timing of the Well MWC-2 modification was very close to the time that a new well (Well MWC-4) was installed for Meadowbrook Water Company.

d) Although IT Corporation had reported the liner installation and deepening of Well MWC-2 in both the June 1992 and September 1992 reports, there was no mention of either the liner installation or deepening of this well in the subsequent IT Corporation reports of April 27, 1994, October 18, 1994, or June 1, 1999.

e) The mill slotted perforations that were observed in the August 5, 2009 video survey of Well MWC-2 (in the interval from 88 feet to about 130 feet, bls) were never mentioned in any report, well log, or other documentation prior to the confirmation of their presence by the 2009 video.

The environmental contamination investigation at the BAC facility would be expected to have prompted thorough oversight and documentation of the characteristics and history of Well

**EXHIBIT C**

*Ex* C

ORDINANCE NO. __1271__

AN ORDINANCE AMENDING CHAPTER 9.28, TITLE
"WELLS," TO ALIGN THE COUNTY CODE WITH TH
STATE REGULATIONS CONCERNING WATER WELLS.
(Ord. 1197, 1128)

THE BOARD OF SUPERVISORS OF THE COUNTY OF MERCED, STATE OF
CALIFORNIA, ORDAINS AS FOLLOWS:

SECTION 1:  Chapter 9.28, Section 9.28.010, titled
"Purpose," approved by the Board of Supervisors as Ordinance
Number 1128, Section 2, is hereby repealed and reinstated as
follows.

9.28.010  Declaration and Purpose.
A.  The Board of Supervisors of Merced County finds that the
majority of water used in the county is obtained from underground
sources and that such waters are subject to impairment in quality
and purity, causing detriment to the health, safety, and welfare
of the people of the county.  The Board of Supervisors therefore
declares that the people of the county have a primary interest in
the location, construction, maintenance, abandonment, and
destruction of water wells, monitoring wells, and cathodic
protection wells.
B.  The Board of Supervisors finds and declares the
following:
1.  Improperly constructed, abandoned, and destroyed
water, cathodic protection, and monitoring wells can allow
contaminated water on the surface and in subsurface strata to
flow down the well casing, thereby contaminating the useable
groundwater.
2.  Contamination of groundwater poses serious public
health and economic problems in many areas of the county.
3.  The Health Officer is responsible for regulating
all aspects of well permitting, construction, inspection, and
standard enforcement in all areas  of Merced County subject to
ordinance adoption by Resolution by incorporated cities, based on
the following:
a.  The health implications of contaminated
groundwater and the inherent responsibilities of the County
Health Officer to address health matters in incorporated areas
not served by their own health authority.
b.  Groundwater cannot be contained within incor-
porated or unincorporated boundaries.  Varying standards and
enforcement of standards within individual incorporated areas
impact the quality of groundwater in the county as a whole.
c.  Regulation and monitoring of hazardous
material storage in underground tanks within Merced County is the
responsibility of the County Health Officer.  Construction of

-1-

monitoring and recovery wells is required under this program.  It is important that the regulatory agency and the involved private parties not be encumbered by duplication of effort or conflict in regulations.

        d.  Under Title 17 of the California Administrative Code, the health agency has the overall responsibility for preventing water from unapproved sources from entering potable water systems.

    SECTION  2:  Chapter 9.28, Section 9.28.020, of the Merced County Code, titled "Definitions," is amended to read in part as follows:

* * *

    E.  "Annular seal" means a watertight seal of cement grout or other approved material placed between the well casing and the side wall of the excavation.

    F.  "Cathodic protection well" means "any artificial excavation constructed by any method for the purpose of installing equipment or facilities for the protection electrically of metallic equipment in contact with the ground, commonly referred to as cathodic protection."

* * *

    J.  "Dry/Drainage Well" means a well constructed for the purpose of disposing of waste water, hazardous material, or drainage water.

    K.  "Health officer" means the Health Officer of Merced County or an authorized representative of the Health Officer.

    L.  "Industrial Well" means a water well used to supply water for an industrial plant or operation or agricultural processing plant.  The water may also be used for domestic purposes.

    M.  "Monitoring Well" means an artificial excavation by any method for the purpose of monitoring the fluctuations in groundwater levels, the quality of underground waters, the presence or concentration of contaminants in subsurface soil and water, and for the purpose of vapor monitoring.

    N.  "Out-of-service well" means a water well not presently in service for which the owner has declared his intention for future use.  An out-of-service well will be considered abandoned if after one (1) year from the date it is taken out of service it has not been placed in service.

    O.  "Person" means any individual, firm, corporation, or governmental agency subject to the jurisdiction of the County of Merced.

    P.  "Pollution" means an alteration of the quality of water to a degree which unreasonably affects (1) such waters for beneficial uses; or (2) facilities which serve such beneficial uses.  Pollution may include contamination.

    Q.  "Public well" means a water well furnishing potable water for human consumption which has five (5) or more service connections or regularly serves an average of at least

-2-

twenty-five (25) individuals daily at least sixty (60) days out of the year.

R.   "Quality of water" refers to chemical, physical, biological, bacteriological, radiological, and other properties and characteristics of water which affect its use.

S.   "Recharge/injection well" means a well constructed to introduce water into the ground as a means of replenishing groundwater basins, repelling the intrusion of sea water, or to introduce water, nutrients and/or microbes for the purpose of subsurface contamination treatment.

T.   "Sanitary seal" means a grout, mastic or mechanical device to make a watertight joint between the pump and casing or between the pump base and the concrete platform.

U.   "Soil boring" means an artificial excavation by any method for the purpose of obtaining lithology or for the purpose of determining the presence or extent of contamination in subsurface soils.

V.   "Surface seal" means a monolithically poured concrete platform constructed around the top of the well casing on thoroughly compacted earth.

W.   "Test well" means a well constructed for the specific purpose of determining geologic and hydrologic data prior to the construction of a well.

X.   "Well or water well" as defined in Section 13710 of the Water Code, well or water well means "any artificial excavation constructed by any method for the purpose of extracting water from, or injecting water into, the underground.  This definition shall not include:

(a)  oil and gas wells, or geothermal wells constructed under the jurisdiction of the Department of Conservation, except those wells converted to use as water wells; or

(b)  wells used for the purpose of (1) dewatering excavation during construction, (2) stabilizing hillsides or earth embankments, or (3) monitoring wells."

Y.   "Well construction" means creation of an artificial excavation by any method for the purpose of obtaining water, providing cathodic protection, or monitoring subsurface water, soil, or vapors.  Construction shall include excavation, placement of the annular, surface, and sanitary seals and installation of the sample faucet, as appropriate.

Z.   "Well pit" means an installation in which the top of the well casing terminates below the ground surface.

SECTION 3:  Chapter 9.28, Section 9.28.030, of the Merced County Code, titled "Permit--Requirement", is amended to read as follows:

9.28.030  Permit--Requirement.
A.   The well contractor shall apply for and obtain a permit from the Health Officer prior to commencing construction, reconstruction, deepening, abandonment, or destruction of any well or

soil boring within the unincorporated areas of Merced County and
incorporated areas where authorized.  The application for a
permit shall be in the form prescribed by the Health Officer and
contain such information as the Health Officer may require.
Every permit issued shall be contingent upon compliance with the
requirements specified in this chapter and on the permit.  For
the purpose of this section the term "well" shall include
cathodic protection wells, monitoring wells, and soil borings.

B.  When one or more wells are existing on a parcel, an
application for permit to construct a water well on the same
parcel must be accompanied by a "Letter of Intent" for each well,
signed by the property owner which elects one of the following
options concerning the future of the existing well(s):

1.  Immediate destruction at the time the new well is
placed in service (required under the conditions in 9.28.110); or

2.  Continued use coinciding with the use of the new
well; or

3.  Taking the well out of service and maintaining it
in accordance with the provisions of this chapter for a period of
one year.  At the end of one year the well will be restored to
service or be destroyed in accordance with this chapter.  A
permit and inspection are required when an out-of-service well is
placed into service.

C.  When the well contractor makes an application for a
permit said contractor shall have on file or file a copy of a
valid C-57 license and a certificate of insurance which states
that there is in existence a valid policy of workmen's compensa-
tion insurance in a form approved by the Insurance Commissioner.
Said certificate shall show the following:

1.  The expiration date;

2.  Coverage is provided for construction permits in
accordance with Labor Code Section 3800;

3.  The insurer shall give the county at least ten (10)
days' notice of the cancellation of the policy.  No permit shall
be issued without the above insurance information.

D.  It shall be the responsibility of the well contractor to
post the permit at the work site prior to commencement of work
for which the permit is required.  Any drilling contractor who
fails to comply with this requirement and commences work for
which a permit is required but has not been secured, and without
twenty-four (24) hours notification prior to commencing work (as
reflected in Section 9.28.080 herein), shall be in violation of
this chapter.

E.  A permit shall be required for the construction of a
test well.  If subsequent test wells are constructed at the same
location within a period of thirty (30) days, separate fees will
not be charged for each permit, unless more than one completed
water well is constructed.  All abandoned test wells shall be
destroyed in accordance with the methods prescribed in Section
9.28.060 of this chapter.

-4-

F.  An application for a well permit may be submitted to the Merced County Department of Health by mail, but construction of the proposed well shall not be commenced until the permit application has been approved by the Health Officer and the contractor is in receipt of the approved permit.

G.  An application for a water well permit shall be accompanied by a non-refundable permit fee (when a fee is required).

H.  A permit issued under this chapter shall be valid for a period of six (6) months from the date of issuance.  Completion of the permitted work in accordance to this ordinance shall be within twelve (12) months from the date of issuance of the permit.

I.  Any person operating a public water system shall obtain a permit to operate from the Health Officer.

J.  The construction of a water well within the service area of a public water system where water is available is prohibited. Exemptions may be granted for industries which require water in quantities greater than that which can be provided by the public water system or when it can be shown by the business that connection to the public water system would cause undue financial hardship.

SECTION 4:  Chapter 9.28, Section 9.28.035, of the Merced County Code, titled "Permit--Fees", is amended to read as follows:

9.28.035  Permit--Fees.  Fees will be established by the Board of Supervisors of Merced County pursuant to resolution. When the State Department of Health Services issues an amended permit to a public water system constructing a well, the permit and fee will be waived.

SECTION 5:  Chapter 9.28, Section 9.28.040, of the Merced County Code, titled "Permit--Emergency exemption", is amended to read as follows:

9.28.040  Permit--Emergency exemption.  Should persons or property be threatened by a sudden, unforeseen impairment in the quantity or quality of water available, so that it becomes necessary to obtain a new water supply or increase the existing supply and a permit cannot be obtained because county offices are not open, a water well may be constructed, deepened or reconstructed without a permit.  All work performed under such emergency conditions shall comply with the requirements of this chapter.  In all such cases, the person who performed the work shall, within forty-eight (48) hours after such work is begun, excluding weekends and holidays, obtain a permit and file a statement with the Health Officer indicating the reason for the emergency work.

SECTION 6:   Section 9.28.120, of the Merced County Code, titled "Appeals", is moved to 9.28.050 and the title is amended to read as follows:

9.28.050   Permit--Appeals.

SECTION 7:   Chapter 9.28, Section 9.28.050, of the Merced County Code, titled "Water well standards", is amended to read as follows:

9.28.060   Water well standards.
A.   Standards adopted.   Except as may be otherwise specified in this chapter, the standards for the construction, repair, reconstruction, abandonment, or destruction of wells published in the Department of Water Resources Bulletin 74-81, "Water Well Standards," State of California and Bulletin 74-1, "Cathodic Protection Well Standards" or as may be subsequently revised or supplemented, are hereby incorporated in and made an applicable section of this chapter.
B.   Prohibited Construction
1.   The construction of dry/drainage wells, recharge/ injection wells, and air conditioning wells as defined in this chapter is prohibited.   The Health Officer may make exceptions to this prohibition if it can be shown that: (a) the quality of the water being introduced into the well will not have an undesirable impact on the ground-water; and/or (b) the well's construction will not permit the intermixing of aquifers or provide a conduit for the vertical movement of known or potential contaminants.
2.   The construction of well pits is prohibited except in dewatering agricultural areas when discharge is into surface irrigation facilities only.
C.   Well Construction
1.   Well location.   All wells shall be so constructed as to prevent the entrance of surface water and contaminated ground water into the well or into the producing aquifer, and shall be separated a safe distance from potential sources of contamination and pollution.   The following minimum horizontal distances shall be maintained for all wells furnishing potable water for human consumption:

|  | Domestic Well | Public Well |
|---|---|---|
| Septic tank or sewer line | 50 feet | 100 feet |
| Leach line or disposal field | 100 feet | 100 feet |
| Seepage pit or cesspool | 150 feet | 150 feet |
| Elevated sewage disposal field | 150 feet | 150 feet |
| Areas of intense animal confinement | 100 feet | 100 feet |
| Agricultural wells | 300 feet* | 300 feet* |
| Unlined canals, surface water course or drainage water retention ponds | 100 feet | 100 feet |

-6-

*An exception may be authorized when an existing agricultural well meets or exceeds the sanitary, surface and annular seal requirements specified for the proposed water well.

     a.  The Health Officer may authorize an exception to these requirements in specific instances.

     2.  Property line setback.  All wells shall be located with a minimum setback of fifteen (15) feet from a property line. The Health Officer may authorize an exception to this requirement where space restrictions on existing small lots necessitate, but in no case shall the minimum setback of the well from the property line be less than five (5) feet.

     3.  Casing perforations.  All wells supplying potable water for human consumption shall be constructed with a fifty (50) foot minimum, continuous, unperforated casing, except in areas where the only potable water is at a depth of less than fifty (50) feet.  In such instances, the depth to the first perforations in the well may be reduced to less than fifty (50) feet below ground surface if prior approval is granted by the Health Officer.  In no case shall the depth of the annular seal or the depth of the first perforations be reduced to less than twenty (20) feet below ground surface.

     a.  Corcoran clay.  All wells penetrating Corcoran clay shall be constructed in a manner such as to prevent the intermixing of waters above and below the Corcoran clay layer. There shall be no perforations above and below the Corcoran clay layer in the same casing.

     4.  Gravel packing.  In gravel packed wells that furnish potable water for human consumption, the gravel packing shall not extend above fifty (50) feet below ground surface, except in areas where the only potable water is at a depth of less than fifty (50) feet.  In such instances, the gravel packing shall not extend more than five (5) feet above the first perforations.

     a.  Gravel packed wells with a conductor casing shall be exempted from this requirement provided that the annular space between the conductor pipe and the wall of the drilled hole is filled with sealing material fulfilling the specifications and depth requirements of Parts G and H of this section.

     5.  Well seals.  All wells shall have a sanitary seal, surface seal and an annular seal.  An access opening in the well cap, well casing, or pump base for the purpose of disinfecting the well or measuring the water level shall be protected with a threaded, watertight plug or cap.  Wells requiring air vents shall be installed in an approved manner.

     a.  Annular seal.  On all wells the annular space between the well casing and the wall of the drilled hole shall be effectively sealed with cement grout or other approved sealant material to protect against contamination or pollution by surface or shallow subsurface waters.  The annular seal shall begin no

more than 20 feet above the most shallow perforation.  The following minimum annular seal depths shall be required*:

| Type of Well | Depth of Annular Seal Below Ground Surface |
|---|---|
| Domestic wells | 50 feet |
| Public wells | 50 feet |
| Dairy wells | 50 feet |
| Industrial wells | 50 feet |
| Agricultural wells | 50 feet |
| Cathodic protection wells | 20 feet |
| Observation and monitoring wells | 20 feet |

* The Health Officer may change the required depth of the annular seal when adverse or special conditions warrant.

(1)  Sealing conditions.  The following are the requirements to be observed in sealing the annular space:  The sealing material shall consist of neat cement grout, sand-cement grout, concrete, or Bentonite clay, and shall conform to the specifications given in the Standards (Bulletin 74-81).  Sealing materials and their uses shall be in accordance with manufacturer's recommendations.

(2)  Gravel packed wells - The width of the annular seal space between the wall of the drilled hole and the well casing or the conductor casing, where applicable, shall be at least two (2) inches.  If gravel fill pipes are installed through the seal, the annular seal shall be of sufficient thickness to assure that there is a minimum of 2 inches between the gravel fill pipe and the wall of the drilled hole.  If a temporary conductor casing is used, it shall be removed as the sealing material is placed.

The sealing material shall be applied in the annular space in one continuous operation from the bottom.

(3)  Cable tool wells - Wells constructed by the cable tool method of drilling are exempt from the annular seal requirements specified in Part 5.a of this section, provided:

(a).  A slurry of Bentonite clay is maintained around and in contact with the casing at all times during construction.

(b).  The well casing is without perforations.

(c).  The casing shoe or collar is landed in an impermeable clay interval.

(d).  If a conductor casing is used, the space between the well casing and the conductor casing is effectively sealed with a watertight welded cover or filled with approved sealant material.

b.  Surface seal.
(1)  A concrete surface seal or slab shall be
constructed on the ground surface around the top of the well
casing and shall be free from cracks or other defects likely to
detract from its watertightness.  The slab shall be monolithi-
cally poured on thoroughly compacted native earth and shall be a
minimum thickness of six (6) inches, extending four (4) inches
above and two (2) inches below surrounding ground level, and
shall be extended at least two (2) feet in all directions from
the well casing.  The surface of the concrete slab shall be
smooth troweled and shall be graded away from the well casing in
all directions for a distance of at least one (1) foot from the
casing, with sufficient fall to drain water away from the casing.
(2)  The concrete slab shall be poured in
contact with the sealant material in the annular space.
(3)  The top of the well casing shall extend
a minimum of one (1) inch above the concrete surface slab.
c.  Sanitary seal.  A sanitary seal shall form a
durable, weatherproof and watertight seal on top of the well,
between the pump base and the concrete slab, or between the pump
base and the top of the well casing.  Sanitary seals that are
manufactured and sold specifically for this purpose are required.
"Home made" sanitary seals are not permitted unless plans for its
construction, signed by an engineer, are submitted and approved
by the Health Officer.  When a pump is offset or submerged, any
pipes or electrical cables which enter the well shall do so above
ground and from the top of the casing and shall be completely
surrounded by the sanitary seal so as to be water tight.  Ropes
for holding pipes or the submersible pump must be installed
completely inside of the casing.  Objects and materials that are
not necessary for the operation of the well shall not enter the
casing.  Holes shall not be made in the casing.  This requirement
shall not restrict the proper installation of perforated casing
below the annular seal or the proper installation of tubes for
chlorination or sounding of the well.  All proposed construction
that varies from the requirements of this section must be
approved by the Health Officer.
6.  Backflow prevention.  All pumping equipment shall
be installed with protective devices to effectively prevent the
entrance of foreign matter for back siphonage into the well
casing.  A properly designed air gap may be considered an
acceptable protective device for agricultural wells.  No person
shall install any equipment or mechanism, or use any water
treating chemical or substance, if it is found that such equip-
ment, mechanism, chemical or substance may cause pollution or
contamination of the domestic water supply.  Such equipment or
mechanism may be permitted only when equipped with an approved
backflow prevention device.
7.  Building code compliance.  All electrical, plumbing
and appurtenant structural work relating to the well installation
or repair shall be performed in conformity with all applicable

-9-

building code requirements of the jurisdiction in which the well is constructed.

8.  Disinfection.  All wells and associated equipment furnishing or in contact with potable water for domestic purposes, shall be disinfected after the construction, installation or repair of the well, pump, or storage equipment and prior to its use or return to operation.  The minimum concentration of the disinfectant solution shall be equivalent to at least one hundred (100) P.P.M. (parts per million) of available chlorine, with a minimum contact time of 12 hours.

9.  Sampling Faucet (Hose Bib).  A sampling faucet shall be installed on all new domestic and dairy wells.  Sampling faucets are required on all public wells.  The sampling faucet shall be located:

    a.  So that it is accessible;

    b.  On the discharge line between the pump and the pressure tank in such a manner that a sample may be taken when the pump is not in operation;

    c.  A minimum of 18 inches above the surrounding grade; and

    d.  So that the opening of the faucet is facing downward.

10.  Temporary cover.  During periods when no work is being performed on a well under construction, the well and appurtenant excavation if any, shall be adequately covered to preclude creation of a safety hazard.

11.  Storage and Pressure Tanks.  Tanks used for storage of potable water or to provide pressure for delivery of potable water shall conform to the minimum guidelines established by the Health Officer.  Tanks used for potable water storage or to provide pressure must have been manufactured specifically for this purpose.  Tanks which have previously contained materials other than potable water may not be used.  Flexible tank liners shall be National Sanitation Foundation (NSF) approved.  Interior tank coatings must meet AWWA Standard D102-78 and appear on the U.S. Environmental Protection Agency (E.P.A.) list of approved tank coatings.

D.  Out-of-service well.  The owner shall continuously maintain, in accordance with the provisions of this chapter, any well which is in or out of service, so as to be safe and to prevent pollution of any aquifer.  A properly maintained out-of-service well shall not be considered to be an abandoned well for a period of one (1) year.  When placed into service, all above-ground well construction must comply with current requirements, to be verified by on-site inspection.  As evidence of his intentions for future use, the owner shall within thirty (30) days of taking the well out of service, submit to the Health Officer a signed "Letter of Intent" to place the well in service within one year.  Furthermore, the owner shall properly maintain the well in such a way that:

1.   The well has no defects which shall impair the quality of the water in the well or in the aquifers penetrated.
2.   If the pump has been removed, the well casing shall be covered with a durable, weatherproof and watertight seal to prevent unauthorized access and entrance of surface contaminants into the well.
3.   The well is clearly marked and the surrounding area is kept clear of brush or debris.
E.   Abandoned well.   Every abandoned well shall be considered the property owner's responsibility and shall be destroyed in accordance with the methods prescribed in this chapter.
F.   Well destruction.   The objective of destruction is to restore as nearly as possible those subsurface conditions which existed before the well was constructed.   Destruction of a well shall consist of the following:
1.   The soil around the casing must be excavated to a minimum depth of four (4) feet and the casing removed from that point upward.
2.   When a completed water well drillers report is available and, if reported subsurface conditions make it practical, the well may be destroyed by alternating clean native fill or sand with the sealing material inside the casing so as to seal each non-clay strata ten (10) feet above and ten (10) feet below its reported depth.*
3.   When no water well drillers report is available, the well casing shall be filled entirely with the sealing material.
4.   In all cases the upper most twenty (20) feet of casing shall be filled with the sealing material.
5.   Borings made for the purpose of obtaining a single soil sample shall be destroyed in accordance with this chapter if any of the following apply:
a.   Ground water is encountered;
b.   A clay layer is penetrated;
c.   The boring exceeds twenty (20) feet;
d.   The presence of a contaminant is confirmed or suspected.
6.   The sealing material and its installation shall conform with the requirements for annular seals listed in this chapter.

Well destruction is required when a property where a well is located is connected to a public water system.

*The Health Officer may change the destruction requirements when adverse or special conditions warrant.

-11-

SECTION 8:  Chapter 9.28, Section 9.28.060, titled "Exceptions," is moved to 9.28.060G, titled "Exception to standards," and amended as follows:

G.  Exception to standards. An exception to any provision of these standards may be authorized when in the judgment of the Health Officer, the application of such provisions is unnecessary or impose additional requirements if necessary to protect the quality of the underground water resource. Specific conditions or exceptions will be prescribed on the variance permit.

SECTION 9:  Chapter 9.28, Section 9.28.070, titled "Well drillers", approved by the Board of Supervisors as Ordinance Number 1128, Section 2, is hereby repealed and reinstated as follows:

9.28.070  Well Contractors  The person responsible for the construction, alteration, destruction, or abandonment of a water well, cathodic protection well, or monitoring well shall possess a C-57 Water Well Contractor's License Law of the State of California.  A copy of the current and valid C-57 license shall be submitted to the Health Officer prior to undertaking any well construction, alteration, destruction, or abandonment.

SECTION 10:  Chapter 9.28, Section 9.28.080, of the Merced County Code, titled "Inspection", is amended to read as follows:

9.28.080  Inspection.
A.  A well site and surrounding property may be inspected by the Health Officer at any time prior to  or during the construction or destruction of any well.. The Health Officer shall be notified by the well contractor at least twenty-four (24) hours prior to commencement of the work authorized by the permit.
B.  Except when a valid, verifiable emergency exists, the sanitary surface and annular seals on a well furnishing water for human consumption shall be installed prior to placing the well into service.

SECTION 11:  Chapter 9.28, Section 9.28.090, of the Merced County Code, titled "Water analyses", is amended to read as follows:

9.28.090  Water analyses.  After new domestic and dairy water wells are placed into service, the Health Officer shall obtain water samples for chemical and bacteriological analysis.

-12-

SECTION 12:  Chapter 9.28, Section 9.28.100, of the Merced County Code, titled "Replacement of new well", is amended to read as follows:

9.28.100  Replacement of new well.  If a new water well, for which a valid permit was obtained, should require abandonment and replacement within a period of one hundred eighty (180) days after installation, an additional permit and fee shall not be required.  In the event of such an occurrence, the property owner shall comply with the following provisions:
A.   The Health Officer shall be notified before work on the replacement well is started and an inspection shall be made during the course of the construction.
B.   The abandoned well shall be properly destroyed in accordance with the methods and requirements prescribed in this chapter.

SECTION 13:  Chapter 9.28, Section 9.28.110, titled "Replacement of existing well", is added to the Merced County Code to read as follows:

9.28.110  Replacement of existing well.  If a new well must be constructed as a result of the failure of an existing well, mandatory destruction of the existing well will be a condition for issuance of a permit for the new construction.  Well failure may be determined by, but not limited to, the following criteria:
A.   When groundwater drops to a level below the useful depth of the well;
B.   When the well yields sand or soil in quantities so as to make it unusable for domestic or agricultural purposes;
C.   When contamination is present;
D.   When the well is inside of the established minimum setback requirements from potential sources of contamination;
E.   When established setback requirements do not exist and when, in the judgement of the Health Officer degradation of the groundwater is likely to occur or continue as a result of failure to destroy the well, the Health Officer may order its destruction.

The existing well shall be properly destroyed in accordance with the methods and requirements of this chapter.

SECTION 14:  Chapter 9.28, Section 9.28.110, of the Merced County Code, titled "Reports", is amended to read as follows:

9.28.120  Reports.
A.   A contractor who has constructed, deepened or reconstructed a water well shall, within thirty (30) days after completion of the work, furnish the Health Officer with an official copy of the "Water Well Driller's Report" (State of California, Department of Water Resources, Form #DWR-188).
B.   Confidentiality of reports will be strictly enforced according to the California Water Code, Section 13752.

-13-

SECTION 15, Validity:  If any section, subsection, sentence, clause, word, or phrase of this ordinance is held to be unconstitutional or otherwise invalid for any reason, such decision shall not affect the validity of the remainder of this ordinance.  The Board of Supervisors hereby declare that they would have passed this ordinance, and each section, subsection, sentence, clause, word or phrase thereof, irrespective of the fact that one or more section, subsections, sentences, clauses, words, or phrases be declared invalid or unconstitutional.

SECTION 16, Enactment:  This ordinance shall become effective and be in full force on and after thirty (30) days of its passage and adoption, and prior to the expiration of fifteen (15) days from the passage and adoption thereof, shall be published in a newspaper of general circulation printed and published in the County of Merced, State of California, together with the names of the members of the Board of Supervisors voting for and against the same.

The foregoing ordinance was passed and adopted by the Board of Supervisors of the County of Merced, State of California, at a regular meeting thereof held on the 28th  day of   June          , 1988, by the following vote:

SUPERVISORS:
AYES:  MICHAEL BOGNA, DUB DAVENPORT, ANN KLINGER, DEAN PETERSON


NOES:  NONE

ABSENT:  ANTHONY WHITEHURST

Chairman, Board of Supervisors

ATTEST:
KENNETH L. RANDOL
County Clerk and Ex-officio Clerk of
the Board of Supervisors of the
County of Merced.

by
Deputy

-14-

**EXHIBIT D**

# EXPERT REPORT

**Meadowbrook Water Company Well No. 2**
**and**
**Joe Bernardo (Rocha) Dairy Farm Irrigation Well**

**Near Former Baltimore Aircoil Facility**
**Merced, California**



**Prepared by**

**Marvin F. Glotfelty, R.G.**
**Clear Creek Associates**

**November 30, 2009**
**Job No. 267001**

**ATTACHMENT B**

**Record of Conversation**
**Telephone Conversation with Mr. Edward Mitchell**
**(the driller who installed Well MWC-2)**
**November 13, 2009**

Tele con                    11-13-09
Record                      15:35

Edward   Mitchell    707-599-6900
Mitchell  Drilling


Drilled Meadowbrook Well No. 2 in 1960

Was drilled rotary, but encountered hard
rocks, so they had to drive casing + jet
to get the well in. The casing had a
drive shoe on it.

> Mr. Mitchell stated "it was constructed,
> for all practical purposes, like a cable
> tool well". The well has No annular
> seals.

The well was developed by Shannon Pump, using
a DC-9 (airplane) Motor.

The casing is constructed of "Hard red"
steel, which is Kaiwel (similar to HSLA).
perforated
Liner was installed later, by either
John Hoffman or Belnap + both are deceased.

Marin Schtfeld
11-13-09

**EXHIBIT E**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA/FRESNO DIVISION

---oOo---

ABARCA, RAUL VALENCIA,          )
et al.,                         )
                                )
        Plaintiffs,             )
                                )   No. 1:07-CV-00388
vs.                             )   OWW-DLB
                                )
                                )
MERCK & CO., INC., et al.,      )
                                )
        Defendants.             )
                                )

VIDEOTAPED DEPOSITION OF

MARVIN F. GLOTFELTY, R.G.

Wednesday, March 17, 2010

NOTICING ATTORNEY:  DAVID A. GIFFORD

REPORTED BY:   LEIGH ANN OROZCO, RPR, CSR NO. 7607

Page 63

1    shoe?

2    A.        I asked Fred Tregaskes if he had a copy of a

3    drive shoe that was welded onto a casing.

4    Q.        Now, Mr. Parker, who sends this to

5    Mr. Tregaskes, Mr. Parker seems to have written, "If

6    this is a 'drive shoe' then I did accidentally get a

7    photo."

8              Is there any question in your mind that what

9    is depicted, in particular the red part of the tube

10   laying on its side there in Exhibit E1, that's a

11   drive shoe?

12   A.        That is a drive shoe.  I am certain.

13   Q.        And you gave estimates earlier in your

14   testimony about the size and the dimensions of the

15   drive shoe but I take it you don't have any

16   information as a fact as to what the exact size is?

17   A.        Of the well -- for the well Meadowbrook

18   Number 2?

19   Q.        No, for the Exhibit 1 depiction.

20   A.        No, I don't.

21             MR. MARDEROSIAN:  Which is just an exemplar

22   of a drive shoe.  Nobody is representing that as the

23   drive shoe that drilled Meadowbrook 2.

24   Q.        BY MR. GIFFORD:  I understand.  If it's

25   still around.  We know where the drive shoe that

MARVIN F. GLOTFELTY, R.G.                    3/17/10

Page 64

1   drilled Well Number 2 is, don't we, sir?

2   A.        It's at 98 feet unless it has corroded

3   completely away.

4   Q.        In Well Number 2?

5   A.        In Well Number 2 if the records are

6   accurate.

7   Q.        If -- right.  Now, you looked at the video

8   survey.  Were you able to see or ascertain where the

9   drive shoe is on the video survey of Well Number 2?

10  A.        No.

11  Q.        We'll come back to the video survey later.

12            Based on your interview with Mr. Mitchell

13  and your understanding of what a drive shoe is and so

14  forth, do you have any understanding as to how -- the

15  exact dimensions of the drive shoe in Well Number 2?

16  A.        No.

17  Q.        I think you told us though that you believe

18  that it's -- strike that.

19            I think you told us that in Exhibit E1 the

20  drive shoe there appears to be a quarter of an inch

21  wider than the casing?

22  A.        That's the way it looks to me.

23  Q.        Would you expect or do you have an opinion

24  as to whether or not that's the size of the drive

25  shoe in Well Number 2, a quarter inch wider than the

053e7051-2b3c-4515-b858-68b2dae8f1b7

MARVIN F. GLOTFELTY, R.G.            3/17/10

Page 67

1    you look out the side of those corrosion holes you do

2    not see a drive shoe.

3            Whether the driller measured from the land

4    surface, as commonly done, whether he measured from a

5    part of his rig called the Kelly bushing, which is

6    also commonly done -- that would be about 3 or 4 feet

7    above ground surface -- is unknown to me.  So I just

8    know that when you look out that one corrosion hole

9    at 98 feet you did not see the drive shoe at that

10   depth.

11   Q.       BY MR. GIFFORD:  Did you ask Mr. Mitchell

12   from what point they were measured?

13   A.       No.

14   Q.       Based on the driller's log, 98 feet would be

15   in gray/blue clay, wouldn't it?

16   A.       Based on the driller's log, that is correct.

17   Q.       And in fact based on the driller's log

18   between 92 to 102 feet is gray/blue clay, correct?

19   A.       Based on the driller's log, that is correct.

20   Q.       And based on the driller's log, 90 to 92,

21   that is solid clay, correct?

22   A.       Based on the driller's log, yes.

23   Q.       So, again, do you have an opinion as to what

24   the material was where the drive shoe was set?

25   A.       I know that drillers -- being a driller

1    said in the reports it says the drive shoe and the

2    initial casing goes down to 98 feet, which reports

3    are you referring to?

4    A.       Well, some of the initial, earliest reports

5    on the construction of the well.  The depth of

6    casing.  The depth -- the depth of casing, the

7    initial well was drilled by driving the casing to a

8    depth of 98 feet and then continuing to drill open

9    hole down to 130 feet.  That's in the record.

10           I didn't see visibly during the video survey

11   the well, the original well casing below the top of

12   the well liner which was subsequently installed.  A

13   well liner is a smaller diameter casing -- casing

14   within a casing.  And so that's why I say that I

15   didn't see it.  In the well video survey you will see

16   that it wasn't shown to that depth in the initial one

17   because I didn't see it.  But reports say it was

18   there so this is the best understanding of that well

19   structure configuration.

20   Q.       So as far as you are concerned for purposes

21   of your report and your opinions, you don't take

22   issue with the fact that the drive shoe was set at

23   98 feet?

24   A.       I don't take issue with the fact that it was

25   set at approximately that depth.

**EXHIBIT F**

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA/ FRESNO DIVISION


ABARCA, RAUL VALENCIA, et al.,

      Plaintiffs,

    vs.                              No. 1:07-CV-0388

MERCK & CO., INC., et al.,

      Defendants.

_____

RELATED CROSS-ACTION.
_____


DEPOSITION OF MURRAY EINARSON

San Francisco, California

Friday, April 16, 2010


Reported by:  PUA'AINA McVAY
CSR No. 12868
Certified LiveNote Reporter

JOB No. 132837

MURRAY EINARSON                    4/16/2010

1          MR. GIFFORD:  313.

2    BY MR. MARDEROSIAN:

3       Q    313.  You understand that all of those have

4    annular seals, right?  If you look in the boring logs,

5    they all -- in your file, they all identify annular seals

6    in every one of those wells.  Are you aware of that or

7    not?

8          MR. GIFFORD:  Object to the form of the

9    question.  Compound.

10         Go ahead, sir.

11         THE WITNESS:  Yes.  And I think I am aware that

12   there are artificial seals in most, if not all, of those

13   monitoring wells, but it's important to make a

14   distinction between --

15   BY MR. MARDEROSIAN:

16      Q    An artificial and natural?

17      A    -- between artificial and natural, and those

18   are artificial seals that were installed based on the

19   drilling method that was used to -- to --

20      Q    So what's the purpose of an artificial seal?

21   Why would one ever have to install an artificial seal if

22   natural seals result?

23      A    It depends on the drilling method.  With cable

24   tool drilling methods, a natural seal is a sound and

25   accepted method for installing a -- for preventing

MURRAY EINARSON                           4/16/2010

Page 131

1    vertical movement in the bore hole outside of the driven

2    casing; however, with rotary drilling methods and holster

3    rigs and percussion hammer methods, i.e., those have been

4    used for exploratory borings at the site.  They create a

5    larger annular space that cannot -- is not reliably

6    sealed by either natural collapse or swelling of the

7    earth materials, and therefore needs to be sealed with

8    either a bentonite or cement slurry.

9         Q    Have you asked Mr. Gifford if he could produce

10   for you any permits that identify any further drilling of

11   Meadowbrook Well Number 2 from its original installation

12   of the bore hole or extension to the casing?

13        A    I did not ask him for any information about

14   that.

15        Q    Do you know if those extensions that you

16   believe occurred to the casing and to the well -- do you

17   know if they were done pursuant to a permit issued by the

18   County of Merced or any other governmental agency?

19        A    As I mentioned earlier, I'm not familiar with

20   any of the permits and the permitting processes related

21   to any parts of this project.  That wasn't within the

22   scope of my assignment nor necessary for me to develop my

23   opinions.

24        Q    Have you seen the documents that have been

25   referenced in this case, which I'll mark as Exhibit 317.

ab29d3bc-37e0-403b-a045-c7535a14ddae

1   Department of Public Health.

2            THE WITNESS:  That's correct.  And I believe --

3   BY MR. MARDEROSIAN:

4        Q     Do you know who filled that out?

5        A     I do not, but it looks like it was done in

6   1964.  It says the source of information is Fred Walker,

7   but I do not know who filled this out.

8        Q     And any reference there to an annular seal for

9   Well 2?

10           MR. GIFFORD:  Objection.  The document speaks

11   for itself.

12           Go ahead, sir.

13           THE WITNESS:  The --

14   BY MR. MARDEROSIAN:

15        Q     It's blank, right?

16        A     Yes.  And that pertains, I believe, to an

17   artificial annular seal.  Certainly with the cable tool

18   drilling method, driven well casing, there is not the

19   need to install an artificial cement seal, nor is it

20   possible.

21        Q     Do you know if the County of Merced accepts --

22   do you know if the County of Merced requires all drinking

23   water wells to have an artificial annular seal?

24           MR. GIFFORD:  Objection.

25   BY MR. MARDEROSIAN:

**EXHIBIT G**



**INTERNATIONAL
TECHNOLOGY
CORPORATION**

Project No. 191089
June 1992

# Retort Area

## Group II Field Investigation Report

BAC—Pritchard Facility
Merced, California

MSP8 101403

RESPONSIVE TO THE NEEDS OF ENVIRONMENTAL MANAGEMENT

MER 014999

*Retort Area*
*Group II Field Investigation*
*BAC-Pritchard Facility*
*Merced, California*
*June 1992*

## 1.0  Introduction

The Group II Field Investigation was conducted at the BAC-Pritchard facility located at 3058 Beachwood Drive, Merced, California, between April 13, and May 7, 1992 (Figure 1). The field investigation included the following activities:

* One stratigraphic boring was drilled
* Eight deep and two shallow soil borings were drilled
* Three vertical profile borings were drilled
* Two monitoring wells were installed
* Mechanical integrity tests were performed on the two facility domestic wells.

The above activities, except mechanical integrity tests, were located outside the area of known contamination defined by earlier investigations, to help further delineate the lateral and horizontal extent of contamination in the soil and groundwater.  The locations of the soil borings (RBs), vertical profile borings (VPs), monitoring wells (MWs) and domestic wells (DWs) from the Group II Field Investigation and previous investigations are shown on Figure 2.  The chemicals of potential concern for the investigation in the retort area are arsenic, chromium, hexavalent chromium, and copper.  These analytes were associated with wood treatment activities that occurred at the facility prior to May 1, 1991, when wood treatment operations ceased.

Additional activities associated with this investigation were:

* Environmental investigations in the area
* Well survey
* Updated base-map.

The objectives of this investigation were:

MSP8 101409

MER 015005

183 to 400 feet and 400 to 430 feet. The static water level was 47 feet in 1980. The well is located cross-gradient to the BAC-Pritchard facility.

E. Caton has an irrigation well located approximately at the intersection of Belcher Avenue and Santa Fe Drive. The well was installed in 1977. The 14-inch diameter well is 178 feet deep and the casing extends to 96 feet. The well is open hole completion. The well is equipped with a 900 gallons per minute (gpm) capacity pump. Static water level is 42 feet. The well is in a position cross-gradient to the BAC-Pritchard facility.

## 10.2 Downgradient Wells

The survey identified four municipal wells, three irrigation wells, numerous domestic wells and eleven monitoring wells within the study area (Figure 11).

### 10.2.1 Municipal Wells

Meadowbrook Water Company (MWC) owns the four municipal wells identified in the study area (Figure 11). MWC started providing service to the Beachwood Drive area in 1960. They currently supply most of the drinking water to the residential development that lies between Trinidad Road and Highway 59 and between Route 99 and Santa Fe Drive. This service area includes the area downgradient of the BAC-Pritchard facility. Based on its customers needs, MWC currently operates only two production wells, MWC-#2 and MWC-#3 (Figure 11). Typical pumping rates for production wells are between 600 and 1,000 gallons per minute. Water levels have been measured regularly. The wells are regularly sampled and analyzed for drinking water parameters.

Well MWC-#1 is located at the corner of Meadowbrook Avenue and Oakland Avenue, approximately 4,250 feet due south of DW-1. Currently, the well is not operated because it generates too much sediment. The well was originally drilled in 1955 to a depth of 130 feet. The original well's 14-inch diameter casing extended to 130 feet. In 1989, the well was drilled to 356 feet. A 12-inch diameter casing was installed from surface to 356 feet. The well is open bottom and has no perforation zone. Arsenic, chromium and copper have not been detected in this well. This well is located in a downgradient to cross-gradient position to the project site.

Well MWC-#2 is located at the corner of Maple Avenue and Fir Avenue, approximately 1,700 feet southwest of BAC-Pritchard's well DW-1. This is the primary well used for water supply in the area. MWC-#2 was originally constructed in 1960 as a 14-inch diameter well. At a later date, the well was drilled to aa total depth greater than 155 feet. A 12-inch liner was installed

to a depth of 155 feet. The well is open bottom. The well pumps from 50 feet. Static water level is at 30 feet when the pump is not operating. Arsenic, chromium and copper have not been detected in this well. This well is located in a downgradient position to the project site.

Well MWC-#3 is located at the corner of Poplar Drive and Balsam Way, approximately one mile west of DW-1. The well is used to augment water supply whenever necessary, and it has a 60-horsepower pump. MWC-#3 is a 14 inch diameter well constructed in 1981. The well was drilled to a depth of 250 feet and cased to 190 feet. The screened interval is 190 to 240 feet and it is gravel packed between 175 and 240 feet. Arsenic, chromium and copper have not been detected in this well. This well is located in a downgradient to cross-gradient position to the project site.

Well MWC-#4 is located along Santa Fe Avenue (parallel to Santa Fe Drive), approximately 2,000 feet southeast of DW-1. The well was recently installed. It was initially developed by pumping at 4,000 gallons per minute (gpm). The well is currently being developed. MWC-#4 is 376 feet deep and sealed to a depth of 200 feet. The screened intervals are 210 to 235 feet and 295 to 371 feet. The well is open at the bottom. Arsenic and chromium have not been detected, but copper has been detected at 5.2 parts per billion (ppb). The well is in a position cross-gradient to the project site.

### 10.2.2 Irrigation Wells

Three irrigation wells have been identified downgradient of the BAC-Pritchard facility (Figure 11). Well MID-10 is owned by the Merced Irrigation District and is located at the corner of Dan Ward Road and Franklin Avenue. In 1923, the well was drilled to a depth of 236 feet. The well has an 20-inch steel casing extending to 87.5 feet. The well is open hole completed and perforated between 60 and 75 feet. The well is known to be in operation. This well is located in a cross-gradient position to the project site.

The second irrigation well is owned by MWC and is located near Santa Fe Drive approximately 4,000 feet southeast of the Beachwood-Santa Fe intersection. The well is in a cross-gradient position to the project site. The well is reported to have been drilled in 1948 to a depth of 100-feet. The well is perforated at shallower depths. To date, the well has not been tested. The irrigation well's 25-horsepower pump is capable of generating up to 900 gpm of water. This pump is occasionally run to irrigate an oats crop when the seasonal rainfall is insufficient. A domestic well is also located on this property. This well is located in a cross-gradient position to the project site.

MSP8 101445

MER 015041

**EXHIBIT H**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA/FRESNO DIVISION

---oOo---

| | |
|---|---|
| ABARCA, RAUL VALENCIA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. 1:07-CV-00388 ) OWW-DLB ) |
| MERCK & CO., INC., et al., | ) ) |
| Defendants. | ) ) ) |

VIDEOTAPED DEPOSITION OF

R. DOUGLAS BARTLETT, R.G.

Thursday, April 8, 2010

Volume 2 (Pages 237 - 537)

NOTICING ATTORNEY:  JOHN F. BARG

REPORTED BY:  LEIGH ANN OROZCO, RPR, CSR NO. 7607

R. DOUGLAS BARTLETT, VOL. 2   4/08/10

Page 484

1   to draw water from to maintain the pumping rate that

2   is assigned.  We did not specifically look at or

3   assess where the water was coming from.  In other

4   words, we didn't calculate by each layer what percent

5   was coming because it changes over time.  And that --

6   our opinion is that water can enter the well from any

7   layer below the water table at any time because of

8   the lack of an annular seal.  So that question wasn't

9   pertinent to the way we simulated MWC-2.

10   Q.      And your model, it's not dependent at all on

11   where the 14-inch casing ends, what depth it's at?

12           MR. MARDEROSIAN:  That is a misstatement,

13   argumentative.

14           THE WITNESS:  No, it does not depend on

15   that.

16   Q.      BY MR. GIFFORD:  So what difference does it

17   make then if the 14-inch casing ends at 80 to 88 feet

18   versus 98 feet?

19   A.      Well, in fact with respect to the model it

20   doesn't.

21   Q.      Does it make some difference to you

22   otherwise aside from the model?

23   A.      Yes, it indicates that the well historically

24   prior to the deepening would have been -- when

25   screened in the shallow aquifer above this clay

aaa1588a-5264-478a-a050-420e924e6cea