1
2
3
4
5
6
7

8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10  ABARCA, RAUL VALENCIA, *et al.*,        1:07-CV-0388-OWW-DLB

11                        Plaintiffs,        MEMORANDUM DECISION RE: BAC
                                             DEFENDANTS' MOTION FOR
12              v.                           JUDGMENT AS A MATTER OF
                                             LAW, OR IN THE ALTERNATIVE
13  FRANKLIN COUNTY WATER DISTRICT,          MOTION FOR NEW TRIAL.
                                             (PHASE 1)
14                        Defendants.

15

16                          INTRODUCTION

17       Defendants Merk & Co., Inc. Amsted Industries Inc., and

18  Baltimore Aircoil Company, Inc. (collectively, "BAC Defendants")

19  bring this motion for judgment as a matter of law ("JMOL"), or in

20  the alternative, motion for new trial following jury verdicts in

21  the first phase ("Phase 1") of this multi-party, multi-phase

22  toxic tort case.

23       According to Defendants, Plaintiffs either failed to present

24  or presented insufficient evidence of exposure to contaminants

25  which allegedly originated from a now-closed cooling tower

26  manufacturing facility (the "BAC site") operated by entities that

27  were formerly owned by BAC Defendants. Specifically, Defendants

28  assert that Plaintiffs' burden of proof (perponderance of the

                              1

1  evidence) was not met regarding the surface water and air
2  pathways, as required under the Phase 1 Court Order Modifying
3  Scheduling Conference Order ("Phase 1 Pretrial Order"). (Doc.
4  540.) BAC Defendants further contend that Plaintiffs did not
5  present sufficient evidence regarding Defendants legal
6  responsibility for release of contaminates at the BAC Site, i.e.,
7  to what extent, and when did Defendants, Merk, Amsted and BAC
8  own, direct actions, remediate, and/or operate the BAC Site to
9  cause contaminant releases that could be actionable.

10      The first phase of discovery was focused on "whether
11  contaminants from the former [] BAC Site, Franklin County Water
12  District or the April 2006 Flood have ever reached any location
13  where plaintiffs could have been exposed to them, and if so, when
14  such contaminants arrived, how such contaminants arrived at the
15  location, how long they were present, and at what levels they
16  were present."  (Doc. 540 at 1:14-1:28.)

17      Plaintiffs oppose the motion. Plaintiffs' rejoin that they
18  presented "substantial evidence" at trial in the form of expert
19  opinion and analysis to show that contaminants migrated from the
20  BAC facility to Plaintiffs' homes and/or properties through the
21  various pathways.  Plaintiffs further argue that BAC Defendants'
22  criticisms regarding certain expert testimony go to the weight,
23  not admissibility of the opinion. Finally, Plaintiffs assert that
24  corporate liability was not an issue for determination in Phase 1
25  and as such JMOL cannot be granted for Defendants on this issue.[1]

26

27      [1] This issue has been resolved by Plaintiffs' motion to amend
28  decided August 10, 2011 and an order scheduling discovery for the
    corporate liability claims.

1

2                              1. PROCEDURAL HISTORY.

3         On March 8, 2007, Plaintiffs commenced this civil action

4    against the current public entity defendants, alleging property

5    damage caused by an April 2006 flood.  (Doc. 1.)  On September

6    13, 2007, in the second amended complaint, Plaintiffs named Merck

7    & Co., Inc., Amsted Industries, Inc., Baltimore Aircoil Company,

8    and Track Four, Inc. as Defendants in this action.  (Doc. 35.)

9    The eighth amended complaint[2] was filed by Plaintiffs on March

10   26, 2010.  (Doc. 633.)  The eighth amended complaint alleges ten

11   claims against the BAC Defendants:  (1) violation of 42 U.S.C.

12   6972(a)(1) [RCRA];  (2) violation of 42 U.S.C. 6972(a)(1)(b)

13   [RCRA]; violation of 33 U.S.C. 1311(a) [CWA]; (4) violation of 33

14   U.S.C. 1342(a) and (b) [CWA]; (5) negligence; (6) trespass; (7)

15   nuisance; (8) wrongful death; (9) fraud and deceit; and (10)

16   civil conspiracy.

17        On March 23, 2009, BAC Defendants filed a "Motion for Case

18   Management Order Re: Exposure" ("*Cottel* motion") to "compel

19   plaintiffs to make a prima facie showing of exposure."  (Doc.

20   355.)  The motion was denied on July 6, 2009; however, on August

21   12, 2009, the Court established a multi-phase trial plan in which

22   case-wide contaminant exposure issues were to be tried first

23   ("Phase 1"), before general medical causation ("Phase 2") and

24

25

26        [2] The eighth amended complaint is the current operative

27   complaint; however, leave to amend in order to allege Plaintiffs'
     corporate liability claims was granted on August 10, 2011. (Doc.

28   1442.)

                                    3

1    plaintiff-specific exposure and causation ("Phase 3").[3]   The

2    August 12, 2009 Phase I Pretrial Order provides, in relevant

3    part:

> Discovery and expert disclosures shall be conducted in
> phases.  Phase 1 shall focus on the issue of general
> exposure;  that is, whether contaminants from the former []
> BAC Site, Franklin County Water District or the April 2006
> Flood have ever reached any location where plaintiffs could
> have been exposed to them, and if so, when such contaminants
> arrived, how such contaminants arrived at the location, how
> long they were present, and at what levels they were
> present.

9    (Doc. 540 at 1:14-1:28.)

10   On June 1, 2010, BAC Defendants moved for partial summary

11   judgment on Plaintiffs' state law tort claims for personal injury

12   and property damages. Defendants' motion was denied in part and

13   granted in part. (Doc. 982.)

14   The Phase 1 trial began on February 2, 2011. The jury

15   returned verdicts on March 31, 2011. (Doc. 1226.) Defendants

16   filed their JMOL on April 28, 2011, asserting that Plaintiffs had

17   not met their burden of proof regarding: (1) general exposure to

18   contamination via the surface water pathways, including

19   contamination via the El Capitan canal (the "canal") and water

20   from a 2006 flood ("flood water"); (2) general exposure to

21   contamination via the air pathway; and (3) the Plaintiffs' failed

22   to present evidence regarding corporate liability of the

23   Defendants for the relevant time-periods. (Doc. 1259.)

24   ///

25   ///

26

27         [3] This phasing schedule is set to change in light of the order
     granting Plaintiffs leave to allege their corporate liability
28   claims.

**4**

## 2. BACKGROUND.

The facts underlying this case are summarized in the Court's previous Memorandum Decisions in this case, filed on May 18, 2009, July 15, 2009, and January 5, 2011.[4]  In brief: approximately 2,100 Plaintiffs seek damages relating to two occurrences: (1) an April 2006 flood; and (2) alleged long-term contamination comprised of hexavalent chromium (CR 6) and arsenic released from the BAC Site operated by entities formerly owned by the BAC Defendants. The BAC Site is the alleged source of contamination. Plaintiffs contend, relevant to this JMOL, that BAC Defendants caused and/or contributed to Plaintiffs' exposure to carcinogens and/or toxins released from contamination in the soil, air, a storm water pond (the "pond") and the El Capitan irrigation canal (the "canal") located on or connected to the BAC Site which reached Plaintiffs' residence (the "Beachwood neighborhood.")

Phase 1 of this multi-phase trial lasted nearly two months. Substantial evidence was presented and over thirty witnesses testified, approximately a third of whom were expert witnesses. At the close of trial, the jury was asked to determine whether contaminants from the BAC Site reached a location where Plaintiffs could have been exposed to them, and if so, when and in what amount contaminants arrived, how long they were present, and their concentrations. The jury's verdict found, in relevant

---

[4]  *See, e.g., Abarca v. Franklin County Water Dist.*, 761 F. Supp. 2d. 1007 (2011); *Valencia v. Merck & Co.*, 2009 WL 2136384 (E.D. Cal. July 15, 2009); *Abarca v. Franklin County Water Dist.*, 2009 WL 1393511 (E.D. Cal. May 18, 2009).

parts: (1) hexavalent chromium was present in the canal from 1969 to 2006 at a concentration of 87 ppb; (2) hexavalent chromium was present in the flood water from 2006 to the "present" at a concentration of 87 ppb; and (3) hexavalent chromium reached the Beachwood neighborhood via the air in 1969 and was present for twenty-five years until 1994 at the concentrations described in trial exhibit 893, a series of maps (isopleths) prepared by Plaintiffs' expert Camille Sears.

### 3. LEGAL STANDARDS.

a. Judgment as a Matter of Law.

Fed. R. Civ. Pro. 50(a) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

The standards governing a motion for judgment as a matter of law pursuant to Rule 50 are reiterated in *Gibson v. City of Cranston*, 37 F.3d 731, 735 (9th Cir. 1994):

> When confronted with a motion for judgment as a matter of law . . . a trial court must scrutinize the proof and the inferences reasonably to be drawn therefrom in the light most amiable to the nonmovant ... In the process, the court may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence ... A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ in the outcome ....

> "[W]hen an expert opinion is not supported by sufficient

6

facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). "A reasonable jury cannot credit testimony that fails to reflect reality." *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5, 2008).

    b.    <u>Motion for New Trial</u>

    A motion for new trial "may be granted to all or any of the parties and on all or part of the issues ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. Pro. 59(a). "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.' " *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990).

    A new trial is necessary when the court, upon reviewing the evidence presented at trial and considering the jury's verdict, "is left with the definite and firm conviction that a mistake has been committed." *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1087-88 (9th Cir. 2009) (*quoting Landes Constr. Co v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987)). A motion for new trial may also be granted to correct an erroneous evidentiary ruling that results in substantial prejudice to a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

    The grounds upon which a new trial has been granted are: (1) where the jury's verdict is so contrary to the clear weight

of the evidence; (2) if the verdict is based on false evidence; or (3) if there would otherwise be a miscarriage of justice. *Roy v.Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990).

"While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.'" *Id. quoting Wilhelm v. Associated Container Transp. (Australia) Ltd.*, 648 F.2d 1197, 1198 (9th Cir. 1981); *Wallace v. City of San Diego*, 479 F.3d 616, 630 (9th Cir. 2007).

## 4. DISCUSSION

### A. Exposure Via Surface Water.

The jury found that Plaintiffs could have been exposed to hexavalent chromium at a concentration of 87 ppb in the El Capitan Canal from 1969 to 2006 and in flood waters in the Beachwood neighborhood from April 2006 to the present:

| Pathway | Chemical | Location | Year of Arrival | How Long Chemical was Present | Concentrations |
|---------|----------|----------|-----------------|------------------------------|----------------|
| Flood Water | $CR^6$ | Beachwood Neighbor-hood | April 2006 | to Present | 87 ppb |
| Canal Water | $CR^6$ | Canal | 1969 | 1969-2006 | 87 ppb |

(Verdicts of Trial Jury at 3) (recreation.)

### 1. El Capitan Canal.

Defendants assert that the jury's finding of 87 ppb of

8

hexavalent chromium in the canal throughout the period of 1969 to 2006 is unreasonable, or alternatively, the only reasonable time span the jury could find that 87 ppb hexavalent chromium existed in the canal is from 1969 to no later than 1991.

Facts on which these findings are based, include: Most of the data evidence presented were samples which reflected total chromium values. Evidence presented is uncontradicted that hexavalent chromium is a percentage of total chromium. It is undisputed that water from the pond flowed to the canal through a connecting pipe. It is further undisputed that the pond was the source of alleged contamination; i.e., no evidence was presented that, with regard to the canal surface water pathway, any other contamination source existed.[5] The dispute centers on whether and when above-standard levels ("MCL") of hexavalent chromium were present in the pond and/or canal.

### a. Jury's Verdict Re: Canal Contamination From 1969 — 1991.

Over the period of 1969 — 1991, sampling of the pond was conducted only in January and March of 1989.  These samples tested positive for both hexavalent and total chromium, which was recorded in a report by Dames & Moore titled, Phase II Soil and Surface Characterization Report ("Dames & Moore Report").  No

_____

[5] All the data evidence and expert testimony presented from all parties was related to the pond, canal, and soil sampling and how this sampling evidence aligned with Plaintiffs' theory that "storm water comes in contact with the contaminated surface soils, [then flows] into the pond and then into the canal. That's the claim." (Final Trial Transcript at 1136:21-23, Feb. 9, 2011.)

1  sampling of the canal was done during this time.  No other data

2  or test evidence regarding the pond or canal was presented at

3  trial for this time period. The absence of testing or sampling

4  prevents any finding where contamination was present in the

5  canal. Plaintiffs have strenuously argued that Defendants cannot

6  benefit from their failure to test by asserting that negative

7  inferences should be drawn against Defendants. This contention,

8  however, does not substitute for evidence.

9      Defendants argue that Plaintiffs' have not met their burden

10  of proof as to whether hexavalent chromium was in the canal

11  during the period of 1969 to 1991 because no canal water sampling

12  exists for that time period and Plaintiffs' expert, Dr. Laton,

13  "admitted that samples collected at the outlet of the pond show

14  non-detect-to-low detect concentrations of hexavalent chromium,"

15  citing Dr. Laton's testimony regarding the Dames & Moore Report's

16  March 1989 sample results. (Doc. 1259 at 10:24-11:1.)

17      Plaintiffs' theory is significantly different and rests on a

18  series of inferences. Plaintiffs rejoin that Dr. Laton

19  conditioned his testimony regarding the March 1989 samples by

20  opining that the January 1989 samples were representative, and

21  these included a hexavalent chromium measurement of as high as

22  630 parts per billion ("ppb").

23      Dr. Laton further testified that surface soil measurements

24  at the BAC Site were above-standard levels for hexavalent

25  chromium in 2006. (*See* Declaration of Michael G. Marderosian

26  ["Decl. Marderosian"], Ex. G, Rough Trial Transcript ["RT"] at

27  209:22 — 210:3, Feb. 9, 2011) [testifying to an 800 ppb

28  hexavalent chromium surface soil sample when the remediation goal

was 10 ppb.]). Plaintiffs argue that since remediation at the BAC

Site was not started until 1991 and this soil sample was found

even after remediation began, Dr. Laton made a reasonable

scientific assumption that the soil at the BAC Site has been

contaminated for the last forty years. The argument continues

that, combined with Dr. Laton's testimony that the contaminated

soil was being washed into the pond from 1969 on and, construing

the evidence in the light most favorable to Plaintiffs, a jury

could reasonably find that re-contamination of the pond and canal

was constantly occurring during this time period before clean-

closure of the pond. Dr. Laton opined as follows:

> Q. Returning to the Feinstein report. . . . The document
> says, 'Samples collected from the outlet of the pond during
> the rain event at that time contained significantly lower
> concentrations (total chromium at 180 and hexavalent
> chromium not detected above 50 parts per billion). . .'
>
> Do you agree with that?
>
> A. I agree they had total chromium of 1490 and 630 parts per
> billion for hexavalent chrome [on January 20, 1989].

(Declaration of Stephen C. Lewis ["Decl. Lewis"], Ex. 5, RT at

33:1-9, Feb. 10, 2011.)

> Q. Okay. And am I correct that the sample of water that was
> flowing out of the pond into the canal on March 15th, 1989,
> had no hexavalent chromium?
>
> A. According to this sheet, yes.
>
> Q. Do you have a doubt? I mean, when you said 'according to
> this sheet.'
>
> A. Because the January 20th, 1989 sample did have hexavalent
> chrome leaving.
>
> Q. It had hexavalent chromium in January of 1989 in the pond
> surface waters; correct?
>
> A. Correct.

(Decl. Lewis, Ex. 4, RT at 222:7-22, Feb. 9, 2011; *and see* Decl.

Lewis, Ex. 25) (reporting the concentration value of 630 ppb hexavalent chromium in January 1989 and low-to-non-detect in March of 1989).)

> Q. So prior to 2008, is it your understanding that contaminated soils still remained on this site?
>
> A. Yes.
>
> Q. For almost 40 years?
>
> A. Correct.
>
> [. . .]
>
> Q. What is your understanding of the mechanism [] as to how those soils reached the pond?
>
> [. . .]
>
> THE WITNESS: [] As the water moves over the surface and entrains sediments and other chemicals it comes in contact with, and then it moves toward that drainage ditch, which ends up at a sump, which is then pumped up into the pond.
>
> And by the evidence of the water quality that we've seen in 1988 [sic] and 1989, within the pond, obviously contamination made it to that point.

(RT at 1155:16-1156:16, Feb. 9, 2011.)

Plaintiffs further argue that the jury's verdict was reasonable based on Dr. Laton's testimony that, pursuant to the Dames & Moore Report's 1989 sampling, an average of 581.8 ppb total chromium was flowing from the pond to the canal from 1969 — 1991. Dr. Laton opined as follows:

> Q. And what was your opinion as to that range or average of chromium in that canal during that period of time between 1969 and 1991?
>
> A. The average that I calculated was 581.8 micrograms per liter or parts per billion [of total chrome].

(*Id.* at 1154:16 — 22.)

Because evidence was presented that hexavalent chromium is included in the total chromium value, Plaintiffs argue the jury

could reasonably infer that 87 ppb of hexavalent chromium existed

throughout the canal as part of the 581.8 ppb total chromium

value over the entire 1969 — 1991 time period.

Dr. Laton further opined that this 581.8 ppb total chromium

concentration was flowing unimpeded into the canal from 1969 to

1991:

> [A.] There's nothing to impede flow from what's in the canal
> to get -- what's in the pond to get into the canal. And then
> to migrate downstream from there.
>
> So based upon that, I reviewed the dataset, which is
> only one year for the pond water quality, which ranged in
> values from a low of 6 to as high as 1490 micrograms per
> liter of total chromium.  And took the average of that and
> just said that's a conservative value for what would be
> getting into that canal over that whole time frame.

(*Id.* at 1154:7 — 15) (emphasis added). From this, Plaintiffs

argue, a reasonable jury could find that 87 ppb hexavalent

chromium existed in the canal from 1969 — 1991 based on Dr.

Laton's testimony.

Defendants rejoin that the jury's canal finding cannot be

justified because Dr. Fendorf's "unrebutted" testimony concerning

chromium valance conversion defeats Plaintiffs' argument and Dr.

Laton had no basis to estimate that from one year of data

observation, twenty-two years of contamination was present.

Defendants assert that Dr. Fendorf's analysis proves that no

above-standard levels of hexavalent chromium could have reached

the canal, particularly because Dr. Laton refused to consider the

degree of valance reduction of the chromium leaving the pond.

Plaintiffs respond first, that Dr. Fendorf's testimony was

successfully challenged – i.e., Dr. Fendorf's theory was not

presented or established as a matter of law.

Dr. Fendorf's direct examination established:

> [T]he bacteria [in the pond] directly take[s] hexavalent
> chromium to trivalent chromium. . . . And seeing the pond. .
> . in terms of its vegetation and so on [w]e could see that
> it was reducing.

(RT at 105:15-17, Feb. 10, 2011.)

> Any chromium that's coming out into, discharging into El
> Capitan Canal [] I would expect to have converted to
> trivalent chromium dominantly.

(*Id.* at 107:21-23.)

Dr. Fendorf's cross-examination, in relevant part, shows:

> 'Question: So in your work in this case, what did you do to
> determine the existence of anaerobic conditions in the soil?
>
> Answer: I didn't do an extensive analysis. . . I was charged
> with looking at whether there might be conditions and to
> explain the conditions that could lead to this. What I did
> do is I went out to the site, I dug two soil pits.'
>
> [. . .]
>
> Q. But enable [sic] to determine if there were anaerobic
> conditions in areas where hexavalent chromium were used, no
> samples were dug in those areas?
>
> A. No samples were dug. . .
>
> [. . .]
>
> Q. So the bottom line is this. You can't really tell this
> jury if there were really anaerobic conditions that existed
> on this site where the chemicals were used; can you?
>
> A. Where they were used, no, I can't. I can't say that.

(Decl. Marderosian, Ex. U, RT at 173:25-174:8; 175:18-21; 196:13-16, Feb. 10, 2011.) Plaintiffs' question on cross-examination was "where" the chemicals were "used" in the retort, not where the chemicals were "released," which includes the drop pad, pond (sump) and its connection to the canal. This misdirection in the question negates any meaningful effect to the Fendorf answer, which is not impeaching about the anaerobic effects in the pond

14

1 and canal. Dr. Fendorf's testimony invokes an indisputable

2 scientific principle applicable to valance reduction of chromium.

3      Plaintiffs argue the jury was instructed that they may

4 reject the testimony of an expert like Dr. Fendorf. (*See* Decl.

5 Marderosian, Ex. I [jury instruction no. 13].)  Jury instruction

6 number 13 states:

7        Some witness, because of education or experience, are
         permitted to state opinions and the reasons for those
8        opinions.

9        Opinion testimony should be judged just like any other
         testimony. You may accept it or reject it, and give it as
10       much weight as you think it deserves, considering the
         witness's education and experience, the reasons given for
11       the opinion, and all the other evidence in the case.

12       If the expert witnesses disagreed with one another, you
         should weigh each opinion against the others.  You should
13       examine the reasons given for each opinion and the facts or
         other matters that each witness relied on.  You may also
14       compare the experts' qualifications.

15 *Id.*

16      Nevertheless, Plaintiffs argue that it appears the jury did

17 weigh each expert opinion.  The jury found 87 ppb of hexavalent

18 chromium, which Plaintiffs argue could have taken Dr. Fendorf's

19 conversion theory into account since Plaintiffs' expert, Dr.

20 Laton, testified to a hexavalent chromium level in the pond of

21 630 ppb and an average total chromium level of 581.8 ppb. In

22 other words, because Dr. Laton testified to 630 ppb hexavalent

23 chromium and 581.8 ppb total chromium and the jury's verdict of

24 87 ppb hexavalent chromium is significantly lower then either of

25 these values, the jury must have taken Defendants' conversion

26 theory into account.

27      Plaintiffs finally argue that Defendants' witness  Ms.

28 Kretsinger and Regional Board representative  Mr. Austin

15

1    admitted the pond was contaminated prior to 1991:

2        Q. Is it your opinion that the pond was not contaminated
         with hexavalent chromium between 1969 and 1991?
3

4        A. No. That is incorrect.

5    (RT at 79:8-10, Testimony of Ms. Kretsinger, Mar. 15, 2011.

6        [Q.] Now, here, in this report, it is reported to the
         senator that, 'From the early 1960s to mid 1991, wood
7        treatment operations at the BAC site discharged hexavalent
         chromium. This hexavalent chromium polluted soil and
8        groundwater. In addition, hexavalent chromium was released
         off-site through storm water discharges to an adjacent
9        irrigation canal.'

10       Now, is that a true statement?

11       A. That's correct.

12       Q. So you told the senator that the pollutants from the BAC
         site entered the pond and then went off site through the
13       storm water discharges to this -- to this irrigation canal,
         the El Capitan; is that right?

14       A. Yes.

15       Q. And, in fact, isn't it true that you told the residents
         at the meeting in 2009, that the contamination got into the
16       canal. Do you remember that?

17       A. Yes.

18   (RT at 192:13-193:6, Testimony of Mr. Austin, Feb. 18, 2011; *see*

19   *also* Decl. Marderosian, Ex. E, Briefing for Senator Dianne

20   Feinstein Former Baltimore Aircoil Company Cleanup Site, Jan. 15,

21   2009 ["Feinstein Report"] ["From the early 1960s to mid 1991,

22   wood treatment operations at the BAC site discharged hexavalent

23   chromium. This hexavalent chromium. . . was released off-site

24   through storm water discharges to an adjacent irrigation

25   canal."].)

26       Plaintiffs' evidence includes scientific inferences based on

27   an extremely small amount of data, but it is still "tied to the

28   facts of the case."    *Daubert v. Merrell Dow Pharmaceuticals,*

                                    16

*Inc.*, 509 U.S. 579, 591 (1993). Plaintiffs' mantra throughout trial was that BAC Defendants' failure to sample and test through the years "hid" the historical concentrations in the pond and canal. Based on the only sampling evidence presented, Dr. Laton opined that re-contamination was occurring via surface soil washing into the pond which flowed unimpeded into the canal at an average concentration of 581.8 ppb total chromium. The jury was told that part of this total chromium value could contain hexavalent chromium. Plaintiffs correctly argue that Dr. Fendorf's conversion theory was not proved as a matter of law and, nonetheless, the jury could have given some weight to Dr. Fendorf's theory based on the verdict.

Construing the evidence in the light most favorable to Plaintiffs, a reasonable conclusion is one which is consistent with the jury's verdict. Some evidence supports Dr. Laton's opinion that hexavalent chromium was being released from the pond into the canal. This evidence supports the jury's verdict on the canal water pathway for 1969 — 1991. The extent of aerobic reduction of hexavalent chromium remains a mystery. The parties had four years and approximately six days of *Daubert* hearings to prepare for these issues. Plaintiffs' evidence on canal waters through 1991 meets the sufficient evidence requirement based on the totality of the BAC Site operation from 1969 — 1991. Defendants' motion is DENIED as to the finding that hexavalent chromium in the canal from 1969 — 1991.

Defendants' motion for new trial is also DENIED. Although a very limited amount of quantitative evidence was presented "[d]oubts about the correctness of the verdict are not sufficient

grounds for a new trial." *Landes Constr. Co.*, 833 F.2d at 1372. The court must be "left with the definite and firm conviction that a mistake has been committed". *Id.* (*citing Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944). To justify a new trial, the errors must be "so prejudicial as to require a new trial which would be likely to produce a different result." *O'Dell v. Hercules Inc.*, 904 F.2d 1194, 1200 (9th Cir. 1990); *see also* Fed. R. Civ. P. 61. For the 1969 – 1991 time period, taking all Plaintiffs' evidence into account, including Defendants' own expert witness who admitted she believed the pond was or could be contaminated during that time period, the court would simply be substituting a different view of the evidence for that of the jury. The record does not create a "firm conviction" that the jury was mistaken.

### b.   Jury's Verdict Re: Canal Contamination From 1992 — 2006.

Defendants argue that there is no evidentiary basis for the jury's finding that 87 ppb hexavalent chromium existed in the canal after 1991 for the following reasons: First, the pond was "clean closed" and any contaminates it may or may not have emitted would have ceased.  (*See* RT at 135:18-21, Feb. 18, 2011; Decl. Lewis, Ex. 7 ["[A]s far as the Water Board was concerned, the contaminated sediments in the pond had been adequately excavated and disposed of properly."]; Decl. Lewis, Ex. 21 [1992 Letter from Regional Water Quality Control Board ("RWQCB") stating "BAC-Prichard has complied with its environmental remediation obligations with respect to the storm water pond."]).

Second, the only pond sampling data presented demonstrates only below-standard levels of total chromium from 1992 — 2007, aside from one above-standard sample, in January 1994:

| Date of Sample | Storm Water Discharge Total Chromium (µg/L) | Storm Water Entering Site Total Chromium (µg/L) |
|---|---|---|
| 07-Dec-92 | 20 | |
| 24-Jan-94 | 87 | |
| 09-Apr-94 | 20 | |
| 06-Dec-94 | 24 | |
| 20-Mar-95 | 26.4 | |
| 18-Dec-95 | 28.2 | |
| 05-Mar-96 | 30.7 | |
| 02-Jan-97 | 23.8 | |
| 10-Dec-97 | 13.4 | |
| 12-Jan-98 | 19.8 | |
| 23-Feb-98 | 10.6 | |
| 19-Jan-99 | 35.2 | |
| 08-Feb-99 | 13.8 | |
| 09-Mar-99 | 28.5 | |
| 18-Jan-00 | 24.1 | |
| 14-Feb-00 | 11.85 | |
| 11-Jan-01 | 24.8 | |
| 05-Mar-01 | 3.8 | |
| 02-Jan-02 | 16.2 | 15 |
| 20-Feb-02 | 37.2 | 39.3 |
| 20-Feb-03 | 4.5 | 10.4 |
| 14-May-03 | 4.6 | 51 |
| 11-Oct-07 | <10 | |

(Decl. Lewis, Ex. 23 at 3) [Recreation of chart in Feinstein Report]) (highlight added.)

19

1    Third, Dr. Laton admitted that after 1991 the average total

2  chromium detected in the pond was below MCL standard at 22.3 ppb.

3  (Decl. Lewis, Ex. 4, RT at 212:20 — 213:4, Feb. 9, 2011.)

4    Fourth, Ms. Kretsinger opined regarding over 50 surface

5  water samples collected by IT Corporation and the Regional Water

6  Quality Control Board in 1992, 1995, 1998, and 1999 from various

7  locations along the canal, none of which detected chromium at

8  concentrations above MCL standard:

9    A. This map shows locations along the El Capitan Canal, both
     upstream from the BAC-Pritchard facility and downstream and
10   away from it. And these are locations that were included
     [in] sampling by our firm and also sampling that had been
11   historically conducted by others. And also sampling that
     occurred by the Regional Water Quality Control Board after
12   our investigation.

13   And so it includes samples collected by IT in 1995 and it
     includes sampling locations that were sampled on multiple
14   events by IT in 1998 and 1999. And it includes the Regional
     Water Quality Control Board's sampling locations in
15   February 2009.

16   And all of these locations are described in the text of my
     report and references to these documents.
17
     Q. And approximately how many samples were collected at the
18   various sites that are indicated on this exhibit, 5653.2?

19   A. There were 50 samples.

20   Q. And not all of those samples were tested for hexavalent
     chromium; is that correct?
21
     A. That's correct. About a third of them were.
22
     Q. And for those samples that were tested for hexavalent
23   chromium, were there any detections of hexavalent chromium
     in that set of samples?
24
     A. There was no hexavalent chromium detected in those
25   samples.

26   Q. Okay. And that's between 1995 and 2009?

27   A. That's correct.

28   Q. Okay. Let's look, for a moment, at 5653.1.

20

1        [. . .]

2        A. All the sampling results that are shown by the bars were
         less than 10 or about 10 with one sample at 21 parts per
3        billion. So they were all well below the California MCL for
         chromium.
4
         Q. Do you know whether or not IT Corporation did any
5        sampling in the El Capitan Canal before 1995?

6        A. Yes. I learned of another sample, in reading depositions
         just prior to my deposition. So there was a sample collected
7        by IT in 1992.

8        Q. And do you recall what was found in that sample?

9        A. In that sample, they found [a below-standard value of]
         44.4 parts per billion of chromium.
10
      (RT at 33:20-36:6, Mar. 15, 2011.)
11
         Plaintiffs' counsel briefly cross-examined Ms. Kretsinger
12
   on this subject, but the cross-examination predominantly  focused
13
   on the pre-1992 time-period:
14
         [Q.] So you're here -- your opinions are as of 2008 and
15       2009, no contamination in the canal. Correct?

16       A. No. No. We also looked at the historical data. So we
         had some 51 samples between the samples that we had
17       collected and also those that had been collected by others,
         that were for the El Capitan Canal that showed that there
18       was no contamination that exceeded the MCL.

19       Q. Right. All after the time the plant closed; correct?

20       A. It was closed from 1992 forward.

21   (RT at 81:13-21, Mar. 15, 2011.)

22       [Q.] We're talking about the 1992 canal sample. That was
         your understanding of the first sample that was taken of
23       canal water; is that correct?

24       A. That was the earliest sample that we identified.

25       Q. And this was after the pond was drained and the sediment
         scraped out of it.
26
         A. It was after closure, yes.
27
   (RT at 91:15-21, Mar. 15, 2011.)
28
         Plaintiffs' counsel attempted to challenge the 1992 canal

                                     21

1  sample value:

2      Q. All right. But in terms of the canal sampling, the 1992
       sample, remember, I'm the one that showed you that in your
3      deposition. Do you remember that?

4      A. Well, actually I brought deposition exhibits with me that
       explained the difficulty with how that sample had been
5      collected and when it had been analyzed and had very high
       concentrations of aluminum and iron and silicon and how it
6      had been affected by soil and how that sample resembled very
       highly the benchmark soils from Merced County in its
7      composition.

8      Q. Okay. We're going to talk about that. But you're telling
       this jury that that sample, in 1992, of canal water is not
9      valid; correct?

10     A. The sample was the sample. But it showed that it had been
       affected by the large amount of sediment. . .
11
   (RT at 81:22-82:10, Mar. 15, 2011.)
12
       [Q.] Do you remember reading this from the report about that
13     1992 canal sampling?

14     A. Yes.

15     Q. And it says, 'In addition to the groundwater samples, two
       surface quality samples (CS-1, CS-2) were taken from the
16     canal stream adjacent to the BAC-Pritchard facility (Figure
       3).'
17
       That's the figure we were just looking at.
18
       'These samples were taken when the site was considering
19     applying for a National Pollutant Discharge Elimination
       System (NPDES) permit so that interim groundwater control
20     system could discharge to the canal. The first sample was
       taken upgradient from the facility.'
21
       That's the one that I think you just referenced; is that
22     right, Ms. Kretsinger?

23     A. Correct.

24     Q. Upgradient from the facility, while the second one was
       taken downgradient of the storm water retention pond. So
25     that would been [sic] toward the Beachwood neighborhood;
       right? Downgradient?
26
       A. It appears from the text that's in the downgradient
27     direction.

28     Q. So there were two samples, one upgradient and one

                                22

1    downgradient from the pond; correct?

2    A. That's what the report says.

3    Q. And it says, 'The results of the analysis detected in the
     first canal stream sample are presented in Table 10.' That's
4    the table we just looked at that showed [below MCL standard]
     44 parts per billion; correct?
5
     A. Correct.
6
     Q. 'The second canal stream sample was not analyzed due to
7    the decision to apply for a waste discharge permit and not
     the NPDES permit.'
8
     So here's my question: Did you ever inquire as to why the
9    second sample, the sample that was downgradient from the
     pond toward the Beachwood neighborhood, why that sample
10   was never analyzed?

11   A. No.

12   Q. Did you look for any lab reports to see if it had been
     analyzed?
13
     A. We read the report and understood that it was not.
14
(RT at 92:3 — 93:19, Mar. 15, 2011.)
15
16       Ms. Kretsinger did not admit that the 1992 sample was

17   invalid and Plaintiffs' cross-examination did not illicit

18   testimony that any post-1991 canal water samples were above MCL

19   standard for total or hexavalent chromium.
20
         Dr. Daniel B. Stephens testified similarly to Ms. Kretsinger
21
     that samples were taken of the canal water between 1995 — 2009
22
     and there were no detections of hexavalent chromium.   Dr.
23
     Stephens testified as follows:
24
     Q. Okay. Were the tests that were done in 1995 of canal
25   water for total chromium?

26   A. Yes.

27   Q. 1998, total chromium?

28   A. Yes.

                              23

1    Q. 1999, total chromium?

2    A. Yes.

3    Q. 2008, total chromium?

4    A. Yes.

5    Q. 2009, total chromium?

6    A. To the best of my knowledge.

7    Q. Was total chromium in any of those years ever found above
     drinking water standards?

8

9    A. Not that I know of.

(RT at 97:10-23, Mar. 3, 2011; *and see* Decl. Lewis, Ex. 27

10

11   [showing low-to-non-detect for hexavalent chromium in the El

12   Capitan canal from 1995 — 2009]; Decl. Lewis, Ex. 28, [Dr.

13   Stephens & Associates, Inc. Report showing no hexavalent chromium

14   detected in El Capitan canal between 1998 – 2009].)[6]

     Plaintiffs ignore this overwhelming and uncontradicted

15

16   evidence and an attorney's questions and/or arguments are not

17   evidence. (*See* Doc. 1224, Jury Instructions ["Arguments and

18   statements by lawyers are not evidence. . . Questions and

19   objections by lawyers are not evidence."].) Plaintiffs' argument

20   rests solely the totally unsupported and argumentative testimony

21   of Dr. Laton who opined that re-contamination was occurring in

22   the canal throughout 1969 — 2006 based on the 1989 Dames & Moore

23   Report pond water samples and the 2006 surface soil samples. For

24   the 1992 — 2006 time period, however, this theory is not

25   supported by a scintilla of evidence and directly conflicts with

26   _____

27        [6] Plaintiffs' counsel's cross-examination of Dr. Stephens did
     not address this sampling evidence.

28
                              24

1  all the scientific and sampling evidence presented. Dr. Laton

2  acknowledged and did not dispute the Feinstein Report's findings.

3  (*See* Decl. Lewis, Ex. 4, RT at 212:25-213:4, Feb. 9, 2011) ["By

4  reviewing the storm water reports presented by the defense, I was

5  able to go through and look at all the chemical concentrations

6  within the pond in the water. And the average of those, over that

7  time frame [1992 — 2007], was only 22.3 micrograms per liter [of

8  total chromium]."].) Dr. Laton never testified regarding the 1992

9  — 2009 canal sampling evidence, and made no effort to refute this

10  undisputed evidence.[7] Neither he nor any other witness presented

11  evidence to explain, e.g., why all the testing samples taken

12  measured below MCL standard levels of total and hexavalent

13  chromium, despite the alleged "continual re-contamination" of the

14  pond. This is because, Defendants' point out, there cannot be re-

15  contamination when remediation has removed the source.

16      There is a total absence of evidence to provide a foundation

17  for an opinion that re-contamination was occurring after 1991.

18  Dr. Laton's unsupported, unscientific opinion is pure

19  speculation. The testimony suggests a complete lack of scientific

20

21  _____

22          [7]  Dr. Laton apparently did not review this sampling evidence
    and was never presented this evidence at trial. He was never
23  questioned about nor did he testify to this evidence. (*See e.g.*, RT
    at 12:11-19, Feb. 10, 2011) ("THE WITNESS: I don't recall reading
24  any documents that stated [the canal] was sampled.") Plaintiffs,
    however, acknowledge that the canal was tested after 1991. (*See
25  e.g.*, Doc. 1288 at 26:2-5 ["If the Merck defendants had routinely
    tested the canal, perhaps their arguments on this basis could be
26  taken seriously. Of course, no such testing was performed <u>until</u>
    after 1991. . ."]) (emphasis added.) Despite their acknowledgment,
27  Plaintiffs choose to turn a blind eye to this evidence.

28

objectivity and the
assumption of an advocate's role. An experts' opinion need not be
accepted uncritically simply because his credentials render him
qualified to testify.  "When an expert opinion is not supported
by sufficient facts to validate it in the eyes of the law, or
when indisputable record facts contradict or otherwise render the
opinion unreasonable, it cannot support a jury's verdict."
*Brooke Group Ltd.*, 509 U.S. at 242 (finding that expert testimony
was not sufficient to defeat JMOL because expert's opinion was
not based on sufficient facts to support jury verdict); *see also*
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)
("'[N]othing in either *Daubert* or the Federal Rules of Evidence
requires a district court to admit opinion evidence that is
connected to existing data only by the *ipse dixit* of the
expert.'"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)
("A court may conclude that there is simply too great an
analytical gap between the data and the opinion proffered.").
Here, Dr. Laton's re-contamination testimony is based on no
evidence. It is simply *ipse dixit*, which creates an unbridgeable
analytical gap between the data and the opinion proffered.

Although not specifically argued by Defendants, even taking
the January 24, 1994 sample into account, the jury's verdict is
unreasonable for a further reason.[8] The measurement on January

---

[8] After 1991 the only evidence to base a finding that
hexavalent chromium existed in the canal is the 87 ppb value of
<u>total</u> chromium found in the pond in January 1994. (*See* Decl. Lewis,
Ex. 23, Feinstein Report.)

1   24th is 87 ppb <u>total</u> chromium.  The jury was instructed that

2   hexavalent chromium is a <u>fraction</u> of the total chromium value.

3   (*See e.g.*, Doc. 1288 at 27:25 - 28:2 ["the jury had been provided

4   ample testimony during trial as to the fact that total chromium

5   <u>included</u> hexavalent chromium."]) (emphasis in original)). This

6   was proved by all the evidence presented and is indisputable.

7   (*See e.g.*, Decl. Lewis, Ex. 25, [Dames & Moore Report

8   demonstrating that for each sample in which total chromium was

9   detected in the pond, hexavalent chromium was detected at a

10  fraction of the total chromium value; i.e., hexavalent chromium

11  detections were never higher than 46% of the total chromium

12  value]).  The jury was <u>never</u> told by any expert that hexavalent

13  chromium could encompass the entirety of or exceed a total

14  chromium sample value.[9] The jury, nonetheless, found that 87 ppb

15  <u>hexavalent</u> chromium was continuously present in the canal after

16  1991. Because the jury had no evidence whatsoever that hexavalent

17  chromium could encompass and/or exceed the entire total chromium

18  value in any sample, the jury could not reasonably find that 87

19  ppb hexavalent chromium was in the canal for approximately

20  fourteen years after clean closure and remediation, based on the

21  single 87 ppb total chromium, January 24th sample.

22      An absence of any evidence to support an opinion or finding

23  of the continuous presence of 87 ppb hexavalent chromium existed

24

25  _____

26      [9] Dr. Laton agreed that "total chromium, as a measurement, is
    more commonly found in the earth's crust, naturally occurring, than
27  hexavalent chromium." (Final Trial Transcript at 1171:6-10, Feb. 9,
    2011.)

28
                                27

1  in the canal is overreaching.  And, an expert cannot provide

2  opinions that are without factual and scientific basis.

3  Defendants' motion for judgment as a matter of law is GRANTED as

4  to the canal pathway from the time period 1992 – 2006.[10] There is

5  no evidence of hexavalent chromium over the MCL for that time

6  period.

7

8                    (1)  **Flood water**

9       The jury found that 87ppb hexavalent chromium reached the

10 Beachwood neighborhood during a flood which occurred in April of

11 2006 and remains in the neighborhood to the "present." The

12 uncontradicted testimony is that flood waters subsided within two

13 days. The canal is the sole source of alleged "contaminated flood

14 waters"; i.e., no evidence was presented that flood water

15 contamination occurred from any other source.[11]

16

17      [10] **At the July 11, 2011 hearing of argument on the motions,**
   **Defendants pointed out that the jury was presented evidence**
18 **regarding a series of "caps" in or around 1994 in which cement was**
   **poured over the most contaminated areas of the BAC Site. (See**
19 **Hearing Transcript at 47:24 — 48:5, July 11, 2011.) Defendants,**
   **however, did not cite at the hearing or in their brief where in the**
20 **record this evidence was presented. With thousands of pages**
   **transcript and exhibits from this nearly two-month trial, a**
21 **citation to the record is necessary in order for the evidence to be**
   **considered. Nevertheless, the need for this evidence is moot as**
22 **Defendants' JMOL on the canal surface water pathway from 1992 —**
   **2006 is granted despite the fact that the "capping" evidence was**
23 **not considered.**
24
25      [11] **All expert witness to opine on the subject stated that the**
26 **Beachwood neighborhood was flooded by a mixture of canal water and**
   **other water sources not-at-issue when a levee approximately a mile**
27 **from the pond breached in April 2006. For example, Plaintiffs**
28

                              28

Defendants assert that Plaintiffs have not met their burden to prove hexavalent chromium was in the flood water because the flood water emanated from the canal and the unchallenged evidence proves the canal was not contaminated during the relevant time period. It follows, Defendants assert, that since the flood water emanated from the canal, none of the flood water could have been contaminated.[12]

Plaintiffs assert their previously described argument, that the canal water was contaminated from 1969 – 1991 by the unimpeded flow of hexavalent chromium from the pond through the connecting pipe, which caused the canal water to remain

_____

expert Dr. James Shaaf testified:

> Q. You're not suggesting in any way that the pond at the BAC site was in any way a cause of the flood; are you?
>
> A. It certainly wasn't the cause of the flood.
>
> Q. What did you determine was the cause of the flood?
>
> A. The excessive amount of water coming from the upper watersheds, particularly from Bear Creek.
>
> Q. So there wasn't anything about the function of the BAC site, BAC-Pritchard site pond that you believe caused the levee to fail; is that correct?
>
> A. No. It was just another one of the upstream watershed elements that flowed downstream. And there was just too much water for the system to handle.

(Final Trial Transcript at 1132:7-18, Feb. 9, 2011.)

[12] No evidence was admitted that in 2006 or after that any activity was conducted that released chromium or arsenic from the BAC Site, the pond, or the canal.

contaminated until it was swept into the Beachwood neighborhood

by the April 2006 flood.  Dr. Laton testified:

> [T]he levee breached in 2006.  When that happened, water
> spilled into the Beachwood neighborhood. And so did the
> sediments that had been sitting there [the canal] from 1969
> and earlier, all the way through 1991, being contaminated
> from the waters emanating from the BAC facility. They
> accrued over that time frame.

(RT at 41:25-42:5, Feb. 10, 2011.)

Dr. Laton's opinion about canal contamination after 1991 is

not based on evidence. Sampling and test results show no detects

above MCL and it is speculation that any flood water which

emanated from the canal during the relevant time period, 2006 to

present, could have been contaminated in light of the

remediation, clean closure of the BAC Site, and testing evidence.

Defendants supplement this contention with three other

undisputed facts to demonstrate that the jury's finding is

unsupported by the evidence. First, the flood water was never

tested. Plaintiffs concede this, but argue that they were not in

a position to test the flood water as they were not notified by

Defendants that the water could be contaminated and Defendants

did "no testing."  Plaintiffs' assertions are of little value, as

Plaintiffs had the burden to present evidence of exposure and

Plaintiffs present no case law that supports their assertion that

absence of testing permits projections based on non-existent

samples from facilities which had been remediated in conjunction

with regulatory agency directives and Defendants' compliance with

these regulatory requirements.

Second, any total chromium that existed in the canal had to

30

be diluted by other contributing flood waters.   Dr. Laton

admitted:

> A. There were other sources of water besides the BAC pond,
> obviously. The El Capitan Canal continues slightly to the
> north as Dr. Schaaf pointed out. And certainly those waters
> would have come in contact with that. And there would have
> been some dilution that would have been accounted for in
> there, yes.

(RT at 10:16-21, Feb. 10, 2011.)   Defendants expert, Dr.

Haltiner, quantified the extent of dilution: "Our estimate [of

dilution] in our report was about 1500 to 1." (RT at 160:7-8,

Mar. 15, 2011.) Although the existence of dilution was

undisputed, the jury did not take dilution into account.   After

1991 the only evidence to base a finding that hexavalent chromium

was present in the canal, is the 87 ppb test sample of <u>total</u>

chromium found in the pond in January 1994. Even assuming,

*arguendo*, the 87 ppb sample of total chromium was comprised

entirely of hexavalent chromium, a reasonable jury should have

reduced such hexavalent value to less than 87 ppb hexavalent

chromium to account for dilution.

      Third, the 2008 — 2009 soil samples taken in the Beachwood

neighborhood show low-to-non-detect levels of hexavalent

chromium. Plaintiffs argue that there were two areas of the

Beachwood neighborhood that the soils were sampled; one area that

was immersed by the flood water, and another area, the Gospel

Defender Church, that was not. The total chromium levels in the

Gospel Defender Church soils were lower than the areas that were

flooded. Plaintiffs argue this is circumstantial evidence that

above MCL standard levels of hexavalent chromium reached the

1   Beachwood neighborhood via the flood.

2       Defendants correctly rejoin that no evidence was presented

3   and no expert testified in support of Plaintiffs' theory.

4   Plaintiffs cite Defendants' expert, Ms. Kretsinger, who opined

5   that even though the total chromium amount was higher in the

6   flooded area, neither area tested at above-standard background

7   levels.

8       A. 26.2 parts per million is 26,200 parts per billion.

9       Q. Certainly well above background; correct?

10      A. No, that's not correct.

11      Q. Okay. And what was the level detected at the Gospel
        Defender Church?
12
        A. It was 6.8 parts per million.
13
        Q. So at the Franklin County Water District yard, next to
14      the canal, it was 26.2. But at the Gospel Defender Church,
        it was 6.8.
15
        A. That's correct. But it's a range of concentrations that's
16      comparable to the range of concentrations that we observed
        at locations removed from the BAC-Pritchard facility.
17
(Decl. Marderosian, Ex. C, RT at 101:5-16, Mar. 15, 2011.)
18
        Finally, Plaintiffs' expert witness, Dr. James Schaaf, who
19
    modeled the migration of flood waters for Plaintiffs, testified
20
    that a "hydraulic connection" existed between the pond and
21
    Plaintiffs' neighborhood, but that he had no opinion whether
22
    chemicals from the BAC Site ever reached the Beachwood
23
    neighborhood:
24
        THE WITNESS: Hydraulic connection means is it possible for
25      water to flow from one area to another area so that those
        two areas are connected hydraulically.
26
(RT at 158:2-4, Feb. 9, 2011.)
27

28
                                32

1
2

    Q. All right. So water from the pond reached the Beachwood neighborhood on April 4th, 2006; is that correct?

    A. Yes.

3
4

(Final Trial Transcript ("FT") at 1110:12-14, Feb. 9, 2011.)

5
6

    Q. And Dr. Schaaf, you did not ever perform any calculations to determine whether any compounds or sediments or materials from the BAC site ever reached the Beachwood neighborhood; is that correct?

7

    A. That's correct.

8
9

    Q. And you have no opinion as to whether any chemicals or compounds from the BAC site have ever reached the Beachwood neighborhood; is that correct?

10

    A. That's correct.

11

(RT at 181:9-17, Feb. 9, 2011.)

12
13
14
15
16
17
18

    There is no underlying evidence to base an expert opinion or finding that above-standard levels of hexavalent chromium existed in the Beachwood neighborhood from 2006 to present from the 2006 flood waters which receded after two days. (*See* RT at 80:9-11, Mar. 22, 2011.) Defendants' motion for judgment as a matter of law regarding the flood waters pathway after April 2006 is GRANTED.

19

20

B.   <u>Air Pathway.</u>

21
22
23
24

    The jury found that Plaintiffs in the Beachwood neighborhood could have been exposed to hexavalent chromium in air at the concentrations depicted in exhibit 893, a series of isopleth maps prepared by Plaintiffs' expert Camille Sears.

25
26
27

    Defendants' continue to challenge Ms. Sears' qualifications and expertise in chemistry and her ability to perform chemical testing, but the challenge remains unpersuasive. Ms. Sears

28

1   testified in the *Daubert* hearings that she has taken college

2   level courses in chemistry; has taught chemistry through an

3   extension program at the University of California at Santa

4   Barbara; uses chemistry on a weekly basis in her job; and has

5   calculated air emissions in a number of environmental

6   contamination cases, beginning in 1983 when Ms. Sears was hired

7   by the Santa Barbara county air pollution control district as an

8   air pollution engineer. (*See* Doc. 982 at 28:22 - 33:27.) Further,

9   Dr. Cowherd, the court's Fed. R. Evid. 706 expert, deemed Ms.

10  Sears a "well-qualified" air modeler:

11          Q. Right. But you recognize Ms. Sears as an experienced air
            modeler with -- is that correct or not?
12
            A. I do recognize that.
13
    (RT at 113:12-14, Mar. 9, 2011.)
14
15          As the Memorandum Decision on Partial Summary Judgment

16  ("Summary Judgment Order") analyzed and decided:

17          Camille Sears is qualified to offer the testimony about how
            to calculate fugitive air emissions from a former
18          wood-treatment facility.  She has substantial experience in
            the air emission field, having calculated air emission rates
19          for over twenty years in and around Northern and Central
            California.  Sears has calculated fugitive air emissions for
20          public and private employers and has experience with
            industrial sites and a variety of harmful pollutants,
21          including hexavelant chromium. By education and experience,
            Ms. Sears is qualified to opine on air emissions, analysis
22          and modeling in this case and her calculations can be
            challenged through cross-examination and presentation of
23          contrary evidence.

24  (Doc. 982 at 34:1-12.)

25          Defendants argue that the following nine "errors and

26  baseless assumptions" in Ms. Sears' expert opinions renders her

27  testimony an insufficient basis for the jury's verdict:

28
                                    34

1.  Ms. Sears assumed that chromium that dripped off of wood treated at the Facility would adhere to small particles of silt that would be subject to wind transport, when in fact, as Dr. Fendorf testified, almost no adsorption of chromium onto such particles would occur, resulting in Sears' model erroneously overstating emission concentrations by a factor of 1,000.[13]

2.  Ms. Sears assumed that all of the chromium- and arsenic-containing particles on the surface of the treated wood storage area would be smaller than 75 microns. But Dr. Cowherd testified that only approximately 20 percent would be that size. Dr. Fendorf also explained that particles formed by evaporation would be larger than 150 microns in diameter, and site data showed that Ms. Sears' assumption was wrong. According to Dr. Cowherd, this erroneous assumption resulted in the model overstating emissions by a factor of approximately 5.51.

3.  Ms. Sears assumed that chromium and arsenic were deposited uniformly over the entire treated wood storage area, whereas in fact the storage area contained marked traffic lanes separated by stacks of wood, and Dr. Cowherd testified that higher concentrations would accumulate in lowtraffic areas under and immediately around the stacks of wood. Dr. Cowherd testified that this erroneous assumption resulted in an overstatement of emissions by a factor of approximately 3.53.

4.  Ms. Sears assumed that the concentrations of hexavalent chromium and arsenic in particulate matter at the Facility exceeded 90 percent (i.e., 900,000 parts per million), a concentration that exceeds by orders of magnitude any measured concentrations at the Facility and implies— implausibly—that less than 10 percent of the material on the surface of the wood treating area was anything other than pure chromium or arsenic. When soils immediately beneath the traffic lanes in the treated wood storage area were tested for hexavalent chromium in 1990, while the Facility was still operating, eight out of nine samples detected no

---

[13] In their Reply, Defendants assert that the court's 706 expert, Dr. Cowherd, and defense expert, Dr. Fendorf, "testified that Ms. Sears' individual errors caused her to overstate concentrations of hexavalent chromium in the Beachwood neighborhood by factors ranging from <u>two</u> to 1,000." (Doc. 1310 at 8:14-15) (emphasis added.)

35

hexavalent chromium; the ninth had a concentration of less than 1 part per million.

5.  Ms. Sears assumed, without any foundation or testing, that 100 percent of the chromium in particles at the Facility was hexavalent chromium, and not less toxic trivalent chromium, the only chemists to testify at trial, Dr. Cowherd and Dr. Fendorf, testified to the contrary.

6.  Ms. Sears assumed that one year's worth of drippage would be present on the surface of the treated wood storage area at all times, but Dr. Fendorf testified that, in fact, any drippage would form easily soluble salts that would be flushed from the surface by rain.

7.  Ms. Sears used an AP-42 emission factor that was developed for "freely flowing" traffic at speeds greater than 10 miles per hour, instead of the new AP-42 emission factor that applies to "stop-and-go" traffic traveling at less than 10 miles per hour, when the forklifts at the facility traveled stop-and go at an average speed of four to five miles per hour.

8.  Ms. Sears admitted that her modeled emissions would be 30 percent lower if she used the current and appropriate EPA emissions factors to predict particle emissions from the Facility. Dr. Cowherd testified that the emissions would be 50 percent lower.

9.  Ms. Sears relied on the erroneous calculations of plaintiffs' expert Franklin Agardy, who used the wrong chemical form of chromium in preparing his estimates of drippage. This error approximately doubled Ms. Sears' modeled chromium emissions from the Facility.

(Doc. 1259 at 20-23.)

Plaintiffs correctly rejoin that these identical criticisms were advanced and extensively analyzed and ruled on in Defendants' motion for partial summary judgment and the *Daubert* challenges to Ms. Sears' testimony and opinions made over six days of evidentiary hearings covered by the court. The Summary Judgment Order found that "[t]he comparison between the relevant expert opinions demonstrates that a reasonable scientific disagreement exists among the experts. . . Such a dispute goes

1  [to] the credibility and the weight of the opinions, not

2  admissibility." (Doc. 982 at 52:6-7.) "Having observed the

3  experts at the *Daubert* hearing under intensive cross-examination

4  by counsel, it is clear that the current dispute over Ms. Sears'

5  calculations should be determined by the trier of fact, not by

6  the Court on a motion to exclude." (*Id.* at 53:25-54:1.) These

7  differing opinions were presented at trial. Under vigorous cross-

8  examination, Ms. Sears responded with scientific explanations to

9  each of Defendants' criticisms and explained her alleged

10 volumetric overestimations.

11     Because these criticisms were extensively examined in the

12 Summary Judgment Order and *Daubert* ruling, it is not necessary to

13 revisit every detail. However, a prime example of a scientific

14 factual dispute presented by Defendants' summary judgment motion

15 and again at trial is Ms. Sears' emission calculations based on a

16 100 percent hexavalent chromium value. Defendants argue that Ms.

17 Sears' values are unreasonable because Dr. Cowherd and Dr.

18 Fendorf testified at trial that "there would be some conversion

19 of Chromium 6 to Chromium 3 in the drippage." (Decl. Lewis, Ex.

20 12, RT at 115:5-6, Mar. 10, 2011; *and see* Decl. Lewis, Ex. 11, RT

21 at 83:20-21, Mar. 9, 2011) ("Based on my general knowledge of

22 this area, 100 percent would not be the appropriate number.")).

23     Ms. Sears rejoined that her value conformed to scientific

24 values:

25         Q. Can you point us to a specific piece of professional
           literature that establishes that your 100 percent chromium,
26         hexavalent chromium assumption is true?

27         A. Well, I've got several -- I have several different

28
                                    37

1

2
references that we discussed in earlier hearings on why I
believe that that's reasonable. And, again --

3
Q. What would those be?

4
A. I'll tell you what they are in a moment. But again, 100
percent versus 95 percent versus 90 percent, those are all
trivial differences, in my view. That's only 5 percent, 10

5
percent difference.

6
Q. They're trivial to you.

7
A. They are. Over in the big picture of things, and when
we're talking about the mass of material we're talking

8
about. So to nit pick whether it was 99, 95, 90 versus 100,
to me that's not an issue.

9

10
But to answer your question, the State of California, which
has been regulating hexavalent chromium now for about a

11
quarter of a century, has specific guidelines on how to deal
with chromium compounds. One of the concerns that we talk

12
about is what is the form of chromium. And because it's
hexavalent chromium, which is the toxic form. There's also a

13
trivalent form.

14
And the State of California has specific mass weighted
adjustment factors and things like that for compounds such

15
as chromium trioxide, which is one chromium and three
oxygens. And basically, when you look at the mass of

16
chromium versus the mass of the chromium and the oxygen
together, it's 100 percent hexavalent.

17
And also, in the risk assessment guidelines that we talked
about before that I helped develop, I was part of the group

18
that helped develop them. The only time that they assumed
that a chemical is not 100 percent hexavalent chromium is

19
when the chromium has been underground for a period of time
and has had some time and certain conditions that have to be

20
measured specifically at the site to determine the rate at
which the hexavalent chromium would convert to the less

21
toxic form. That doesn't happen on the top of the surface,
it happens in the soil. So I didn't have to worry about

22
that.

23
And then we also have some data from 1994 that were measured
at the facility in the shallow layer before the treated wood

24
storage area, which showed that the hexavalent chromium to
total chromium ratio was very high.

25
(Decl. Marderosian, Ex. B, RT at 104: 17-106:10, Feb. 10, 2011.)

26
In the scientific community, experts reach different

27

28

38

1   conclusions from each other, however, reasonable differences in

2   scientific evaluation are not a basis for granting JMOL. *See*

3   *Tennant*, 321 U.S. at 35 ("Courts are not free to reweigh the

4   evidence and set aside the jury verdict merely because the jury

5   could have drawn different inferences or conclusions or because

6   judges feel that other results are more reasonable.").

7        The following testimony by 706 expert Dr. Cowherd

8   corroborates that Defendants' objections regarding Ms. Sears'

9   opinions are factual scientific disputes going to weight rather

10  than admissibility, which were properly decided by the trier of

11  fact. First, while Dr. Cowherd did not agree with all of Ms.

12  Sears' input values, he recognized that she was a "well-

13  qualified" air-modeler and her methodology was correct:

14       Q. Yes. Now, do you -- your knowledge of Ms. Camille Sears,
         the plaintiffs' expert in this case. Do you find that she
15       has a reputation for being a respected air quality emissions
         expert?
16
         [...]
17
         [THE WITNESS:] As far as whether she can calculate emissions
18       using an emission factor equation, I think she's very well
         qualified to do that. As far as her ability to apply AERMOD,
19       which is the dispersion model, I recognize that she is very
         well qualified to do that.
20
         [. . .]
21
         [However,] [t]he calculation is not the problem, it's what
22       value you put into the equation as the basis for the
         calculation, as I see it.
23
         Q. You found this -- let me ask this. And this is not
24       intended as any disrespect at all, so please do not
         interpret it that way at all, Dr. Cowherd. But you are not
25       an air modeler; is that correct?

26       A. I'm very familiar with air models, and I have used air
         models in the past. I'm not primarily an air modeler.
27       However, I will say that I understand the function of an air

28
                                    39

1   modeler, I understand how input information is put in to the
2   model. And I understand the model is only as good as the
    input information put into it.

3   Q. Right. But you recognize Ms. Sears as an experienced air
4   modeler with -- is that correct or not?

5   A. I do recognize that.

6   (Decl. Marderosian, Ex. O, RT at 112:5-113:14, Mar. 9, 2011.)

7       Dr. Cowherd also recognized and agreed that hexavalent

8   chromium reached the Beachwood neighborhood:

9   [Plaintiffs' counsel]: 'Question: Based on the totality of
    your analysis in this case, is there reliable evidence that
10  hexavalent chromium and arsenic were transmitted by the air
    to -- I'm going to call it the target site, you call it the
11  receptor site -- given all the information. I'm including in
    that description the qualifications that this be reliable in
12  terms of scientific data.'

13  'Answer: My response to that would be yes. There is
    certainly indications, evidence that these concentrations --
14  that some concentrations exist at the target site or the
    receptor site. The question obviously is what is the level
15  of those concentrations.'

16  Q. Do you remember that testimony?

17  A. Yes.

18  Q. And you still stand behind that testimony today?

19  A. I would make a similar statement, yes.

20  (Id. at 111:12-112:4.)

21      Finally, unlike, e.g., the evidence presented regarding the

22  canal water pathway from 1992 -2006, there was not a total

23  absence of conclusive, unchallenged underlying evidence to

24  demonstrate that Ms. Sears' opinions were wrong as a matter of

25  law:

26  Q. [] I'm talking about the basis for the assumptions.
    Meaning the fact that you have to make assumptions, it has
27  to be based on some data. Correct?

28

A. It has to be based on an assessment of what went on at the site. Yes.

Q. Right. And let me ask you this: Do you remember at the *Daubert* -- excuse me, at the prior hearing, you indicating that there was very little data available from which to construct the amount of drippage and that that would be a critical quality to doing a scientific assessment in this case?

[. . .]

Q. And I can show you the testimony as well, whatever you're comfortable with.

A. Could you repeat the question?

Q. Yes. Do you recall testifying previously that, in this case, that 'There was very little data available from which to construct the amount of drippage and that that would be a critical quality' -- quantity -- 'critical quantity to have in doing a scientific assessment. So as a result, this kind of quantity needed to be estimated by an indirect method.'

Do you remember saying that?

A. Yes.

Q. Okay. Indirect method is modeling is one of the indirect methods; is it not?

A. I -- I don't consider that to be modeling. Modeling, I consider to be a direct method.

Q. All right. But the direct method is, for example, in this case, it would have been good if, between 1969 and 1994, when the plant was in operation, when forklifts were moving about the plant, it would have been good if there was data collected at that time regarding these assumption issues. Do you agree with that?

A. That would have been helpful in deciding how much drippage actually occurred.

[. . .]

Q. Have you seen any data, Dr. Cowherd, that was collected when the plant was in operation on those issues?

A. I think I stated earlier that we did not find that kind of information in what we looked at.

[. . .]

41

1
2
3

      Q. Have you seen any air quality studies that were obtained when the plant was in operation studying whether or not the air was contaminated with hexavalent chromium and arsenic from the activities in the treated wood storage area, in your work in this case?

4

      A. I'm not aware of any such information.

5 (Decl. Marderosian, Ex. O, RT at 114:21-119:1, Mar. 9, 2011.)

6 Some data was available regarding the air pathway. Based on this

7 data, the experts made scientific assumptions based on recognized

8 air modeling principles which formed the basis for their

9 opinions.

10       Defendants' motion for JMOL regarding the air pathway simply

11 seeks to relitigate the probative value and persuasive effect of

12 the evidence introduced at trial. The motion is replete with

13 inferences Defendants asked the jury to draw and theories for

14 reduction of the weight and value that they wish the jury had

15 applied to Ms. Sears' opinions. Each party submitted substantial

16 evidence, bolstered by expert testimony, in support of their

17 positions on air modeling. The jury found Plaintiffs' showing

18 more persuasive. The jury reasonably could have concluded, based

19 upon the record as a whole that Ms. Sears' scientific estimations

20 were correct, but should have been substantially reduced based on

21 evidence and expert opinions that supported Defendants' position

22 that Ms. Sears' input amounts were gross overestimations of

23 hexavalent chromium reaching and present in the Beachwood

24 neighborhood. However, such conflicts in the evidence, reasoned

25 by the jury as trier of fact, do not provide a sufficient basis

26 for setting aside the verdict. *See Tennant,* 321 U.S. at 35

27 ("Courts are not free to reweigh the evidence and set aside the

28

1  jury verdict merely because the jury could have drawn different

2  inferences or conclusions or because judges feel that other

3  results are more reasonable.").

4       Defendants' trial strategy took an all or nothing approach,

5  arguing that Ms. Sears' testimony had to be entirely rejected.

6  They ignored that Dr. Cowherd opined that some hexavalent

7  chromium reached the Beachwood neighborhood. They did not, e.g.,

8  present competing calculations or offer specific valuations that

9  reduced any amount of hexavalent chromium level which arrived

10 through the air to Plaintiffs' neighborhood. Nor did Defendants

11 ask Dr. Cowherd or any other air modeling defense expert to break

12 down Ms. Sears' model and reduce all concentrations to the

13 substantially reduced to non-existent levels they believed

14 existed. This was a trial strategy and Defendants must abide by

15 the consequences of this choice made by highly experienced and

16 competent counsel. Defendants' motion for JMOL regarding the air

17 pathway is DENIED. Because substantial evidence was presented by

18 Plaintiffs' regarding this issue, Defendants' motion for new

19 trial is also DENIED.

20

21 C.    Entity Responsibility.

22      Defendants argue that the Phase 1 jury was asked to identify

23 the entities that caused the release of contaminants at the

24 former BAC Site and that Plaintiffs introduced no evidence at

25 trial suggesting that any of the Defendants engaged in any

26 activities that released contaminants as part of wood treating

27 process. Plaintiffs rejoin that corporate liability was not an

28
                                43

1  issue for determination in Phase 1.

2      The relevant facts are as follows: The Phase 1 Final
3  Pretrial Order pertains only to Phase 1 of this multi-phase
4  action.  The Phase 1 Pretrial Order focused on containment
5  exposure, i.e., whether contaminates of concern "reached any
6  location where plaintiffs could have been exposed to them, and if
7  so, when such contaminants arrived, how such contaminants arrived
8  at the location, how long they were present, and at what levels
9  they were present."  (Doc. 540 at 1.)  Discovery in Phase 1 was
10 limited to "the issues relevant to exposure" including:

11        (b) BAC Site operations and history relevant to
            identification of the presence, amount and concentration of
12        contaminants at the BAC Site and in the environment.

13 (Phase 1 Pretrial Order at 2:14-16).

14      Defendants filed a *Cottel* motion on March 23, 2009 which
15 caused a predominant shift of discovery focus to the complex and
16 time consuming scientific evidence regarding release of
17 contaminants. From the time of the first case management
18 conference, Defendants strenuously argued there was not and
19 Plaintiffs could not find and/or produce any evidence of
20 contamination. The *Cottel* motion was followed by a limitation on
21 and stay of discovery in or around August of 2009 which
22 discontinued discovery on corporate liability issues.

23      Significant confusion and dispute arose regarding the exact
24 evidence to be presented at trial. The parties and the Court were
25 not in agreement about whether evidence of corporate liability -
26 e.g., theories of vicarious liability, principal/agency, piercing
27 the corporate veil, and related theories, would be tried and

28
                        44

1   determined in Phase 1, or corporate responsibility for exposure –

2   e.g., a basic jury decision regarding who owned and/or operated

3   the BAC Site during the relevant time period.

4        Defendants argue "they understood" that the Phase 1 jury

5   would be asked to identify the entities that caused the release

6   of contaminants at the BAC Site and assign legal responsibility.

7   Defendants filed a trial brief, which they believe was "clearly

8   framed . . . in accordance with the [Phase One Pretrial Order],"

9   that "contain[s] a detailed discussion of the relationships among

10  Merk, Amsted, Baltimore Aircoil, and the various facility owners

11  and operators [and] discusse[s] controlling California case law."

12  (Doc. 1259 at 30:19-31:9.)

13       The Court understood, as Defendants themselves point out,

14  that Phase 1 would not "assign legal responsibility." (Doc. 1259

15  at 33:9-11.) "[T]here is no suggestion in the [Phase 1 Pretrial

16  Order] that we are going to determine liability by party in this

17  phase of the case." (Doc. 1259 at 32:2-3.) What Phase 1 would

18  include, the Court stated, was a basic jury decision as to: "who

19  owned, who operated [the BAC Site], what was done through the

20  period that the lawsuit encompasses." (Doc. 1259 at 33:9-11.)

21       Plaintiffs acknowledge that corporate liability and/or

22  exposure responsibility was an issue for one of the trial phases

23  and at certain times Plaintiffs represented that they would be

24  able to present sufficient evidence on the subject during Phase

25  1.  Yet once Phase 1 began, Plaintiffs had not completed

26  discovery on corporate liability and did not present evidence on

27  the subject. (Doc. 1288 at 38:12-14.) Plaintiffs argue that

28

**45**

1    discovery was not complete and a case was not presented because
2    they understood that corporate liability was not an issue for
3    Phase 1.

4        During the jury instructions conference after Phase 1 trial
5    evidence closed, the Court determined that, due to confusion
6    about the specifics and extent of corporate liability/
7    responsibility evidence was to be presented, in combination with
8    the discovery stay sought by Defendants and the *Cottel* motion,
9    such evidence was not presented for a jury determination on the
10   subject in that Phase of trial. *U.S. v. Dang*, 488 F.3d 1135, 1143
11   (9th Cir. 2007) ("the district court is given broad discretion in
12   supervising the pretrial phase of litigation."); and see Fed. R.
13   Civ. Pro. 42(b). In light of this totality of circumstances,
14   judgment as a matter of law cannot be entered regarding corporate
15   liability. (*See also*, Doc. 1442, Memorandum Decision Granting
16   Plaintiffs' Motion for Leave to Amend Complaint, filed August 10,
17   2011.) Defendants' JMOL is DENIED on this issue.

18

19                            CONCLUSION.

20       For the reasons cited above, Defendants' JMOL is GRANTED in
21   part and DENIED in part and Defendants' motion for new trial is
22   DENIED in its entirety. The record unequivocally establishes that
23   after clean-up and site remediation, there was no chromium of any
24   valance at above MCL standards in the canal or surface water
25   which could have reached Plaintiffs' properties.

26

27       1.   Defendants' JMOL regarding general exposure via the El

28
                                46

Capitan Canal surface water pathway from 1969 — 1991 is
DENIED.

2.   Defendants' motion for new trial regarding general
     exposure via the El Capitan Canal surface water pathway
     from 1969 — 1991 is DENIED.

3.   Defendants' JMOL regarding general exposure via the El
     Capitan Canal surface water pathway from 1992 — 2006 is
     GRANTED.

3.   Defendants' JMOL regarding general exposure via the
     flood surface water pathway from 2006 to present is
     GRANTED.

4.   Defendants' JMOL regarding general exposure via the air
     pathway is DENIED.

5.   Defendants' motion for new trial regarding general
     exposure via the air pathway is DENIED.

6.   Defendants' motion regarding corporate liability is
     DENIED WITHOUT PREJUDICE. A revised trial schedule
     shall be implemented to ensure a full and fair trial on
     the merits of all corporate liability claims.

Defendants shall submit an order in conformity with this

47

1   decision within five (5) calendar days following electronic

2   service of this order.

3

4

5   SO ORDERED.

6

7   DATED: August 31, 2011.

8                                   /s/ Oliver W. Wanger

9                                  Oliver W. Wanger

10                            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**48**